Per A. Ramfjord, OSB No. 934024
per.ramfjord@stoel.com
Jeremy D. Sacks, OSB No. 994262
Jeremy.sacks@stoel.com
Crystal S. Chase, OSB No. 093104
Crystal.chase@stoel.com
STOEL RIVES LLP
760 SW Ninth Ave, Suite 3000
Portland, OR  97205
Telephone: (503) 224-3380

Kelly K. Simon, OSB No. 154213
ksimon@aclu-or.org
ACLU FOUNDATION OF OREGON
506 SW 6th Ave, Suite 700
Portland, OR 97204
Telephone: (503) 227-3986

Attorneys for Plaintiffs Mark Pettibone, Fabiym Acuay (a.k.a. Mac Smiff),
    Andre Miller, Nichol Denison, Maureen Healy, Christopher David,
    Duston Obermeyer, James McNulty, Black Millennial
    Movement, and Rose City Justice, Inc.

[*Additional counsel for Plaintiffs listed on signature page*]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| MARK PETTIBONE, an individual; FABIYM ACUAY (a.k.a., MAC SMIFF), an individual; ANDRE MILLER, an individual; NICHOL DENISON, an individual; MAUREEN HEALY, an individual; CHRISTOPHER DAVID, an individual; DUSTON OBERMEYER, an individual; JAMES MCNULTY, an individual; BLACK MILLENNIAL MOVEMENT, an organization; and ROSE CITY JUSTICE, INC., an Oregon nonprofit corporation, | Case No.: 3:20-cv-1464<br><br>COMPLAINT<br><br>(28 U.S.C. § 1332)<br><br>DEMAND FOR JURY TRIAL |

Page 1   -   COMPLAINT

Plaintiffs,

    v.

DONALD J. TRUMP, in his official
capacity; CHAD F. WOLF, in his individual
and official capacity; GABRIEL RUSSELL,
in his individual and official capacity; JOHN
DOES 1-200, in their individual capacities;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; and UNITED
STATES MARSHALS SERVICE,

      Defendants.

_____

Plaintiffs Mark Pettibone, Mac Smiff, Andre Miller, Nichol Denison, Maureen Healy,

Christopher David, Duston Obermeyer, James McNulty, Black Millennial Movement, and Rose

City Justice, Inc. (collectively, "Plaintiffs"), for their Complaint against the named defendants

("Defendants"), allege as follows:

## I. INTRODUCTION

1.    Plaintiffs are individual Oregonians—or, in the case of Black Millennial

Movement and Rose City Justice, Inc., associations of individual Oregonians—who lawfully

participated in protests in Portland, Oregon directed against systemic racism and police violence

towards Black Americans following the Minneapolis Police killing of George Floyd on May 25,

2020. This action arises out of Defendants' unlawful attempts to crush Black protesters and their

supporters through the use of excessive force and illegal detentions against Plaintiffs in violation

of their rights under the First and Fourth Amendments of the United States Constitution as well

as federal statutory law.

2.    As part of a federal mission known as "Operation Diligent Valor," spurred by

President Donald J. Trump and directed by the purported Acting Director of the United States

Department of Homeland Security ("DHS") Chad Wolf, the federal government deployed more than a hundred federal law enforcement officers or agents employed by a variety of federal agencies in an alleged effort to "quell" the protests, which were occurring near the Mark O. Hatfield Federal Courthouse (the "Hatfield Courthouse") in the center of Portland.  Such federal law enforcement officials, heavily armed and clad in military-type camouflage or dark uniforms, indiscriminately used violent tactics on lawful protesters, including shooting them in the head and body with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting and beating them with batons, firing massive clouds of tear gas at them, and, in some instances, arresting and detaining them without any lawful basis. The federal agencies or divisions and their leaders and employees responsible for this conduct are the Defendants in this action.

3.      Defendants' actions in support of "Operation Diligent Valor" manifestly violated Plaintiffs' rights enshrined in the First and Fourth Amendments to the United States Constitution:  the rights to peaceful assembly, to freedom of speech, and to freedom from unwarranted governmental seizures.

4.      Defendants' actions also violated federal statutory law for at least two reasons:

a.      First, "Operation Diligent Valor" was not legally authorized.  Pursuant to 40 U.S.C. § 1315(a), the Acting Secretary of DHS has limited statutory authority to designate DHS employees to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property."  Defendant Wolf, however, had no such authority because he was not properly designated and serving as the Acting Secretary of DHS under the requirements of the Homeland Security Act of 2002, 6 U.S.C. § 113(g), and the Federal Vacancies Reform

Act, 5 U.S.C. § 3348.  As a result, he had (and still has) no authority whatsoever under 40 U.S.C. § 1315 and his designation of DHS officers pursuant to "Operation Diligent Valor" was null and void.

b.    Second, even assuming "Operation Diligent Valor" had been properly authorized, the DHS officers conducting the operation exceeded their limited powers under 40 U.S.C. § 1315, which does not allow making warrantless arrests or taking actions such as detaining individuals or suppressing protests in locations that are away from, or not required to protect, federal property.

5.    Plaintiffs are now asking the Court to protect them and vindicate their rights by declaring Defendants' actions unlawful, entering appropriate injunctive relief, and awarding them economic damages for the violation of their constitutional rights.

## II.  PARTIES

A.    **Plaintiffs.**

6.    Plaintiff Mark Pettibone is a 30-year-old resident of Multnomah County, Oregon and a citizen of the United States.  He is currently employed as an essential worker by a national grocery company.  He is a supporter of Black Lives Matter and a participant in the recent protests outside the Hatfield Courthouse.

7.    Plaintiff Fabiym Acuay (a.k.a. and referred to herein as Mac Smiff) is a 39-year-old resident of Multnomah County, Oregon and a citizen of the United States.  He is an artist, a utility worker, and the editor-in-chief of a hip-hop magazine.  He is a veteran activist and has been attending Black Lives Matter events in Portland for more than six years, including the recent protests outside the Hatfield Courthouse.

107810438.1 0099880-01343

8.      Plaintiff Andre Miller is a 36-year old resident of Clackamas County, Oregon and a citizen of the United States.  He is currently employed as a facilities and warehouse manager. He is a supporter of Black Lives Matter and participated in the recent protests outside the Hatfield Courthouse on multiple occasions.

9.      Plaintiff Nichol Denison is a 39-year-old resident of Washington County, Oregon and a citizen of the United States.  She is a veteran of the United States Air Force and is currently employed as an advisor at a global company that manufactures and retails personal care products.  She has participated in the protests outside the Hatfield Courthouse on multiple occasions.

10.     Plaintiff Maureen Healy is a 52-year-old resident of Multnomah County, Oregon and a citizen of the United States.  She is currently employed as a history professor at Lewis & Clark College in Portland, Oregon, where she also serves as Chair of the History Department. She has participated in Black Lives Matter protests in multiple locations across the City of Portland, including outside the Hatfield Courthouse.

11.     Plaintiff Christopher David is a 53-year-old resident of Multnomah County, Oregon and a citizen of the United States.  He is a graduate of the United States Naval Academy, a former member of the United States Navy's Civil Engineer Corps, and currently employed by the Department of Veteran's Affairs ("VA") hospital in Portland as a clinical chemist.  He has participated in the protests outside the Hatfield Courthouse in Portland and is a co-founder of Wall of Vets, an unincorporated association initially formed to support the Black Lives Matter protesters outside the Hatfield Courthouse.

12.     Plaintiff Duston Obermeyer is a 42-year-old resident of Clackamas County, Oregon and a citizen of the United States.  He is a graduate of the United States Naval Academy,

Page 5    -    COMPLAINT

a decorated combat veteran of the United States Marine Corps, and currently works as a real estate broker in Lake Oswego, Oregon.  Like Plaintiff David, he has participated in the protests outside the Hatfield Courthouse in Portland and is a co-founder of Wall of Vets.

13.    Plaintiff James McNulty is a 42-year-old resident of Multnomah County, Oregon and a citizen of the United States.  He is currently employed as an educational department manager at a local university hospital.  He has attended the protests outside the Hatfield Courthouse in support of Black Lives Matter and against the disproportionate use of police violence against Black individuals.

14.    Plaintiff Black Millennial Movement is an unincorporated association founded in June 2020 by Cameron Whitten, together with Gregory McKelvey, Shanice Clarke, Candace Avalos, and others, with a mission to reclaim space for the voice of Black Millennials on issues such as criminal justice, policing, and student debt.  Members of Black Millennial Movement have participated frequently in the protests outside the Hatfield Courthouse in support of Black Lives Matter and against the disproportionate use of police violence against Black individuals.

15.    Plaintiff Rose City Justice, Inc. is an Oregon nonprofit corporation whose mission is to bring awareness to the community, to reform systems founded on inequitable and raist ideals, and to demand justice in a nonviolent manner.  Rose City Justice, Inc.'s members participated in the Black Lives Matter protests outside the Hatfield Courthouse to provide support and assistance.

**B.    Defendants.**

16.    Defendant Donald J. Trump is the President of the United States.  He participated with Defendant Wolf and others in setting in motion and causing deployment of "Operation Diligent Valor," as well as in acquiescing in and ratifying the unconstitutional and unlawful

actions of DHS and other federal government employees as part of that operation.  He is sued in his official capacity.

17.    Defendant Chad F. Wolf is a government official who purports to serve as the Acting Secretary of DHS; however, he was not properly designated to that position in accordance with the Homeland Security Act of 2002, 6 U.S.C. § 113(g).  He participated in setting in motion, causing, and supervising "Operation Diligent Valor," designating DHS employees to serve in that operation, and acquiescing in and ratifying the unconstitutional and unlawful actions of such employees as set forth below.  He is sued in his individual and official capacities.

18.    Defendant Gabriel Russell is the Regional Director for Region 10 of the Federal Protective Service ("FPS"), which is an agency housed within DHS, where it is responsible for protection of federal property.  He commanded the DHS Rapid Deployment Force for "Operation Diligent Valor," and is responsible for the actions of the federal employees who conducted that operation and who currently remain stationed in Portland, Oregon.  He is sued in his individual and official capacities.

19.    Defendants Does 1-200 ("Defendant Does") are unknown officers, agents, or contract employees of DHS and/or the United States Marshals Service ("USMS") deployed to Portland under color of federal authority as part of or in connection with "Operation Diligent Valor."  They are not readily identifiable because they frequently acted in groups and wore uniforms, helmets, and/or other clothing without obvious identifying information.  Plaintiffs will amend the Complaint to allege their true names and identities when ascertained.  Defendants Does are sued in their individual capacities.

Page 7    -    COMPLAINT

20.     Defendant DHS is a cabinet-level department of the United States government that houses various departments and agencies, including United States Customs and Border Protection ("CBP"), FPS, and Immigration and Customs Enforcement ("ICE").  Defendant DHS is an "agency" as that term is defined in 5 U.S.C. § 551(1).

21.     Defendant USMS is a federal law enforcement agency housed within the United States Department of Justice.  Defendant USMS is an "agency" as that term is defined in 5 U.S.C. § 551(1).

22.     Each Defendant is responsible to Plaintiffs for the injuries and damages that Plaintiffs have suffered as a result of the actions of the Defendants alleged in this Complaint.

## III.  JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because the claims in this action present federal questions in that they:  (1) seek to redress the deprivation of rights under the First and Fourth Amendments to the United States Constitution, (2) arise under the federal Administrative Procedures Act, and (3) arise under 28 U.S.C. § 1343 because they seek to redress violations of 42 U.S.C. §§ 1985 and 1986.

24.     Venue is proper in the United States District Court, District of Oregon, Portland Division, because the events giving rise to the claims took place in Multnomah County, Oregon.

## IV.  FACTUAL BACKGROUND

**A.     The Portland Protests and the Federal Deployment of "Operation Diligent Valor."**

25.     Just after 8:00 p.m. on May 25, 2020, Minneapolis Police officers killed George Floyd, a 46-year-old African American man.  Mr. Floyd was arrested on suspicion of his involvement in a nonviolent offense.  After he was handcuffed and fell to the payment, a police officer kneeled on Mr. Floyd's neck with the weight of his body.  For eight minutes and 46

seconds, the officer held his knee on Mr. Floyd's neck as Mr. Floyd pleaded for relief, until he

was killed.  Other officers held his legs or stood by and watched.

26.    The video of Mr. Floyd's murder—coupled with the nation's long history of

police killings of a disproportionately large number of Black Americans—triggered a series of

protests opposing rampant police violence against Black Americans and supporting Black Lives

Matter across the county, including in Portland, Oregon.

27.    Beginning on or about May 29, 2020, protesters took to the streets of Portland in

large numbers.  These protests have continued for more than 80 consecutive nights and have

included regular protests in the city parks and streets that surround the Hatfield Courthouse and

the Multnomah County Justice Center.

28.    Over the course of the month following Mr. Floyd's tragic death, Defendant

Trump issued multiple statements denouncing the protests in various cities and threatening to use

federal forces to crush them.  For example, on May 29, 2020, three days after the protests began

in Minneapolis, Defendant Trump issued a tweet stating, "Either the very weak Radical Left

Mayor, Jacob Frey, get his act together and bring the City under control, or I will send in the

National Guard & get the job done right."[1]  He continued, "Any difficulty and we will assume

control, but when the looting starts the shooting starts."[2]  Similarly, on June 3, 2020, he claimed

in a televised broadcast interview with Sean Spicer "the nation needs law and order because you

have a bad group of people out there and they're using George Floyd and they're using a lot of

---

[1] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:53 PM),
https://twitter.com/realdonaldtrump/status/1266231100172615680.
[2] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:53 PM),
https://twitter.com/realDonaldTrump/status/1266231100780744704.

Page 9    -    COMPLAINT

other people to try and do some bad things," and that "super-liberal mayors" were undermining

local law enforcement, requiring his administration to bring in the National Guard.[3]

29.    On June 26, 2020, as the protests in Portland and elsewhere continued, Defendant

Trump went further, issuing an Executive Order on Protecting American Monuments,

Memorials, and Statutes and Combating Recent Criminal Violence ("Executive Order").[4]  The

Executive Order blamed "left-wing extremists" for "advanc[ing] a fringe ideology that paints the

United States of America as fundamentally unjust and have sought to impose that ideology on

Americans through violence and mob intimidation."[5]  In addition, it directed the Secretary of

DHS to provide "personnel to assist with the protection of Federal monuments, memorials,

statues, or property."[6]

30.    The Executive Order reflected Defendant Trump's consistent policy of defending

racist monuments and institutions and attacking individuals who seek to dismantle them as

lawless extremists.  For example, in a press conference on August 15, 2017, Defendant Trump

criticized protesters who sought to confront white nationalist and neo-Nazi groups opposing the

removal of a statue of Robert E. Lee in Charlottesville, Virginia as "alt-left" groups who were

"very, very violent," suggesting that both sides were to blame for the clash, even though the

principal violence was by a right-wing extremist who killed a woman by driving his car into

---

[3] Associated Press Video Transcript, *Trump: 'the nation needs law and order'*, June 4, 2020, https://news.yahoo.com/trump-nation-needs-law-order-093644124.html.
[4] Exec. Order No. 13,933, 85 Fed. Reg. 40,081 (June 26, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-protecting-american-monuments-memorials-statues-combating-recent-criminal-violence/.
[5] *Id.* at 40,081.
[6] *Id.* at 40,083.

107810438.1 0099880-01343

her.[7]  Two days later, on August 17, 2017, Defendant Trump issues a tweet railing against those

who sought to remove Confederate statues, saying "Sad to see the history and culture of our

great country being ripped apart with the removal of our beautiful statues and monuments.

You…can't change history but you can learn from it.  Robert E. Lee, Stonewall Jackson-who's

next, Washington, Jefferson?  So foolish!"[8]  Similarly, on July 6, 2020, Defendant Trump

mounted a defense of the Confederate flag and suggested NASCAR had made a mistake in

banning it at racing events while accusing a well-known Black race driver, Darrell Wallace, Jr.,

of perpetrating a hoax involving a noose found in his garage.[9]

31.    Acting pursuant to Defendant Trump's Executive Order and consistent with his

purpose of suppressing protests against racism and white nationalism, on July 1, 2020, Defendant

Wolf announced that DHS would form a special task force charged with "conduct[ing] ongoing

assessments of potential civil unrest or destruction and allocat[ing] resources to protect people

and property," and to engage in "potential surge activity to ensure the continuing protection of

critical locations."[10]  He further stated that the federal government "won't stand idly by while

---

[7] Michael D. Shear, et al., *Trump Defends Initial Remarks on Charlottesville; Again Blames 'Both Sides'*, N.Y. Times, Aug. 15, 2017, https://www.nytimes.com/2017/08/15/us/politics/trump-press-conference-charlottesville.html.
[8] David Nakamura, *Trump mourns loss of 'beautiful statues and monuments' in wake of Charlottesville rally over Robert E. Lee statue*, Wash. Post, August 17, 2017, https://www.washingtonpost.com/news/post-politics/wp/2017/08/17/trump-mourns-loss-of-beautiful-statues-and-monuments-in-wake-of-charlottesville-rally-over-robert-e-lee-statue/.
[9] Maggie Haberman, *Trump Adds to Playbook of Stoking White Fear and Resentment*, N.Y. Times, July 6, 2020, https://www.nytimes.com/2020/07/06/us/politics/trump-bubba-wallace-nascar.html.
[10] Press Release, U.S. Dep't of Homeland Sec., DHS Announces New Task Force to Protect American Monuments, Memorials, and Statues (July 1, 2020), https://www.dhs.gov/news/2020/07/01/dhs-announces-new-task-force-protect-american-monuments-memorials-and-statues.

violent anarchists and rioters seek not only to vandalize and destroy the symbols of our nation, but to disrupt law and order and sow chaos in our communities."[11]

32.    In accordance with his announcement, Defendant Wolf and DHS officials created and sent a Rapid Deployment Force to Portland in advance of the July 4, 2020 holiday weekend as part of what they termed "Operation Diligent Valor."[12]  The Rapid Deployment Force, which was directed by Defendant Russell, was composed of approximately 114 CBP and ICE officers. The CBP officers included members of the Border Patrol Tactical Unit, a quasi-militarized operations unit typically based on the United States-Mexico border or deployed overseas.[13]  As DHS itself has admitted, while such federal officers are heavily armed, they do "not specifically [have] train[ing] in riot control or mass demonstrations," *e.g.*, in policing protests that are subject to First Amendment protections.[14]

33.    "Operation Diligent Valor" also relied on USMS officers who were present or brought to Portland and who conducted operations in concert with the DHS Rapid Deployment Force.

---

[11] *Id.*

[12] Gabriella Borter, *Court Documents Reveal Secretive Federal Unit Deployed for 'Operation Diligent Valor' in Oregon*, Reuters, July 22, 2020, https://www.reuters.com/article/us-global-race-portland-valor/court-documents-reveal-secretive-federal-unit-deployed-for-operation-diligent-valor-in-oregon-idUSKCN24N2SH.

[13] Ben Fox & Gillian Flaccus, *Homeland Security Gets New Role Under Trump Monument Order*, Associated Press, July 10, 2020, https://apnews.com/4435a1f27cf85e087e112ba1224a2f1f (last accessed August 26, 2020); Ed Pilkington, *'These Are His People': Inside the Elite Border Patrol Unit Trump Sent to Portland*, The Guardian, July 27, 2020, https://www.theguardian.com/us-news/2020/jul/27/trump-border-patrol-troops-portland-bortac?CMP=Share_iOSApp_Other.

[14] Sergio Olmos et al., *Federal Officers Deployed in Portland Didn't Have Proper Training, D.H.S. Memo Said*, N.Y. Times, July 18, 2020, https://www.nytimes.com/2020/07/18/us/portland-protests.html.

Page 12  -   COMPLAINT

34.     Starting in the early morning hours of July 4, 2020, the Rapid Deployment Force and affiliated USMS officers began to engage in tactical operations designed to crush the protests in Portland and to further Defendant Trump's stated political aim of appearing to take control over allegedly lawless cities run by Democratic mayors.  The tactics used by the officers went beyond what was required for their limited mission of protecting federal property and reflected a policy designed to retaliate against and to deter the protesters because of their views and beliefs. These tactics included the use of surveillance, warrantless arrests, or custodial detentions of protesters, and the indiscriminate use of excessive force, including shooting protesters in the head and body with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting and beating them with batons, and firing massive clouds of tear gas at them, even when doing so was not necessary to protect federal property.

35.     Many of these unlawful actions were captured on video or photographed by the news media or other protesters as they occurred.  For example, on Saturday, July 11, 2020, Oregon Public Broadcasting ("OPB") published a video showing federal law enforcement officers shooting a 26-year-old protester, Donovan LaBella, in the head with impact munitions. At the time Mr. LaBella was shot, he was standing across the street from the Hatfield Courthouse protesting while holding a music speaker above his head.[15]  As a result of that shooting, Mr. LaBella suffered severe injuries—he was initially in critical condition upon admission to a hospital with a skull fracture, and he subsequently underwent facial reconstruction surgery for his injuries.

---

[15] Jonathan Levinson, *Federal Officers Shoot Portland Protester in Head with 'Less Lethal' Munitions*, OPB, July 12, 2020, https://www.opb.org/news/article/federal-officers-portland-protester-shot-less-lethal-munitions/.

36.    Beginning on July 21, 2020, the *New York Times* also issued a series of stories documenting various violent actions by federal officers, including indiscriminate flooding of streets with tear gas,[16] throwing protesters to the ground to detain them,[17] firing off flash grenades,[18] declaring a protest an unlawful assembly,[19] and pushing into the streets of Portland well away from the Hatfield Courthouse, which is the locus of their purported authority.[20]

37.    Still others have issued reports of federal officers stopping drivers and pulling them out of vehicles.  Below is one such photo post from Sergio Olmos, a freelance reporter who has covered the protests for the *New York Times*:[21]



---

[16] Mike Baker et al., *Federal Agents Push into Portland Streets, Stretching Limits of Their Authority*, N.Y. Times, July 25, 2020, https://www.nytimes.com/2020/07/25/us/portland-federal-legal-jurisdiction-courts.html.

[17] Mike Baker, *Chaotic Scenes in Portland as Backlash to Federal Deployment Grows*, N.Y. Times, July 21, 2020, https://www.nytimes.com/2020/07/21/us/portland-protests.html.

[18] Baker et al., *supra* note 16.

[19] *Id.*

[20] *Id.*; Jonathan Levinson et al., *50 Days of Protest in Portland. A Violent Police Response. This Is How We Got Here*, OPB, July 19, 2020, https://www.opb.org/news/article/police-violence-portland-protest-federal-officers/.

[21] Sergio Olmos (@MrOlmos), Twitter (July 22, 2020, 2:41 AM), https://twitter.com/MrOlmos/status/1285872637109866498.

Page 14  -   COMPLAINT

107810438.1 0099880-01343

38.     This same practice of snatching protesters off the street was reported by OPB on July 16, 2020[22] and by an individual protester on July 17, 2020, who posted an online video that showed two men in unidentifiable military-style uniforms seize an isolated individual on a sidewalk, then force him into an unmarked grey van and drive him away for no apparent reason.[23]

**B.      The Individual Defendants Confirm and Ratify Their Support for "Operation Diligent Valor" Despite Denouncements by State and Local Officials.**

39.     Defendants' unlawful actions under "Operation Diligent Valor" were immediately condemned by state and local officials.  For example, Oregon Governor Kate Brown denounced the shooting of Mr. LaBella as "the tragic and avoidable result of President Donald Trump, for weeks, continuing to push for force and violence in response to protests . . . .  President Trump deploying armed federal officers to Portland only serves to escalate tensions and, as we saw yesterday, will inevitably lead to unnecessary violence and confrontation."[24]  Portland Mayor Ted Wheeler echoed Governor Brown's concern, stating "the actions of federal officers last night escalated, rather than de-escalated, already heightened tensions in our city."[25]

40.     Individual Defendants Trump and Wolf nonetheless publicly proclaimed their firm support for the tactics employed as part of "Operation Diligent Valor" and reiterated that the

---

[22] Jonathan Levinson & Conrad Wilson, *Federal Law Enforcement Use Unmarked Vehicles to Grab Protesters Off Portland Streets*, OPB, July 16, 2020, https://www.opb.org/news/article/federal-law-enforcement-unmarked-vehicles-portland-protesters/.
[23] Video, *Feds in Camo Grabs Antifa Suspects in Portland*, YouTube (July 17, 2020), https://www.youtube.com/watch?v=we7lYeNBgck.
[24] *Oregon Leaders React After Portland Protester Injured, in Serious Condition*, KATU, July 12, 2020, https://katu.com/news/local/oregon-leaders-react-to-federal-officer-arrests-in-downtown-portland.
[25] *U.S. Marshals to Investigate Incident That Injured Protester, Mayor Wheeler Says*, KATU, July 12, 2020, https://katu.com/news/local/us-marshals-to-investigate-incident-that-injured-protester-mayor-wheeler-says.

107810438.1 0099880-01343

purpose of the operation was to crush the protests.  For example, on July 13, 2020, two days after

Mr. LaBella's shooting, Defendant Trump lauded federal authorities for doing "a great job" in

Portland.[26]  He stated that "Portland was totally out of control . . . .  [A]nd we very much quelled

it, and if it starts again, we'll quell it again very easily."[27]

41.    Similarly, on July 16, 2020, Defendant Wolf issued a statement while visiting

Portland in which he referred to Portland's demonstrators as "violent anarchists" and a "violent

mob," and stated that "local and state leaders are . . . focusing on placing blame on law

enforcement and requesting fewer officers in their community."[28]  In response to what he

characterized as an invitation for DHS to pack up and go home, Defendant Wolf was blunt:

"That's just not going to happen on my watch."[29]

42.    The next day, July 17, 2020, Defendant Wolf posted a photo on Twitter of federal

agents in camouflage within the Hatfield Courthouse, writing that "[w]e will never surrender to

violent extremists on my watch."  He later removed the post.[30]

---

[26] Noelle Crombie, *Trump Says Feds in Portland Have Done 'a Great Job' on Protests*, OregonLive.com, July 13, 2020, https://www.oregonlive.com/crime/2020/07/trump-says-feds-in-portland-have-done-a-great-job-on-protests.html; Remarks in a Roundtable Discussion on the Positive Impact of Law Enforcement and an Exchange with Reporters, 2009 Daily Comp. Pres. Doc., DCPD 202000512 (July 13, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000512/pdf/DCPD-202000512.pdf.

[27] Crombie, *supra* note 26.

[28] Press Release, U.S. Dep't of Homeland Sec., Acting Secretary Wolf Condemns the Rampant Long-Lasting Violence in Portland (July 16, 2020), https://www.dhs.gov/news/2020/07/16/acting-secretary-wolf-condemns-rampant-long-lasting-violence-portland.

[29] Acting Secretary Chad Wolf (@DHS_Wolf), Twitter (July 17, 2020, 4:02 AM), https://twitter.com/DHS_Wolf/status/1284081029683257344.

[30] *DHS Chief: 'We Will Never Surrender to Violent Extremists' in Portland*, KOIN, July 27, 2020, https://www.koin.com/news/protests/dhs-chief-will-never-surrender-to-violent-extremists-in-portland.

Page 16  -  COMPLAINT

43.    One day later, on July 18, 2020, Defendant Trump issued a Twitter post, stating, "We are trying to help Portland, not hurt it . . . .  Their leadership has, for months, lost control of the anarchists and agitators.  They are missing in action.  We must protect Federal property, AND OUR PEOPLE.  These were not merely protesters, these are the real deal!"[31]

44.    On July 20, 2020, Defendant Trump again criticized Portland as "totally out of control . . . the liberal Democrats running the place had no idea what they were doing."  He went still further, threatening to deploy federal law enforcement officers to other cities run by "liberal Democrats," specifically New York, Chicago, Philadelphia, Detroit, Baltimore, and Oakland.  He portrayed those cities as out of control, characterizing them as "run by very liberal Democrats.  All run, really, by radical left."[32]

**C.    Continued State and Local Opposition Finally Leads to a Stand Down, but Federal Officers Remain in Portland Poised to Recommence Operations.**

45.    Despite the statements of Individual Defendants Trump and Wolf supporting "Operation Diligent Valor," state and local leaders continued to press their request that federal law enforcement officers leave Portland.  For example, on July 19, Portland City Commissioner Jo Ann Hardesty stated that she was joining "the loud chorus of elected officials calling for the federal troops in Portland's streets to go home . . . . Their presence here has escalated tensions and put countless Portlanders exercising their First Amendment rights in greater danger."[33]

---

[31] *House Leaders 'Alarmed' Federal Officers Policing Protests*, Associated Press, July 19, 2020, https://apnews.com/7c8c1a311b5c668a8cd4f757453bcf5c.

[32] The White House, Remarks by President Trump on Phase Four Negotiations, July 20, 2020, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-phase-four-negotiations/.

[33] Katie Shepherd & Mark Berman, *'It Was Like Being Preyed Upon': Portland Protesters Say Federal Officers in Unmarked Vans Are Detaining Them*, Wash. Post, July 17, 2020, https://www.washingtonpost.com/nation/2020/07/17/portland-protests-federal-arrests/.

Page 17  -    COMPLAINT

46.     These calls reflected the widely reported fact that the presence of federal officers was aggravating rather than diffusing tension at the protests and significantly increasing the number of protesters, many of whom were now protesting against the presence of the federal officers as well as in support of Black Lives Matter and in opposition to police violence against Black Americans.[34]  Indeed, federal law enforcement officers speaking on the condition of anonymity acknowledged to OPB that their actions "contributed to the quick escalation between law enforcement and groups of protesters, which had dwindled to a couple hundred people or less earlier this month [*i.e.*, before the attack on Mr. LaBella]."[35]  Such officers also acknowledged that "the nature of the situation in Portland is a 'crisis' being watched and managed from the highest levels of the federal government."[36]

47.     Against this backdrop, on July 28, 2020, Governor Brown negotiated an agreement with Vice President Mike Pence and other senior federal administration officials under which CBP and ICE officers would "leave downtown Portland" and Oregon State Police would step in to keep the peace and allow protesters to refocus attention on racial justice and police accountability.[37]

48.     While federal officials have acknowledged this arrangement, they have steadfastly refused to commit to a full disengagement.  For example, on July 28, 2020, Defendant Wolf acknowledged that Oregon State Police would step in, but informed the nation that DHS "will

---

[34] Giulia McDonnell Nieto del Rio, *What Do Portland Protesters Want, and How Have the Police Responded?*, N.Y. Times, July 31, 2020, https://www.nytimes.com/article/portland-protests-explained-protesters.html; Baker, *supra* note 17; Olmos et al., *supra* note 14.
[35] Conrad Wilson & Jonathan Levinson, *More Federal Officers Deploying to Portland as Protests Gain Momentum*, OPB, July 26, 2020, https://www.opb.org/news/article/more-federal-officers-deploying-portland/.
[36] *Id.*
[37] Governor Kate Brown (@OregonGovBrown), Twitter (July 29, 2020, 8:31 AM), https://twitter.com/OregonGovBrown/status/1288497309848702977.

not back down" and "will continue to maintain our current, augmented federal law enforcement personnel in Portland until we are assured that the Hatfield Federal Courthouse and other federal properties will no longer be attacked and that the seat of justice in Portland will remain secure."[38]  Similarly, on July 29, 2020, Mark A. Morgan, the Acting Senior Official Performing the Duties of the Commissioner for CBP, reiterated that the federal officers "are not leaving Portland" until DHS deemed that "the violent criminal activity" was over.[39]

49.    Defendant Trump also issued similar statements refusing to disengage.  For example on July 29, 2020, he tweeted that Governor Brown "isn't doing her job" and proclaimed that "[w]e will not be leaving until there is safety!"[40]  The next day, July 30, 2020, he went a step further, characterized the situation as an "emergency," and publicly threatened even further escalation if local authorities do not "clean out this beehive of – of terrorists."  "If they don't do it, we'll be sending in the National Guard."  "We're telling [protesters], right now, that we're coming in very soon – the National Guard."[41]  Finally, on July 31, 2020, he tweeted that "Homeland Security is not leaving Portland until local police complete cleanup of Anarchists and Agitators!"[42]

---

[38] Press Release, U.S. Dep't of Homeland Sec., Acting Secretary Wolf's Statement on Oregon Agreeing to Cooperate in Quelling Portland Violence (July 29, 2020), https://www.dhs.gov/news/2020/07/29/acting-secretary-wolfs-statement-oregon-agreeing-cooperate-quelling-portland?fbclid=IwAR12Gszc5r4WHfv_ngO0BWlck3aDkG6TlZQkAx5j6lHcBfSAmQP9ms6rv6g.

[39] CBP Mark Morgan (@CBPMarkMorgan), Twitter (July 29, 2020, 11:33 AM), https://twitter.com/CBPMarkMorgan/status/1288543305769406465).

[40] Donald J. Trump (@realDonaldTrump), Twitter (July 30, 2020, 6:20 AM), https://twitter.com/realDonaldTrump/status/1288826742539464707.

[41] The White House, Remarks by President Trump in Press Briefing, July 30, 2020, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-july-30-2020/.

[42] Donald J. Trump (@realDonaldTrump), Twitter (July 31, 2020, 8:52 PM), https://twitter.com/realDonaldTrump/status/1289408673324777472.

Page 19  -   COMPLAINT

50.    Along these same lines, on August 4, 2020, DHS confirmed that although federal officers had not interfered with peaceful protesters during the preceding days, "[t]here has been no reduction in federal presence; federal law enforcement officers remain in Portland at augmented levels."[43]  "[T]he increased federal presence in Portland will remain until [DHS] is certain that federal property is safe."[44]  DHS characterized the situation as "dynamic and volatile" and stated that "no determination of timetables for reduction of protective forces has yet been made."[45]

51.    On August 7, 2020, OPB also reported that federal officials speaking off the record said that some of the forces might be drawn down, depending on how the weekend went, but an elevated force would likely remain in Portland through the November election.[46]

52.    Meanwhile, Defendant Trump has continued to defend and reward the actions of Defendant Wolf and DHS.  As recently as August 21, 2020, Defendant Trump thanked Defendant Wolf "very much," commenting that "[y]ou're right in the heart of it, and you've got some very big things coming.  Very big things.  Good job."[47]

53.    Given these statements, there is a continuing risk that Defendants' illegal actions will recommence and an ongoing need to address them through this lawsuit.

---

[43] Press Release, U.S. Dep't of Homeland Sec., *MYTHS VS. FACTS: Cooperation and Receding Riot Activity in Portland, OREGON* (Aug. 4, 2020), https://www.dhs.gov/news/2020/08/04/myths-vs-facts-cooperation-and-receding-riot-activity-portland-oregon.
[44] *Id.*
[45] *Id.*
[46] Conrad Wilson & Jonathan Levinson, *Some Federal Forces Poised to Leave Portland, Others Could Remain Through Election*, OPB, Aug. 7, 2020, https://www.opb.org/article/2020/08/07/federal-officers-leave-portland-election/.
[47] The White House, Remarks by President Trump at the 2020 Council for National Policy Meeting, Aug. 21, 2020, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-2020-council-national-policy-meeting/.

**D.** **The Deployment and Continued Presence of Federal Officers in Portland as Part of "Operation Diligent Valor" Was Not Lawfully Authorized or Executed.**

54.     In addition to violating Plaintiffs' constitutional rights, the deployment of federal officers to Portland as part of "Operation Diligent Valor" was unlawful because Defendant Wolf lacked the authority to designate DHS employees to protect the Hatfield Courthouse and because the operation was not executed in accordance with the federal statute under which Defendants claimed to be acting.

**1.** **Defendant Wolf Lacked the Authority to Deploy Federal Officers to Portland Because He Was Not Properly Serving as Acting Secretary of DHS.**

55.     Defendant Wolf designated DHS officers to protect the Hatfield Courthouse pursuant to 40 U.S.C. § 1315, which grants the Secretary of DHS (or properly serving Acting Secretary) limited statutory authority to designate DHS employees to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property." Defendant Wolf's designation, however, was not lawful, valid, or effective because he was not legally serving as the Acting Secretary of DHS when he commenced "Operation Diligent Valor." As a result, he had and still has no power under 40 U.S.C. § 1315 and there was no lawful basis for the deployment of the Rapid Deployment Force to Portland.

56.     By way of background, the Secretary of DHS is normally appointed by the President with the advice and consent of the Senate. 6 U.S.C. §§ 112(a)(1), 113(a)(1)(A). In the event of a vacancy, the Homeland Security Act of 2002 provides an order of succession to fill the position pending the presidential appointment of a replacement. *Id.* § 113(g). Pursuant to this order of succession, the Deputy Secretary and Under Secretary for Management of DHS are next in line to serve in an acting capacity when there is a vacancy. *Id.* § 113(g)(1). Beyond this

Page 21   -   COMPLAINT

mandated order, "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary." *Id.* § 113(g)(2).

57.     Defendant Wolf assumed the role of Acting Secretary through a series of events following the resignation of DHS Secretary Kristjen Nielsen on April 10, 2019.  At that time, the Deputy Secretary position had been vacant since April 14, 2018 and the Under Secretary for Management had resigned on April 10, 2019, meaning that Secretary Nielsen's own list of further successors would apply.  That list, which was set forth in Delegation 00106, Revision No 08.5 (Apr. 10, 2019), provided that vacancies due to the Secretary's death, resignation, or inability to perform the functions of the position were to be filled in the following order: (1) Deputy Secretary, (2) Under Secretary for Management, (3) Administrator of Federal Emergency Management Agency, and (4) Director of the Cybersecurity and Infrastructure Security Agency.

58.     Although this was the required order of succession, it was not followed.  Instead, the person who purported to assume the Acting Secretary position was Keven McAleenan, who had been serving as the Commissioner of CBP.  While Mr. McAleenan had been identified in Delegation 00106 as a potential successor to Secretary Nielsen in the event of a disaster or catastrophic emergency, he was not properly in line to assume her role in the event of her resignation.  As a result, Mr. McAleenan's assumption of the role of Acting Secretary was not lawful and all orders that he issued in that capacity are null and void.

59.     Defendant Wolf assumed the position of Acting Secretary following Mr. McAleenan's resignation as of November 13, 2019.  Defendant Wolf took the position based on a new version of Delegation 00106, Revision No. 08.6, that Mr. McAleenan issued on November 8, 2019, to create a new order of succession.  However, given that Mr. McAleenan

had not properly assumed the role of Acting Secretary in the first instance, he lacked the authority to modify Delegation 00106, rendering his modifications invalid and making Defendant Wolf's designation as Acting Secretary pursuant to such modifications similarly invalid.

60.     Defendant Wolf was also barred at the time from lawfully serving or issuing valid orders as Acting Secretary by a separate statute, the Federal Vacancies Reform Act ("FVRA"). Under the FVRA, the power of any acting official to perform the functions and duties of the office expires 210 days after the office first became vacant.  5 U.S.C. § 3346.  Moreover, if 210 days pass without a Senate-confirmed officer or a nomination for the office, the FVRA requires the office to remain vacant.  *Id.* § 3348(b)(1).  When Mr. McAleenan issued his revision of Delegation 00106 under which Defendant Wolf assumed the Acting Secretary role, more than 210 days had passed since Secretary Nielsen resigned on April 10, 2019, and the President had not appointed a successor.  As a result, even if Mr. McAleenan had properly assumed his position, he lacked the authority to modify Delegation 00106 so that Defendant Wolf could become Acting Secretary.  Passage of the 210-day deadline also meant that the office had to remain open and that it could not be filled with anyone serving in an acting capacity, including Defendant Wolf.

61.     The invalidity of Defendant Wolf's claim to serve as Acting Secretary was confirmed on August 14, 2020, in an analysis by the United States Government Accountability Office ("GAO").[48]  The GAO concluded that, for the reasons summarized above,

---

[48] GAO, Decision in the Matter of Department of Homeland Security—Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of Deputy Secretary of Homeland Security, File No. B-331650 (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf.

Page 23  -   COMPLAINT

Mr. McAleenan was the "incorrect" official to have assumed the title of Acting DHS Secretary following the resignation of Secretary Nielsen and that his subsequent amendments to the order of succession "were invalid." As such, Defendant Wolf's purported assumption of the role was "improper" and pursuant to "an invalid order of succession."

62.     Given that Defendant Wolf did not lawfully assume the role of Acting Secretary of DHS and that more than 210 days had passed since the office became vacant, he was without any authority to designate employees of DHS to protect federal property pursuant to 40 U.S.C. § 1315. His orders deploying DHS officers to Portland as part of "Operation Diligent Valor" and maintaining such officers in the city should therefore be declared unauthorized and unlawful.

**2.      Even if "Operation Diligent Valor" Had Been Validly Authorized, It Has Been Conducted in a Manner Exceeding DHS's Limited Authority Under 40 U.S.C. § 1315.**

63.     Even if it had been properly authorized, "Operation Diligent Valor" has been conducted in a manner that exceeded DHS's limited authority under 40 U.S.C. § 1315. Pursuant to 40 U.S.C. § 1315(b)(2), DHS employees properly designated to protect federal property and persons on the property have limited enumerated powers, including the powers to:

a.      "enforce Federal laws and regulations for the protection of persons and property," 40 U.S.C. § 1315(b)(2)(A);

b.      "make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony," *id.* § 1315(b)(2)(C); and

c.    "conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property," *id.* § 1315(b)(2)(E).

64.    Defendants have exceeded these limited powers by (a) engaging in the warrantless arrest of multiple individuals well away from any federal property and without probable cause to believe they were committing or had committed a felony; (b) using excessive force to suppress protesters who were exercising their First Amendment rights and who were not posing any threat to federal property or persons on federal property; and (c) engaging in surveillance and intelligence gathering directed at suppressing protests rather than protecting federal property or persons on federal property.

65.    Defendants' employment of such tactics in excess of their statutory authority should be declared unlawful, and Defendants should be enjoined from engaging in the same tactics in the future.

**E.    Factual Allegations Relating to Individual Plaintiffs.**

**1.    Plaintiff Mark Pettibone**

66.    Mr. Pettibone has attended the protests outside the Hatfield Courthouse on multiple occasions since they initially commenced in late May 2020.  While attending the protests, he has repeatedly witnessed the use of excessive force by federal officers, including the use of impact munitions, pushing and shoving, and the indiscriminate use of tear gas on individuals protesting in a peaceful and lawful manner.  In the early morning hours of July 15, 2020, after having attended the protests and non-violently protesting in support of Black Lives Matter, he was personally subjected to such unlawful tactics when he was snatched off the street

by unidentified federal officers, who arrested him and detained him in jail for hours without ever

informing him of the reasons for their actions, much less charging him with an offense.

67.     The incident began when Mr. Pettibone and a friend were walking home from the

protests a block west of Chapman Square on Main Street.  They were approached by a group of

people who warned them that unidentified men in camouflage were driving around the area in

unmarked minivans and grabbing people off the street.  Almost immediately thereafter, an

unmarked dark-colored minivan stopped in front of Mr. Pettibone and four to five men in

camouflaged military garb jumped out of the van and sought to detain him.

68.     Mr. Pettibone could not see any specific agency badges or identification on the

clothing worn by the men, particularly given the darkness at the time, and they did not identify

themselves as law enforcement officers.  Uncertain about who the men were and afraid of what

they might do, Mr. Pettibone ran west on Main Street and then turned south on Broadway with

one of the camouflaged men chasing him.  As he ran down Broadway, the same or a similar

unmarked van pulled up and stopped in front of him and several men wearing the same clothing

jumped out in front of him.

69.     Mr. Pettibone still did not know who the men were but felt that he was not free to

leave.  He sank to his knees and asked "Why?" several times.  The men did not respond and

offered no explanation for their actions.  Instead, they firmly led him into the unmarked van,

where he was put on the floor.  One of the men restrained Mr. Pettibone's hands above his head

and put pressure on his head and neck to force his head down.  The men then pulled his hat down

over his eyes to temporarily blind him, determined that he had no weapons, and drove him into

the garage of a building that he later learned was the Hatfield Courthouse.

70.     Once Mr. Pettibone was inside the Hatfield Courthouse, a second group of unidentified men wearing fatigue pants and tee shirts photographed him, searched the contents of his backpack without asking consent, cuffed his hands and ankles, and placed him in a cell. While Mr. Pettibone was in the cell, two officers approached him, represented that they were recording their interaction with him, and read Mr. Pettibone his *Miranda* rights.  The officers asked Mr. Pettibone to waive his *Miranda* rights.  Mr. Pettibone refused to answer questions and requested a lawyer.  No lawyer was provided.  Instead, the officers left, saying, "This interview is terminated."

71.     At the time of his arrest, Mr. Pettibone had not committed and was not committing any federal offense and he was blocks away from the Hatfield Courthouse.  In addition, the federal officers who detained him did not have either probable cause or a warrant for his arrest.  After being held in the jail cell for more than an hour, Mr. Pettibone was released without being given any paperwork indicating that he had even been arrested, much less charged with any crime.  He was given his belongings back in a garbage bag, but a respirator that was in his backpack had been damaged, and it was unclear whether his cell phone had been accessed.

72.     Not surprisingly, the experience of being snatched off the street and put in an unmarked van by unidentified men in military-style uniforms who did not explain their actions, searched his possessions without consent, and held him in jail with no explanation has injured Mr. Pettibone and caused him significant emotional distress and anxiety.  Even after his arrest, Mr. Pettibone has continued to experience anxiety about the potential of being arrested or stopped again for exercising his lawful right to peacefully protest.

73.     On information and belief, some or all of the federal officers who arrested Mr. Pettibone were DHS employees, and the federal officers who photographed him, searched his possessions, and imprisoned him were USMS employees.

74.     On information and belief, Mr. Pettibone was arrested and detained because of his participation in the protests at the Hatfield Courthouse, which was nonviolent in nature.

75.     Defendants have made multiple warrantless arrests of individuals in Portland who had not committed and were not committing any federal offenses, including arrests of individuals who were not in the immediate vicinity of the Hatfield Courthouse.  On information and belief, these arrests, including Mr. Pettibone's arrest, were part of officially sanctioned behavior and reflected a policy, practice, or custom that was directed or sanctioned by high-ranking officials, including Defendants Wolf and Russell in support of Defendant Trump's policy of targeting protesters supporting Black Lives Matter and opposing police violence on Black Americans as violent left-wing extremists or anarchists undermining white nationalist values.

**3.     Plaintiff Mac Smiff.**

76.     Mr. Smiff has attended the protests outside the Hatfield Courthouse on numerous occasions since they initially commenced in late May 2020 and has repeatedly witnessed the use of excessive force by federal officers, including the use of impact munitions, pushing and shoving, and the indiscriminate use of tear gas on individuals protesting in a peaceful and lawful manner.  In the early morning hours of July 25, 2020, he was personally subjected to such unlawful actions when an unidentified federal officer shot him in the head with an impact munition while he was lawfully attending the protests.

77.     At the time he was shot, Mr. Smiff was standing in Lownsdale Square, which is separated from the Hatfield Courthouse by SW Third Avenue.  Mr. Smiff was wearing a helmet

which had a sign on it indicating that he was a member of the press.  Federal officials were

clearing nonviolent protesters in SW Third Avenue immediately in front of the Hatfield

Courthouse, some 15 to 20 yards away from where Mr. Smiff was standing.  Mr. Smiff was

approximately 10 feet away from any other protesters.  When Mr. Smiff looked down at his

phone to send a tweet, he was shot in the right side of his face with an indelible hard-cap

paintball, just below the line of his helmet and just above a face mask he was wearing.

78.     The impact of the shot and resulting shock caused Mr. Smiff to fall to the ground.

He got up and retreated as well as he could towards SW Fourth Avenue where there was an

ambulance and volunteers providing medical care.  Mr. Smiff was partly blinded by the paint in

his face and had a large contusion on his head, which restricted his mobility.  He received

treatment from the volunteer medics, who told him that he may have suffered a concussion.

79.     As a result of being shot by the federal officers, Mr. Smiff suffered physical pain

as well as anxiety that his concussion could leave him vulnerable to more serious adverse health

consequences if he were injured again.  This trauma affected Mr. Sniff's ability to work in the

days following his injuries and the potential of repeated injury left him fearful of exercising his

lawful right to peacefully protest during his recovery.

**4.     Plaintiff Andre Miller.**

80.     Mr. Miller attended the protests outside the Hatfield Courthouse on numerous

occasions since they initially commenced in late May 2020.  Mr. Miller has been involved in

documenting the protests and providing volunteer crowd-safety and medic services at the

protests.  While at the protests, he has repeatedly witnessed the use of excessive force by federal

officers, including spraying peaceful protesters in the face with chemical irritants, hitting

107810438.1 0099880-01343

protesters with batons and firing cannisters of tear gas indiscriminately into crowds of individuals protesting in a peaceful and lawful manner.

81.     On July 22, 2020, he was personally subjected to such unlawful actions when an unidentified federal officer shot him in the head with a tear gas cannister, causing a gash in his head that required seven stitches and a concussion that continues to have lingering effects.  At the time he was injured, Mr. Miller was standing in a crowd of individuals on Main Street, between SW Fourth and Fifth Avenues.  The crowd was peacefully protesting when federal officers began marching up Main Street while firing tear gas cannisters and impact munitions into the crowd without any advance warning or instructions.

82.     The crowd began to fall back in response to the tear gas and shooting.  Mr. Miller turned and began to move back as well.  As he retreated west on Main Street, he looked to his right and left and was then hit on the forehead.  He exclaimed, "I got hit! I got hit!" to his fiancée who was standing next to him.  She said she had been hit as well, apparently with the cannister that ricocheted off of Mr. Miller.  Mr. Miller looked down at his phone and saw that blood was streaming from his head.  His eye closest to the wound then filled with blood and he could not see.  He was deeply frightened by the volume of blood as he remembered the wound suffered at the protests by Donovan LaBella and he was unsure how badly he had been wounded.

83.     Mr. Miller's fiancée applied pressure to his forehead to stanch the bleeding.  She then led him in the same direction with the crowd, moving west on Main Street towards SW Fifth Avenue.  Mr. Miller and his fiancée then turned north on SW Fifth Avenue, at which point Mr. Miller could not walk further.  He sat down and his fiancée continued to apply pressure to the wound on his head and called for an ambulance.  They then walked to try to locate the emergency vehicle, but Mr. Miller passed out momentarily and was unable to continue walking.

Page 30   -   COMPLAINT

He was then helped into a safe vehicle where he laid down and then vomited twice. Eventually, he was transported to the hospital where he received treatment, including the removal of metal fragments from his wound, seven stitches, and a CAT scan.

84.     As a result of his injury, Mr. Miller has suffered significant pain, emotional trauma, memory loss and confusion, and irritability. He has been unable to work and the potential of further injury has left him fearful of exercising his lawful right to peacefully protest during his recovery.

**5.    Plaintiff Nichol Denison.**

85.     Ms. Denison attended the protests at the Hatfield Courthouse on several occasions in June and July 2020. She witnessed the use of excessive force by federal officers, including the use of impact munitions, pushing and shoving, and the indiscriminate use of tear gas on individuals protesting in a peaceful and lawful manner.

86.     On July 24, 2020, she was personally subjected to such unlawful tactics when she had a tear gas cannister hurled into her head, causing a three-inch gash to her forehead that ultimately required 11 stitches. Ms. Denison had come to the protests that evening as a member of the Wall of Moms, an unincorporated association with a mission to support Black Lives Matter, and to protect protesters supporting Black Lives Matter from being subject to excessive use of force by the federal government. She wore a bright yellow short-sleeved tee shirt over a long-sleeved shirt, a respirator, and a bright yellow plastic hard hat with "BLM" written on it in black marker.

87.     Shortly before she was hit by the tear gas cannister, Ms. Denison was standing with the Wall of Moms outside the fence surrounding the Hatfield Courthouse. People in her vicinity were chanting and yelling, and some were banging on the fence, but there were no

lasers, no fireworks, and no items being thrown at the Hatfield Courthouse anywhere near where she was standing.  Ms. Denison herself did not engage in any violence or destruction of property. She merely stood in a line of women with arms linked, facing the fence, which was approximately eight feet in front of them.

88.     As she and others were chanting, Ms. Denison saw federal officers emerge from the Hatfield Courthouse.  They made no announcement or order to disperse.  Instead, they simply began launching cannisters of tear gas at the peaceful protesters without warning.  Some of the protesters who had leaf blowers tried to blow the gas back towards the federal agents.

89.     While this was occurring, approximately five additional federal officers dressed in black with the label "DHS" on their chests came out from the Hatfield Courthouse and rushed up to the fence line.  They had their weapons drawn and pointing directly at the women who were standing in the line with Ms. Denison.  Without any warning, the officers then began firing at Ms. Denison and the other women through gaps in the fence.  The weapons appeared to be shooting pepper balls or bullets the size of paint balls.  The officers were close enough that Ms. Denison could see them looking for people to shoot, including her.

90.     Ms. Denison was hit repeatedly and was then struck far more forcefully in the head by a tear gas cannister that was, on information and belief, thrown or shot from a position well above her in the Hatfield Courthouse.  Although she was wearing a yellow hard hat, the blow stunned her.  She tried to back away through the crowd, but the blow to her head made it difficult to move.  As she removed her mask to check her injury, she was exposed to additional tear gas, burning her face and eyes.  As she touched her head, she realized she was bleeding profusely.  Meanwhile, federal officers were discharging more gas cannisters at the protesters.

Page 32   -   COMPLAINT

91.    Ms. Denison then worked her way as best she could to a medic van where volunteers were offering treatment to injured protesters.  When she removed her hard hat and respirator to receive treatment, she found that she had a three-inch v-shaped gash that was gushing blood and was exposed to a significant amount of tear gas.  The wound was too severe to be treated on site, and Ms. Denison was taken to the VA hospital by some friends, where she received 11 stiches before being taken home.  A photo showing the wound on Ms. Denison's head taken at the hospital is below:



CS gas canister to the head.
7/24/20

92.    Once she was at home, Ms. Denison developed a black eye and major swelling from the injury.  Although she was exhausted by the incident, she was unable to sleep and suffered extreme anxiety, reliving the event in her mind and finding herself unable to stop crying.

93.    As a result of her injury, Ms. Denison has suffered pain and ongoing anxiety and irritability consistent with having received a concussion.  She has also incurred medical

107810438.1 0099880-01343

expenses, and suffered limitations on her ability to perform her daily tasks during her recovery and fear of repeated injury for exercising her lawful right to peacefully protest.

**6.    Plaintiff Maureen Healy.**

94.    Ms. Healy has attended protests supporting Black Lives Matter and opposing police violence against Black Americans at multiple locations in Portland, including the Hatfield Courthouse.

95.    On July 20, 2020, Ms. Healy was among a large group of protesters in Lownsdale Square in front of the Hatfield Courthouse who were peacefully protesting and chanting.  Just after midnight, she saw a small number of protesters trying to remove plywood from around the Hatfield Courthouse.

96.    Without warning, federal officers then appeared and began firing flash-bangs, impact munitions, and tear gas cannisters into the crowd.  The federal officers were approaching the Hatfield Courthouse and the crowd from the south, either from the Justice Center or the Federal Building.  The crowd began to fall back, and Ms. Healy heard other protesters telling people to walk and not run to avoid trampling each other.  Many people, however, including Ms. Healy, began to turn and run.  Just as she did so, Ms. Healy was hit in the head with a projectile that felt metallic and the size of a small can.  Although she was wearing a bike helmet at the time, the impact cut her face and gave her a black eye and concussion as shown below:

Page 35   -   COMPLAINT



97.    Ms. Healy realized she had been hit and was bleeding profusely.  After calling out for help, Ms. Healy was helped to some volunteer medics who sought to treat her injuries.  But federal officers continued to fire tear gas into the area, forcing them all to move farther away to a van where Ms. Healy was bandaged.  She was then driven to a location where her husband was able to pick her up and take her to the hospital for additional treatment.

98.    The actions of the federal officers caused Ms. Healy to suffer pain, fear, and anxiety.  Ms. Healy has been forced to take time off from work owing to her concussion and outsource work to colleagues.  She has had multiple medical appointments and still does not know what substance is trapped under her skin as a result of being struck by the metallic can. Although she would have liked to continue attending protests while the federal officers were deployed in and around the Hatfield Courthouse, she was afraid for her safety and did not do so.

107810438.1 0099880-01343

In other words, she has suffered a fear of repeated injury for exercising her lawful right to peacefully protest.

**7.     Plaintiff Christopher David.**

99.     On July 18, 2020, Mr. David attended the protests at the Hatfield Courthouse for the first time.  He decided to attend after seeing news and online video footage of protesters being attacked by federal officers, as well as the online video of an unknown person being abducted in an unmarked van by officers without any readily apparent identifying insignia.  He wanted to support the voices of the protesters in support of Black Lives Matter and against police violence.

100.     Mr. David arrived downtown at around 8:15 p.m. on July 18, 2020.  Mr. David was wearing a sweatshirt that said "NAVY" on the front.  He was also wearing a disposable surgical cloth facemask, but he was not wearing a respirator, helmet, or any other protective clothing.

101.     At around 10:45 p.m., as he was about to leave the protest, Mr. David saw federal officers emerging from the Hatfield Courthouse.  He saw them launch tear gas cannisters and rush a line of protesters standing in the intersection, knocking several to the ground.

102.     Mr. David was standing in Lownsdale Square at the time.  He was shocked by the federal officers' actions and walked into SW Third Avenue to talk to the officers, as shown below:



103.    Mr. David then attempted to ask the officers what they were doing and why they were not honoring their oath to support the Constitution.  The officers did not verbally respond or instruct Mr. David to move, but one of the officers trained his firearm on Mr. David's chest and then lowered it, after which another officer plowed into Mr. David to knock him back.

104.    Mr. David stumbled backwards in the street to recover his balance.  Two federal officers then approached Mr. David, one after the other, and struck him with their batons while one of them deployed a canister of chemical irritant spray directly into Mr. David's face.  Mr. David was able to knock the cannister away in self-defense only to have another officer approach and spray him in the face again.

105.    In addition to being sprayed twice in the face, Mr. David believes that he was struck with a baton at least five times, including a blow to his right hand.  Mr. David tried to

107810438.1 0099880-01343

move away, but the officers kept hitting him and spraying him with irritant.  An officer struck him across the back with a baton after he had completely turned around and begun walking away.

106.    Mr. David was unable to see or move freely as a result of the chemicals deployed directly in his eyes and face.  He moved away gingerly, walking through a cloud of tear gas, and sat down on a park bench, where a volunteer street medic helped him with his injuries before locating an ambulance for him.

107.    The ambulance took Mr. David to Portland's VA hospital, where he learned that his right hand had been broken in two places as a result of the baton beating from the federal officers.  His ring finger required surgery.

108.    At the time of the incident, Mr. David did not know which federal agency employed the officers who beat and gassed him.  Subsequently, however, Kenneth Cuccinelli (purportedly Acting Deputy Secretary of the DHS) indicated that officers involved in beating Mr. David were USMS officers.[49]

109.    Mr. David would like to return to the protests but has not done so because of the beating that he received and the concerns of his family members that he will be further injured if he returns.  "[S]ometimes I have to listen to better advice from other people," he was forced to

---

[49] Deborah Bloom, *Navy Veteran Says He Was Beaten 'Like a Punching Bag' in Portland*, Reuters, July 20, 2020, https://www.reuters.com/article/us-global-race-protests-portland-veteran/navy-veteran-says-he-was-beaten-like-a-punching-bag-in-portland-idUSKCN24L2CP; Video, *Navy Vet Says Authorities Beat Him at Portland Protest*, CNN (July 21, 2020), https://www.cnn.com/videos/us/2020/07/21/portland-protest-chris-david-navy-vet-ken-cuccinelli-response-sot-vpx.cnn.

Page 39   -   COMPLAINT

conclude. "I am 53 and am not indestructible."[50]  In other words, he is fearful of repeated injury for exercising his lawful right to peacefully protest.

### 8. Plaintiff Duston Obermeyer.

110.    Like Mr. David, Mr. Obermeyer attended the protests outside the Hatfield Courthouse for the first time on July 18, 2020.  He was motivated by press reports that federal officers were using excessive force to suppress the protests.  He believed the protesters should be free to express their views in favor of Black Lives Matter and against systemic racism—views he supported himself.  Mr. Obermeyer was dressed in ordinary clothes with a cotton mask on his face.  He was not wearing any protective gear.

111.    When Mr. Obermeyer arrived at the protests, he witnessed a large number of people talking and chanting emotionally about Black Lives Matter, police reform, and more general government reform.  The protests were generally very peaceful and Mr. Obermeyer did not observe protesters engaged in any actions that would appear to justify a harsh response from law enforcement.

112.    At close to 11:00 p.m., as Mr. Obermeyer was standing in Lownsdale Square facing the Hatfield Courthouse, he noticed a commotion on the right side of the front of the building.  He then saw a phalanx of federal officers begin marching north towards a group of protesters who were chanting in the middle of SW Third Avenue.  Mr. Obermeyer did not see any identification on the officers' fatigues, but he did note that they were heavily armed, with batons and automatic weapons.

---

[50] Danielle Zoellner, *'They Just Started Whaling on Me': Veteran Speaks Out After Video of Federal Officers Beating Him at Portland Protests Goes Viral*, The Independent, July 20, 2020, https://www.independent.co.uk/news/world/americas/portland-protests-trump-veteran-christopher-david-federal-officers-oregon-a9627466.html.

113.    Mr. Obermeyer then saw the officers shoot tear gas into the crowd without any advance warning and push a woman to the ground.  The woman was thrown to the ground with such force that she slid across the pavement.  Mr. Obermeyer saw no provocation for this use of force by the federal officers.

114.    Mr. Obermeyer was shocked by what he saw and approached the federal officers in front of the Hatfield Courthouse.  While he was standing in SW Third Avenue with his hands up in a gesture showing that he meant no harm, Mr. Obermeyer heard a man to his left—whom he did not know, but whom he later learned to be Mr. David—ask the officers if they understood their oath of office.  They did not respond.  Mr. Obermeyer then repeated Mr. David's question, and asked the federal officers whether they understood what an illegal order was.

115.    The federal officers did not respond verbally to the questions that either Mr. David or he had posed, but one of them came up to Mr. David and struck him with a baton.  The same officer then tried to strike Mr. Obermeyer.  Other officers then approached and one pointed an automatic weapon in Mr. Obermeyer's face while another shot him at point-blank range with an orange chemical irritant.  One of the officers also struck Mr. Obermeyer in the face and chest with a baton.  A photograph of Mr. Obermeyer being sprayed in the face is set forth below:



107810438.1 0099880-01343

116.    Mr. Obermeyer's eyes and nose burned terribly from the chemical and immediately closed up.  The burning spread to every part of his body touched by the chemical. He was blinded, had difficulty breathing, and required the assistance of other protesters to guide him away and flush out his eyes.  While medics attended to him, he listened to the sounds of gunfire, artillery simulation rounds, CS gas canisters being deployed, and protesters screaming. To Mr. Obermeyer, a veteran of the wars in Iraq and Afghanistan, it sounded like a combat zone.

117.    The injuries Mr. Obermeyer suffered initially left him unable to walk.  After some time, he was able to make it a block or so away from the scene where he continued to use eye-wash solution and water to flush his eyes and head.  After still more time, he was able to walk to his car, but he still did not feel that he could drive and he called his wife who came and picked him up.  When he got home, Mr. Obermeyer took multiple showers but was unable to completely rinse off the chemical that the officers had sprayed on him, which continued to burn his skin and eyes, as well as the inside of his chest.

118.    Mr. Obermeyer's injuries persisted, and it was three days before he felt well enough to resume his normal activities or to return to the protests, which he has only been able to do on a limited basis.  Even in subsequent days, he has continued to have breathing problems and felt pain in his chest and lungs.  He, too, has suffered a fear of repeated injury if he exercises his lawful right to peacefully protest.

**9.    Plaintiff James McNulty.**

119.    Mr. McNulty attended the protests outside the Hatfield Courthouse on July 21, 2020.  He went because he believed that the federal officers were preventing demonstrators from expressing their legitimate grievances about systemic racism.  He wanted to be another voice to stand up and say that what was happening is unacceptable.

107810438.1 0099880-01343

120.    Mr. McNulty arrived at the protests shortly after 9:00 p.m.  He saw no vandalism, no fires, and nothing being thrown.  The protests were peaceful.

121.    At approximately 11:15 p.m., Mr. McNulty was standing with other protesters on SW Third Avenue near the intersection with Madison Street when he heard flash-bang grenades. When he looked towards the Hatfield Courthouse, he saw federal officers wearing camouflage uniforms marching up Main Street towards the intersection with SW Third Avenue, launching tear gas cannisters and smoke grenades.  The officers came without any warning, and Mr. McNulty did not hear them issue any orders of any kind.  The group of protesters standing next to him began to retreat, and Mr. McNulty followed them as the federal officers advanced up Main Street.

122.    A flash-bang grenade then went off at Mr. McNulty's feet, and the area began to fill with tear gas, which was blowing towards Mr. McNulty.  To escape from the tear gas, Mr. McNulty moved through the intersection of Main Street and SW Third Avenue, crossing in front of the federal officers.  As he crossed the intersection, his eyes and face began to burn.  The federal officers then shot Mr. McNulty four times: three times with rubber bullets and one time with a pepper ball.  He was given no warning and was not disobeying any orders or engaging in any violence before he was shot.

123.    Mr. McNulty was bleeding, in considerable pain, and unable to move easily.  He sought out volunteer medics who could assist him.  The medics provided Mr. McNulty with short-term treatment and sent him to a hospital emergency room.  At the emergency room, Mr. McNulty learned that one of the munitions that struck him in the back had not only gone through his clothes, but pieced his skin, fat layer, and at least one layer of muscle.  The wound was severe enough that Mr. McNulty had to have a CT scan to confirm that it had not punctured his

107810438.1 0099880-01343

peritoneal cavity.  A photograph showing two of his wounds taken at the emergency room where

he received treatment is set forth below (with personal identifying information redacted):



124.    Mr. McNulty's injuries caused him considerable pain, suffering, and emotional

trauma, as well as medical expenses, and an inability to conduct his daily activities in a normal

107810438.1 0099880-01343

manner during the period of his recovery.  In addition, they have made him fearful of repeated injury for exercising his lawful right to peacefully protest.

**10.    Plaintiff Black Millennial Movement.**

125.    On June 5, 2020, a group of younger Black citizens in the Portland area gathered together to create the Black Millennial Movement.  These individuals came together in response to the killings of George Floyd and so many other Black citizens at the hands of the police.  With national attention finally being focused on racial justice, these individuals sought to uplift the concerns shared by many Black Millennials, including student debt, economic opportunity, housing and home ownership, and political representation.

126.    The group was organized by Cameron Whitten, a 29-year old Oregonian, who created a Facebook group and invited several other young Black leaders in the Portland community to join him, including Gregory McKelvey, Shanice Clarke, and Candace Avalos. The Black Millennial Movement originated in that Facebook group.

127.    Traditionally, the press has focused on only one segment of Black leadership; the Black Millennial Movement seeks to provide an alternate voice and educate others about the disproportionate use of force used by law enforcement towards largely nonviolent protesters—a perspective that has not traditionally received media attention.

128.    Portland-area media, such as television station KATU, have looked to members of the Black Millennial Movement to understand the opinions on the Portland protests held by younger Black leaders in Portland, including how the public pressure caused by the protests is forcing local leaders to be more responsive than they have been previously.[51]

---

[51] Lincoln Graves, *Black Millennial Movement seeks to offer different perspective among Black leaders*, KATU, July 30, 2020, https://katu.com/news/local/black-millennial-movement-seeks-to-offer-different-perspective-among-black-leaders.

129.    Members of the Black Millennial Movement were regular participants in the nonviolent protests outside of the Hatfield Courthouse.  While attending those protests, members of the Black Millennial Movement have been repeatedly tear-gassed when federal officers deploy tear gas in an effort to disperse the largely peaceful crowds.  Members of the Black Millennial Movement have suffered injuries from the tear gas used by the federal officers, including vomiting, debilitating pain, and irritation to their eyes, skin, and respiratory systems lasting nearly a week after the respective protest in which they were inflicted.

130.    Being subjected to tear-gassing by federal officials further adversely affected Black Millennial Movement's ability to engage in free speech and to raise its concerns about the racial violence and injustice faced by the Black community.  After experiencing the harm caused by the tear gas deployed by federal officers and seeing video footage of disproportionate violence deployed against nonviolent protesters on a nightly basis, members of the Black Millennial Movement have been fearful of exercising their lawful right to peacefully protest at the Hatfield Courthouse.

**11.    Plaintiff Rose City Justice, Inc.**

131.    Rose City Justice, Inc. ("Rose City Justice") is a Black-led, BIPOC supported, grassroots organization committed to unifying local activism efforts in response to historical racial inequities by the justice system.  While Rose City Justice initially operated as an informal group following the murder of George Floyd, it incorporated as an Oregon nonprofit corporation in June 2020.  Rose City Justice has organized peaceful protests in various neighborhoods in Portland, including ones in front of the Multnomah County Justice Center and adjacent to the Hatfield Courthouse, and participated in the Black Lives Matter protests outside the Hatfield Courthouse.

107810438.1 0099880-01343

132.    After the presence of federal officers and their use of excessive force against protesters increased in early July, Rose City Justice focused its efforts on providing support and safety equipment to protesters outside the Hatfield Courthouse, including helmets, goggles, and masks.  Its members assisted protesters who were injured by the use of tear gas, rubber bullets, and concussion grenades by federal officers against peaceful protesters and were injured themselves by the officers' tactics.  Several members of Rose City Justice have bruises from being shot with rubber bullets and experienced the adverse effects of tear gas.

133.    Being subjected to federal officers' excessive use of force against protesters caused Rose City Justice to utilize its resources to support the peaceful protesters and deterred their ability to organize and engage in other protest activities.  The federal officers' presence in Portland also inhibited its ability to advocate for ending racial inequities, especially as it related to its efforts to divert funds from the Portland Police Bureau to other community activities

## FIRST CLAIM FOR RELIEF

### (Violation of Fourth Amendment Right Against Unlawful Search and Seizure – *Bivens* Claim)

### (Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against Defendants Wolf, Russell, and Does in Their Individual Capacities)

134.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1 through 133 as though fully set forth herein.

135.    Plaintiffs bring this claim against Defendants Wolf, Russell, and Does in their individual capacities.

136.    The actions of Defendants Does—including (1) the use of unjustifiable and excessive physical force against Plaintiffs Smiff, Miller, Denison, Healy, David, Obermeyer, and McNulty in an effort to move them from public spaces in which they gathered to express their

political opinion and/or in retaliation against Plaintiffs for their viewpoints, (2) the seizure of Mr. Pettibone without probable cause or a judicially authorized warrant, or, alternatively, (3) the extraordinary manner of Mr. Pettibone's seizure (an abduction off a public street in the early hours of the morning without stated justification by unidentified individuals who emerged from an unmarked van, whose clothing did not identify their name or agency or government, who did not identify themselves, and who Congress had not authorized to make warrantless arrests in the first place)—and the actions of Defendants Wolf and Russell in ordering or approving such actions deprived Plaintiffs of their rights to be free from unlawful searches and seizures secured to them under the Fourth Amendment to the United States Constitution.

137.    Defendants Wolf, Russell, and Does acted in clear violation of well-settled law with regard to standards for seizure of which a reasonable law enforcement officer in Defendants' positions should have been aware.  They are not entitled to qualified or official immunity.

138.    The actions of Defendants Wolf, Russell, and Does were intentional, malicious, and reckless and showed a callous disregard for, or indifference to, the federally protected civil rights of Plaintiffs.

139.    Defendants Wolf, Russell, and Does are jointly and severally liable to Plaintiffs pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Plaintiffs have no adequate alternative remedy.

140.    As a direct and proximate result of the unlawful actions of these Defendants, Plaintiffs are entitled to recover damages from Defendants Wolf, Russell, and Does, and each of them.

## <u>SECOND CLAIM FOR RELIEF</u>

**(Violation of First Amendment (Violation of Freedom of Speech and Assembly))**

**(Plaintiffs Black Millennial Movement and Rose City Justice Against Individual Defendants Wolf and Russell and Does in Their Official Capacities)**

141.    Plaintiffs Black Millennial Movement and Rose City Justice hereby reallege and incorporate by reference the allegations in paragraphs 1 through 140 as though fully set forth herein.

142.    The actions of Defendants Wolf and Russell in ordering and/or approving the indiscriminate use of excessive force against Plaintiffs Black Millennial Movement and Rose City Justice and their members as set forth above—violated and threatens to continue to violate the First Amendment rights of freedom of speech and assembly of Plaintiffs Black Millennial Movement and Rose City Justice and their members.

143.    Defendants Wolf and Russell's actions were based on the viewpoint being expressed by Plaintiffs Black Millennial Movement's and Rose City Justice's members.  But for their nonviolent participation in the protests at the Hatfield Courthouse in support of Black Lives Matter and against police violence towards Black Americans.  Defendants would not have ordered the indiscriminate deployment of tear gas and other chemical agents, flash-bangs, and less-lethal impact munitions and caused injury to Black Millennial Movement's and Rose City Justice's members.

144.    Defendants' actions of ordering and/or approving violence and/or deployment of tear gas and other chemical agents, flash-bangs, and impact munitions against protesters, including members of Plaintiffs Black Millennial Movement and Rose City Justice, in retaliation against Plaintiffs Black Millennial Movement's and Rose City Justices' members' expression of their viewpoints and exercise of their First Amendment rights.  Based on Defendants' past actions and the continued presence of federal law enforcement officials deployed as part of

Page 49   -   COMPLAINT

"Operation Diligent Valor," Defendants are reasonably likely to take similar actions in the future.

145.    By depriving Plaintiffs Black Millennial Movement and Rose City Justice of the opportunity to express their views and retaliating against them and their members on the basis of their views, Defendants have violated Plaintiff Black Millennial Movement's and Rose City Justices' First Amendment rights and are imposing ongoing irreparable harm upon Plaintiffs. Plaintiff Black Millennial Movements' effectiveness as an organization will be irreparably harmed by its inability to generate participation at protest events because potential participants will have been deterred from participation by the threat of unjustified use of violence and/or tear gas.  Rose City Justice's ability to advocate for racial justice and to advance its mission was irreparably harmed by forcing it to divert resources to protect its members and supporters at protests in front of the Hatfield Courthouse and preventing it from engaging in free speech and assembly, in responses to Defendants' practices.

146.    The Court has inherent equitable power to enjoin violations of federal law by federal officials.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

### THIRD CLAIM FOR RELIEF

**(Unlawful Agency Action Exceeding Statutory Authority Under
40 U.S.C. § 1315 – 5 U.S.C. §§ 702, 706)**

**(Plaintiff Pettibone Against Defendants Wolf and Russell in Their Official Capacities, and
DHS and USMS)**

147.    Mr. Pettibone hereby realleges and incorporates by reference the allegations in paragraphs 1 through 146 as if fully set forth herein.

148.    The arrest of Mr. Pettibone was pursuant to a policy adopted by Defendants DHS, USMS, Wolf and Russell.

Page 50   -   COMPLAINT

149.    The policy pursuant to which Mr. Pettibone was arrested is an agency action, within the meaning of 5 U.S.C. § 551.

150.    The policy pursuant to which Mr. Pettibone was arrested is a final action, ripe for judicial review, within the meaning of 5 U.S.C. § 704.

151.    Federal government officials have issued statements approving of the policy leading to the arrest of Mr. Pettibone.

152.    Defendants DHS, USMS Wolf, Russell, and Defendant Does, acting pursuant to the policy they had put in place, had no statutory authority to arrest Mr. Pettibone without a warrant, as set forth below.

a.    There has been no valid designation of Defendants Does for duty in Portland in connection with the protection of property owned or occupied by the federal government or persons on such property pursuant to 40 U.S.C. § 1315(b)(1) because Defendant Wolf lacked the authority to make that designation and his purported designation has no force or effect.

b.    The arrest of Mr. Pettibone by Defendants Does occurred blocks away from the Hatfield Courthouse and beyond the geographic limit of "areas outside the property" within the meaning of 40 U.S.C. § 1315(b)(1).

c.    Defendants Does patrol of the area where they arrested Mr. Pettibone, blocks away from the Hatfield Courthouse, was beyond "the extent necessary to protect" the property or persons on the property within the meaning of 40 U.S.C. § 1315(b)(1).

d.    Employees of DHS, including Defendants Does, do not possess any power under 40 U.S.C. § 1315(b)(2) to make warrantless arrests, let alone warrantless arrests without probable cause that a crime has been committed, while off the federal property.

Page 51  -   COMPLAINT

e.     Mr. Pettibone did not commit a federal offense in the presence of Defendants Does.

f.     Defendants Does did not have "reasonable grounds," within the meaning of 40 U.S.C. § 1315(b)(2)(C), to believe that Mr. Pettibone had committed or was committing a felony under the laws of the United States.

g.     Even assuming Defendants Does had "reasonable grounds" within the meaning of 40 U.S.C. § 1315(b)(2)(C), to believe that Mr. Pettibone had committed or was committing a felony under the laws of the United States, such "reasonable grounds" do not constitute probable cause sufficient to justify an arrest.

153.   The policy that led to the arrest of Mr. Pettibone was an agency action (a) not in accordance with law, (b) contrary to constitutional right, power, privilege, or immunity, (c) in excess of statutory authority, and/or (d) without observance of procedure required by law.

154.   The Court should hold the policy that led to the arrest of Mr. Pettibone to be unlawful.

155.   As a direct and proximate cause of his arrest, Mr. Pettibone has suffered legal wrong and/or was aggrieved and is realistically threatened by a repetition of Defendants' unlawful acts.

## **FOURTH CLAIM FOR RELIEF**

**(Unlawful Agency Action by Deployment of Force Against Protesters Exceeding Authority Under 40 U.S.C. § 1315 – 5 U.S.C. §§ 702, 706)**

**(Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against Defendants Wolf and Russell in Their Official Capacities, and DHS and USMS)**

156.   Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1 through 155 as though fully set forth herein.

Page 52  -   COMPLAINT

157.    As alleged herein, Defendants Wolf, Russell, DHS and USMS orderd, supervised and implemented the deployment of excessive physical force—including use of pepper spray, impact munitions, batons, chemical agents, and/or physical "charges" by law enforcement officers against Plaintiffs—to forcibly remove them from public spaces in which they gathered with others to lawfully express their political opinions, or in retaliation against Plaintiffs and other protesters for their viewpoints, purportedly pursuant to their statutory authority under 40 U.S.C. § 1315.

158.    The policy of deploying excessive physical force against Plaintiffs was an agency action, within the meaning of 5 U.S.C. § 551.

159.    The policy of deploying excessive physical force against Plaintiffs was a final action, ripe for judicial review, within the meaning of 5 U.S.C. § 704.

160.    Defendants Wolf, Russell, Does, DHS, and USMS had no statutory authority to deploy excessive physical force against Plaintiffs, as set forth below:

a.      There has been no valid designation by Defendant Wolf of Defendants Does for duty in Portland in connection with the protection of property owned or occupied by the federal government or persons on such property pursuant to 40 U.S.C. § 1315(b)(1), because Defendant Wolf lacked the authority to make that designation and his purported designation has no force or effect.

b.      Defendants Does deployed force against Plaintiffs while off federal government property in a manner that was not "necessary to protect the property and persons on the property," 40 U.S.C. § 1315(b)(1), often forcing protesters to move blocks away from the Hatfield Courthouse..

c.   Defendants Does deployed force to arrest Mr. Pettibone and others without the authority or grounds to make any such arrest.

161.   The policy of deploying excessive force against Plaintiffs was an agency action (a) not in accordance with law, (b) contrary to constitutional right, power, privilege, or immunity, (c) in excess of statutory authority, and/or (d) without observance of procedure required by law.

162.   The Court should hold the policy of deploying of excessive force against Plaintiffs unlawful.

163.   As a direct and proximate cause of deployment of force against Plaintiffs, Plaintiffs have suffered legal wrong and/or are aggrieved and are realistically threatened by a repetition of the unlawful acts of Defendants Wolf, Russell, Does, and DHS.

## **FIFTH CLAIM FOR RELIEF**

**(Violation of Fourth Amendment (Right to be Free from Unreasonable Search and Seizures))**

**(Plaintiff Mark Pettibone Against Defendants Wolf and Russell in Their Official Capacities, and DHS and USMS)**

164.   Mr. Pettibone hereby realleges and incorporates by reference the allegations in paragraphs 1 through 163 as if fully set forth herein.

165.   The actions of Defendants in (a) ordering and/or approving the arrest of Mr. Pettibone and (b) the search of his belonging while in federal custody, both of which were done without probable cause or pursuant to any applicable exception under the Fourth Amendment of the United States Constitution, violated Mr. Pettibone's rights to be free from unlawful searches and seizures.

107810438.1 0099880-01343

166.    This Court has inherent equitable power to issue declaratory and injunctive relief, including to enjoin violations of federal law by federal officials.  *See Armstrong*, 575 U.S. 320.

## SIXTH CLAIM FOR RELIEF

### (*Ultra Vires* Action)

### (Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against Defendants Trump, Wolf, and Russell in Their Official Capacities, and DHS and USMS)

167.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1 through 166 as if fully set forth herein.

168.    To the extent any of Defendants' actions are unreviewable under any of the preceding causes of action, this Court has jurisdiction to review Defendants' actions under the doctrine of non-statutory review.

169.    As alleged herein, Defendants' actions exceeded the authority conferred on Defendants by Congress.

170.    As alleged herein, Defendants' actions were contrary to the United States Constitution.

171.    Plaintiffs are entitled to a declaration that Defendants' actions were *ultra vires*.

172.    As a direct and proximate cause of Defendants' *ultra vires* actions, Plaintiffs have suffered legal wrong and are realistically threatened by a repetition of Defendants' unlawful acts.

Page 55  -   COMPLAINT

## SEVENTH CLAIM FOR RELIEF

### (Violation of 42 U.S.C. § 1985(3) (Conspiracy to Deprive Rights))

### (Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against Defendants Wolf, Russell, and Does in Their Individual Capacities)

173.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1 through 172 as if fully set forth herein.

174.    Plaintiffs bring this claim against Defendants Wolf, Russell, and Does in their individual capacities.

175.    Defendants Wolf, Russell, and Does conspired together to deprive Plaintiffs of their civil rights in violation of 42 U.S.C. § 1985(3).

176.    The conspiracy included those involved in ordering and executing "Operation Diligent Valor" and conducting law enforcement actions in connection with that operation, including Defendants Wolf, Russell, and Does.

177.    The conspirators engaged in overt acts in furtherance of the conspiracy, including, but not limited to, using excessive force against civil rights activists outside the Hatfield Courthouse and in the surrounding area between July 4, 2020 and July 29, 2020, including shooting them in the head and body with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting and beating them with batons, firing massive clouds of tear gas at them, and, in some instances, arresting and detaining them without any lawful basis.

178.    The conspiracy targeted Black Americans and their supporters, who were protesting on behalf of Black Lives Matter and in opposition to disproportionate police violence against Black Americans.  Both groups are protected classes under 42 U.S.C. § 1985(3).

Page 56  -   COMPLAINT

179.    Defendants Wolf and Russell directed the conspiracy to take these actions because of their adverse effects upon an identifiable group—namely, civil rights activists protesting on behalf of Black Lives Matter and in opposition to Defendants Wolf, Russell, and Does.

180.    The conspiracy targeted Plaintiffs' protected First Amendment activities because Defendants held animus towards Plaintiffs' viewpoints as reflected in, but not limited to, the public statements of Defendants Trump and Wolf.  The violent actions of the conspirators directly interfered with Plaintiffs' protected First Amendment activities.

181.    The conspiracy violently interfered with Plaintiffs' rights to use public accommodations, and therefore their right to be free from the badges and incidents of slavery. Lownsdale Square, SW Third Avenue, and the surrounding environs are places of public accommodation.

182.    Defendants Wolf, Russell, and Does are liable in their individual capacities under 42 U.S.C. § 1985(3) for damages.

183.    Defendants Wolf, Russell, and Does are liable for punitive damages due to their willfully or recklessly depriving Plaintiffs of the equal protection of the laws and/or equal privileges and immunities under the laws.

**EIGHTH CLAIM FOR RELIEF**

**(Violation of 42 U.S.C. § 1986 (Failure to Prevent a Conspiracy to Deprive Rights))**

**(Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against Defendants Wolf, Russell, and Does in Their Individual Capacities)**

184.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1 through 183 as if fully set forth herein.

Page 57  -  COMPLAINT

185.    Defendants Wolf, Russell, and Does violated 42 U.S.C. § 1986 by failing to meet their duty to prevent or aid in preventing a conspiracy to deprive civil rights.

186.    Defendants Wolf, Russell, and Does knew that a Section 1985 violation was about to occur or was occurring, had the power to prevent or aid in preventing it, and neglected or refused to prevent or aid in preventing it.

187.    As set forth above, the Section 1985 conspiracy consisted of using excessive force against civil rights activists outside the Hatfield Courthouse and in the surrounding area between July 4, 2020 and July 29, 2020, including shooting them in the head and body with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting and beating them with batons, firing massive clouds of tear gas at them, and, in some instances, arresting and detaining them without any lawful basis, for the purpose of depriving them of equal privileges and immunities under the laws.  Defendants Wolf, Russell, and Does knew such violence was planned and could have taken actions to stop or limit that violence.  Defendants Wolf, Russell, and Does willfully or negligently took no such action.

188.    Defendants Wolf, Russell, and Does could have and should have refused to issue or comply with unlawful orders, refused to use unlawful force against Plaintiffs, refused to order or allow officers under their command to carry out unlawful acts against Plaintiffs, and/or attempted to appeal to superiors to take a different course of action.

189.    As a result of Defendants Wolf, Russell, and Does' failure to prevent the Section 1985 conspiracy, Plaintiffs were injured and their rights were violated.

190.    Defendants Wolf, Russell, and Does acted with reckless or callous indifference to the federally protected rights of Plaintiffs and are therefore liable for punitive damages.

Page 58  -  COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

1.    Issue a declaration that the acts of Defendants Wolf, Russell, and Does described

herein violated the Fourth Amendment to the United States Constitution as well as

42 U.S.C. § 1985 and 42 U.S.C. § 1986;

2.    Issue a declaration that Defendants Wolf and Russell's actions in ordering and/or

supervising the indiscriminate use of excessive force against Plaintiffs Black

Millennial Movement and Rose City Justice violated the First Amendment to the

United States Constitution;

3.    Issue a declaration that the policy under which Mr. Pettibone was arrested was an

unlawful agency action (a) not in accordance with law, (b) contrary to

constitutional right, power, privilege, or immunity, (c) in excess of statutory

authority, and/or (d) without observance of procedure required by law;

4.    Issue a declaration that the policy under which excessive force was

indiscriminately deployed against Plaintiffs was an unlawful agency action (a) not

in accordance with law, (b) contrary to constitutional right, power, privilege, or

immunity, (c) in excess of statutory authority, and/or (d) without observance of

procedure required by law;

5.    Issue a declaration that Defendants' unlawful arrest of Mr. Pettibone violated the

Fourth Amendment;

6.    Enjoin Defendants to inform Mr. Pettibone whether Defendants maintain records

relating to his unlawful arrest, including without limitation, photographs, notes

107810438.1 0099880-01343

and/or records of the arrest, and any information collected from Mr. Pettibone's cell phone;

7.     Enjoin Defendants to inform Mr. Pettibone whether Defendants disseminated records relating to Mr. Pettibone's arrest to other individuals and/or agencies;

8.     Enjoin Defendants to expunge all records and information they have retained about Mr. Pettibone collected during his unlawful arrest, including any information collected from his cell phone;

9.     Issue a declaration that Defendants' actions were *ultra vires*;

10.    Award compensatory and punitive damages to Plaintiffs according to proof at trial, including damages for pain and suffering;

11.    Award costs of suit and attorneys' fees; and

12.    Provide such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

13.    Plaintiffs demand a jury trial.

DATED:  August 26, 2020.

STOEL RIVES LLP

_s/ Per A. Ramfjord_
Per A. Ramfjord, OSB No. 934024
per.ramfjord@stoel.com
Jeremy D. Sacks, OSB No. 994262
jeremy.sacks@stoel.com
Crystal S. Chase, OSB No. 093104
crystal.chase@stoel.com
Joel A. Mullin, OSB No. 862533
joel.mullin@stoel.com
Todd A. Hanchett, OSB No. 992787
todd.hanchett@stoel.com
Amy Edwards, OSB No. 012492
amy.Edwards@stoel.com
Geoffrey B. Tichenor, OSB No. 050958
geoffrey.tichenor@stoel.com
Rachel C. Lee, OSB No. 102944
rachel.lee@stoel.com
Andrew T. Ho, OSB No. 185047
andrew.ho@stoel.com
Jacob Goldberg, OSB No. 162565
jacob.goldberg@stoel.com
Telephone: (503) 224-3380

and

ACLU FOUNDATION OF OREGON
Kelly K. Simon, OSB No. 154213
ksimon@aclu-or.org
Telephone:   (503) 227-3986

_Attorneys for Plaintiffs Mark Pettibone,
Fabiym Acuay (a.k.a. Mac Smiff), Andre
Miller, Nichol Denison, Maureen Healy,
Christopher David, Duston Obermeyer,
James McNulty, Black Millennial
Movement, and Rose City Justice, Inc._

Page 61  -   COMPLAINT