Per A. Ramfjord, OSB No. 934024
per.ramfjord@stoel.com
Jeremy D. Sacks, OSB No. 994262
jeremy.sacks@stoel.com
Crystal S. Chase, OSB No. 093104
crystal.chase@stoel.com
STOEL RIVES LLP
760 SW Ninth Ave, Suite 3000
Portland, OR  97205
Telephone: (503) 224-3380

Kelly K. Simon, OSB No. 154213
ksimon@aclu-or.org
ACLU FOUNDATION OF OREGON
506 SW 6th Ave, Suite 700
Portland, OR 97204
Telephone: (503) 227-3986

Attorneys for Plaintiffs Mark Pettibone, Fabiym Acuay (a.k.a. Mac Smiff),
    Andre Miller, Nichol Denison, Maureen Healy, Christopher David,
    Duston Obermeyer, James McNulty, Black Millennial
    Movement, and Rose City Justice, Inc.

[*Additional counsel for Plaintiffs listed on signature page*]

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| MARK PETTIBONE, an individual; FABIYM ACUAY (a.k.a. MAC SMIFF), an individual; ANDRE MILLER, an individual; NICHOL DENISON, an individual; MAUREEN HEALY, an individual; CHRISTOPHER DAVID, an individual; DUSTON OBERMEYER, an individual; JAMES McNULTY, an individual; BLACK MILLENNIAL MOVEMENT, an organization; and ROSE CITY JUSTICE, INC., an Oregon nonprofit corporation, | Case No.: 3:20-cv-1464-YY<br><br>AMENDED COMPLAINT<br><br>(28 U.S.C. § 1332)<br><br>DEMAND FOR JURY TRIAL |
| Plaintiffs, | |

Page 1   -   AMENDED COMPLAINT

v.

DONALD J. TRUMP, in his official
capacity; CHAD F. WOLF, in his individual
and official capacity; GABRIEL RUSSELL,
in his individual and official capacity; JOHN
DOES 1-200, in their individual capacities;
UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; and UNITED
STATES MARSHALS SERVICE,

                    Defendants.

_____

    Plaintiffs Mark Pettibone, Mac Smiff, Andre Miller, Nichol Denison, Maureen Healy,

Christopher David, Duston Obermeyer, James McNulty, Black Millennial Movement, and Rose

City Justice, Inc. (collectively, "Plaintiffs"), for their Amended Complaint against the named

defendants ("Defendants"), allege as follows:

## I.  INTRODUCTION

    1.    Plaintiffs are individual Oregonians or, in the case of Black Millennial Movement

and Rose City Justice, Inc., associations of individual Oregonians who lawfully participated in

protests in Portland, Oregon directed against systemic racism and police violence towards Black

Americans following the Minneapolis Police killing of George Floyd on May 25, 2020.  This

action arises out of Defendants' unlawful attempts to crush Black protesters and their supporters

through the use of excessive force and illegal detentions against Plaintiffs in violation of their

rights under the First and Fourth Amendments of the United States Constitution as well as

federal statutory law.

    2.    As part of a federal mission known as "Operation Diligent Valor," spurred by

President Donald J. Trump and directed by the purported Acting Secretary of the United States

Department of Homeland Security ("DHS") Chad Wolf, the federal government deployed more

Page 2   -   AMENDED COMPLAINT

than a hundred federal law enforcement officers or agents employed by a variety of federal agencies in an alleged effort to "quell" the protests, which were occurring near the Mark O. Hatfield Federal Courthouse (the "Hatfield Courthouse") in the center of Portland.  Such federal law enforcement officials, heavily armed and clad in military-type camouflage or dark uniforms, indiscriminately used violent tactics on lawful protesters, including shooting them in the head and body with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting and beating them with batons, firing massive clouds of tear gas at them, and, in some instances, arresting and detaining them without any lawful basis. The federal agencies or divisions and their leaders and employees responsible for this conduct are the Defendants in this action.

3.     Defendants' actions in support of "Operation Diligent Valor" manifestly violated Plaintiffs' rights enshrined in the First and Fourth Amendments to the United States Constitution:  the rights to peaceful assembly, to freedom of speech, and to freedom from unwarranted governmental seizures.

4.     Defendants' actions also violated federal statutory law for at least four reasons:

a.     First, "Operation Diligent Valor" and the actions undertaken in Portland by federal officers were not legally authorized.  Pursuant to 40 U.S.C. § 1315(a), the Acting Secretary of DHS has limited statutory authority to designate DHS employees to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property."  Defendant Wolf, however, had no such authority, nor did any DHS employee purporting to exercise delegated authority on his behalf, because neither Defendant Wolf nor the prior individual who purported to serve in the role of Acting Secretary of DHS were properly serving as the

Acting Secretary of DHS under the requirements of the Homeland Security Act of 2002, 6 U.S.C. § 113(g), and the Federal Vacancies Reform Act, 5 U.S.C. § 3348. As a result, Defendant Wolf and other DHS officials had no authority whatsoever to designate employees under 40 U.S.C. § 1315 and the designation of DHS officers pursuant to "Operation Diligent Valor" was null and void.

b.    Second, even assuming Defendant Wolf or someone purporting to exercise delegated authority on his behalf had possessed the authority to designate officers pursuant to 40 U.S.C. § 1315, the federal officers deployed to Portland were not designated by the memoranda on which Defendants rely.

c.    Third, even assuming federal officers had been validly designated pursuant to 40 U.S.C. § 1315, the federal officers deployed to Portland exceeded the scope and terms of the designation by acting off federal property and/or by using force prior to the training that was a prerequisite for an officer to utilize the designated authority.

d.    Fourth, even assuming the officers deployed to Portland had been validly designated under 40 U.S.C. § 1315 and had acted within the scope and terms of that designation, the DHS officers conducting the operation exceeded their limited powers under 40 U.S.C. § 1315, which does not allow making warrantless arrests or taking actions such as detaining individuals or suppressing protests in locations that are away from, or not required to protect, federal property.

5.    Defendants' conduct and "Operation Diligent Valor" reflect Defendants' broader policy of violating Plaintiffs' First and Fourth Amendment rights through the use of excessive force and illegal detentions.

Page 4    -    AMENDED COMPLAINT

6.      Although Plaintiffs seek relief from actions undertaken by the Trump

Administration, protests in support of racial justice and against systemic racism and police

violence towards Black Americans will continue after Joseph R. Biden, Jr., is inaugurated as

president on January 20, 2021.  So will protests against other federal policies or actions.  The use

of force by federal officers against protesters thus affects protesters, including Plaintiffs, after the

Biden Administration takes over the reins of power.

7.      Plaintiffs are now asking the Court to protect them and vindicate their rights by

declaring Defendants' actions unlawful, entering appropriate injunctive relief, and awarding

them economic damages for the violation of their constitutional rights.

## II.  PARTIES

A.     **Plaintiffs.**

8.      Plaintiff Mark Pettibone is a 30-year-old resident of Maricopa County, Arizona,

and a citizen of the United States.  At the time of the events recounted herein, Mr. Pettibone was

a resident of Multnomah County, Oregon.  During the summer of 2020, he was employed as an

essential worker by a national grocery company.  He is a supporter of Black Lives Matter and

participated in the 2020 protests outside the Hatfield Courthouse.

9.      Plaintiff Fabiym Acuay (a.k.a. and referred to herein as Mac Smiff) is a 39-year-

old resident of Multnomah County, Oregon, and a citizen of the United States.  He is an artist, a

utility worker, and the editor-in-chief of a hip-hop magazine.  Mr. Smiff is a veteran activist and

has been attending Black Lives Matter events in Portland for more than six years, including the

protests outside the Hatfield Courthouse.

10.     Plaintiff Andre Miller is a 36-year-old resident of Clackamas County, Oregon,

and a citizen of the United States.  He is currently employed as a facilities and warehouse

manager.  He is a supporter of Black Lives Matter and participated in the 2020 protests outside
the Hatfield Courthouse on multiple occasions.

11.     Plaintiff Nichol Denison is a 39-year-old resident of Washington County, Oregon,
and a citizen of the United States.  She is a veteran of the United States Air Force and is
currently employed as an advisor at a global company that manufactures and retails personal care
products.  She participated in the protests outside the Hatfield Courthouse on multiple occasions
in 2020.

12.     Plaintiff Maureen Healy is a 52-year-old resident of Multnomah County, Oregon,
and a citizen of the United States.  She is currently employed as a history professor at Lewis &
Clark College in Portland, Oregon, where she also serves as Chair of the History Department.
During 2020, she participated in Black Lives Matter protests in multiple locations across the City
of Portland, including outside the Hatfield Courthouse.

13.     Plaintiff Christopher David is a 53-year-old resident of Multnomah County,
Oregon, and a citizen of the United States.  He is a graduate of the United States Naval
Academy, a former member of the United States Navy's Civil Engineer Corps, and currently
employed by the Department of Veteran's Affairs ("VA") hospital in Portland as a medical
technologist.  He participated in the protests outside the Hatfield Courthouse in Portland in 2020,
and is a co-founder of Wall of Vets, an unincorporated association initially formed to support the
Black Lives Matter protesters outside the Hatfield Courthouse.

14.     Plaintiff Duston Obermeyer is a 42-year-old resident of Clackamas County,
Oregon, and a citizen of the United States.  He is a graduate of the United States Naval
Academy, a decorated combat veteran of the United States Marine Corps, and currently works as

Page 6    -    AMENDED COMPLAINT

a real estate broker in Lake Oswego, Oregon. Like Plaintiff David, he participated in the 2020 protests outside the Hatfield Courthouse in Portland and is a co-founder of Wall of Vets.

15.     Plaintiff James McNulty is a 42-year-old resident of Multnomah County, Oregon, and a citizen of the United States. He is currently employed as an educational department manager at a local university hospital. He attended the 2020 protests outside the Hatfield Courthouse in support of Black Lives Matter and against the disproportionate use of police violence against Black individuals.

16.     Plaintiff Black Millennial Movement is an unincorporated association founded in June 2020 by Cameron Whitten, together with Gregory McKelvey, Shanice Clarke, Candace Avalos, and others, with a mission to reclaim space for the voice of Black Millennials on issues such as criminal justice, policing, and student debt. Members of Black Millennial Movement have participated frequently in the protests outside the Hatfield Courthouse, including during 2020, in support of Black Lives Matter and against the disproportionate use of police violence against Black individuals.

17.     Plaintiff Rose City Justice, Inc. is an Oregon nonprofit corporation whose mission is to bring awareness to the community, to reform systems founded on inequitable and racist ideals, and to demand justice in a nonviolent manner. In 2020, Rose City Justice, Inc.'s members participated in the Black Lives Matter protests outside the Hatfield Courthouse to provide support and assistance.

**B.      Defendants.**

18.     Defendant Donald J. Trump is the President of the United States. He participated with Defendant Wolf and others in setting in motion and causing deployment of "Operation Diligent Valor" during 2020, as well as in acquiescing in and ratifying the unconstitutional and

unlawful actions of DHS and other federal government employees as part of that operation and pursuant to an unconstitutional policy. He is sued in his official capacity.

19.     Defendant Chad F. Wolf is a government official who purports to serve as the Acting Secretary of DHS; however, he was not properly designated to that position in accordance with the Homeland Security Act of 2002, 6 U.S.C. § 113(g). He participated in setting in motion, causing, and supervising "Operation Diligent Valor," causing DHS employees to be supposedly designated to serve in that operation, and acquiescing in, ratifying, and failing to terminate the unconstitutional and unlawful actions of such employees pursuant to an unconstitutional policy as set forth below. He is sued in his individual and official capacities.

20.     On information and belief, Defendant Wolf knew or reasonably should have known that "Operation Diligent Valor" would cause and was causing the arrests of protesters and the repeated use of excessive force against protesters described herein. Defendant Wolf was personally involved in negotiations with state and local officials about the deploying of federal officers in Portland, including phone calls that he made to the mayor of Portland and the governor of Oregon on July 14, 2020. He also visited the Hatfield Courthouse in person on July 16, 2020, and met there with Portland Police Bureau officers and federal officers who were confronting protesters nightly. Defendant Wolf spoke repeatedly to the press about the unfolding events in Portland, including in media interviews during the month of July 2020, and during a press conference on July 21, 2020. He also testified on August 6, 2020, before the U.S. Senate Committee on Homeland Security and Governmental Affairs ("Senate Committee") about the federal response to the protests in Portland. In both his statements to the press and in his testimony to the Senate Committee, Defendant Wolf represented himself as being knowledgeable about the actions of DHS officers towards demonstrators in Portland. Indeed, he went so far as

to label news coverage of the federal officers as false in certain respects, including specifically denying that officers were stormtroopers, denying that DHS was acting against peaceful protesters, denying that the officers' clothing made them unidentifiable, and denying that the federal agencies were the cause of the violence. Defendant Wolf thereby indicated both that he was reviewing independent media reports of events in Portland and that he believed he possessed superior knowledge of federal officers' actions.

21.    Defendant Wolf publicly supported and failed to terminate the arrests and use of force by federal officers in Portland. Despite his awareness of the unlawful arrests of protesters and the repeated use of excessive force against them, he knowingly failed to order any change in tactics or response to avoid constitutional injury to peaceful protestors such as Plaintiffs. As of August 6, 2020, he had not suspended, terminated, or disciplined any DHS employee for actions against protesters in Portland. On information and belief, he failed to recommend or initiate discipline for any federal officers who arrested or used force against protesters in Portland. Defendant Wolf knowingly failed or refused to terminate DHS employees' unlawful arrests and use of excessive force with knowledge or in deliberate disregard of the risk that his inaction would cause federal officers to inflict constitutional injuries on Plaintiffs.

22.    Defendant Gabriel Russell is the Regional Director for Region 10 of the Federal Protective Service ("FPS"), which is an agency housed within DHS, where it is responsible for protection of federal property. He commanded the DHS Rapid Deployment Force for "Operation Diligent Valor" in Portland and is responsible for the actions of the federal employees who conducted that operation and acted pursuant to an unconstitutional policy and who, upon information and belief, currently remain stationed in the Pacific Northwest and the Portland, Oregon, area. He is sued in his individual and official capacities.

Page 9    -    AMENDED COMPLAINT

23.     Defendant Russell's job duties include ensuring that the officers in the DHS Rapid Deployment Force for "Operation Diligent Valor" in Portland comply with applicable law, standards, and practices and that they do not use excessive force. On information and belief, he knew or reasonably should have known that no DHS employees were identified by the purported designations pursuant to 40 U.S.C. § 1315 that were signed by FPS Director Eric Patterson. On information and belief, he knew or reasonably should have known the terms and scope of the purported designations pursuant to 40 U.S.C. § 1315 of DHS employees who participated in the DHS Rapid Deployment Force for "Operation Diligent Valor" in Portland.

24.     Defendant Russell has tactical control of the DHS Rapid Deployment Force in "Operation Diligent Valor" in Portland, including officers from FPS, United States Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). Beginning on July 4, 2020, he implemented tactics that included identifying and arresting individual protesters. According to a July 21, 2020 statement by Mark Morgan, then-Acting Commissioner of CBP, while a "multitude" of federal agencies were involved in the arrests, every arrest was coordinated by a unified command under FPS leadership.[1]

25.     On information and belief, Defendant Russell knew or reasonably should have known that officers in the DHS Rapid Deployment Force for "Operation Diligent Valor" in Portland would cause and were causing the arrests of protesters and the repeated use of excessive force against protesters described herein. During at least the period from July 12, 2020 through July 29, 2020, Defendant Russell personally observed protesters in Portland and the actions of federal officers from an incident command post or an emergency operations center. He also

---

[1] DHS/CBP Press Conference (July 21, 2020),
https://www.youtube.com/watch?t=2112&v=2XTYITCtFlc&feature=youtu.be.

monitored social media and reviewed publicly available videos showing events at the protests. He was aware of the use of force against protesters by federal officers, including but not limited to the use of force against Plaintiff Christopher David.  On information and belief, he also directed and was aware of the arrests of protesters, including Plaintiff Mark Pettibone.

26.     Despite his awareness of the unlawful arrests of protesters and the repeated use of excessive force against them, Defendant Russell knowingly failed to order any change in tactics or response to avoid unconstitutional injury to peaceful protestors such as Plaintiffs.  On information and belief, Defendant Russell failed to take action to stop the arrests and use of excessive force by federal officers or the arrests and use of force by DHS officers who were not designated by the purported 40 U.S.C. § 1315 designations or whose actions exceeded the terms and scope of the purported designations.  On information and belief, he failed to recommend or initiate discipline for federal officers who unlawfully arrested or used excessive force against protesters in Portland.  Defendant Wolf knowingly failed or refused to terminate DHS employees' unlawful arrests and use of excessive force with knowledge or in deliberate disregard of the risk that his actions and omissions would cause federal officers to inflict constitutional injuries on Plaintiffs.

27.     Defendants Does 1-200 ("Defendant Does") are unknown officers, agents, or contract employees of DHS and/or the United States Marshals Service ("USMS") deployed to Portland under color of federal authority as part of or in connection with "Operation Diligent Valor" and pursuant to an unconstitutional policy.  They are not readily identifiable because they frequently acted in groups and wore uniforms, helmets, and/or other clothing without obvious identifying information.  Plaintiffs will amend the Amended Complaint to allege their true names and identities when ascertained.  Defendants Does are sued in their individual capacities.

Page 11   -   AMENDED COMPLAINT

28.     Defendant DHS is a cabinet-level department of the United States government that houses various departments and agencies, including CBP, FPS, and ICE.  Defendant DHS is an "agency" as that term is defined in 5 U.S.C. § 551(1).  As of August 20, 2020, DHS had not disciplined any DHS employee or agent for any conduct in connection with the protests in Portland.[2]

29.     Defendant USMS is a federal law enforcement agency housed within the United States Department of Justice.  Defendant USMS is an "agency" as that term is defined in 5 U.S.C. § 551(1).  As of August 20, 2020, USMS had not disciplined any DHS employee or agent for any conduct in connection with the protests in Portland.[3]

30.     Each Defendant is responsible to Plaintiffs for the injuries and damages that Plaintiffs have suffered as a result of the actions of the Defendants alleged in this Complaint.

### III.  JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 because the claims in this action present federal questions in that they:  (1) seek to redress the deprivation of rights under the First and Fourth Amendments to the United States Constitution, (2) arise under the federal Administrative Procedures Act, and (3) arise under 28 U.S.C. § 1343 because they seek to redress violations of 42 U.S.C. §§ 1985 and 1986.

32.     Venue is proper in the United States District Court, District of Oregon, Portland Division, because the events giving rise to the claims took place in Multnomah County, Oregon.

---

[2] *Index Newspapers LLC v. City of Portland*, --- F. Supp. 3d ---, No. 3:20-cv-1035-SI, 2020 WL 4883017, at *25 (D. Or. Aug. 20, 2020).
[3] *Index Newspapers*, 2020 WL 4883017, at *25.

## IV.  FACTUAL BACKGROUND

A.     **The Portland Protests and the Federal Deployment of "Operation Diligent Valor."**

33.     Just after 8:00 p.m. on May 25, 2020, Minneapolis Police officers killed George Floyd, a 46-year-old African American man.  Mr. Floyd was arrested on suspicion of his involvement in a nonviolent offense.  After he was handcuffed and fell to the pavement, a police officer kneeled on Mr. Floyd's neck with the weight of his body.  For eight minutes and 46 seconds, the officer held his knee on Mr. Floyd's neck as Mr. Floyd pleaded for relief, until he was killed.  Other officers held his legs or stood by and watched.

34.     The video of Mr. Floyd's murder—coupled with the nation's long history of police killings of a disproportionately large number of Black Americans—triggered a series of protests opposing rampant police violence against Black Americans and supporting Black Lives Matter across the county, including in Portland, Oregon.

35.     Beginning on or about May 29, 2020, protesters took to the streets of Portland in large numbers.  These protests had continued for more than 80 consecutive nights as of the commencement of this action and have included regular protests in the city parks and streets that surround the Hatfield Courthouse and the Multnomah County Justice Center.

36.     As the protests developed, Defendant Wolf quickly denied that there was any systemic racism among law enforcement officers in this country.[4]  Likewise, over the course of the month following Mr. Floyd's tragic death, Defendant Trump issued multiple statements denouncing the protests in various cities and threatening to use federal forces to crush them.  For

---

[4] *See, e.g.*, CBS This Morning, *Acting Trump Cabinet member Chad Wolf denies systemic racism exists in police departments* (June 17, 2020) (interview with Chad Wolf), https://www.cbsnews.com/video/acting-trump-cabinet-member-chad-wolf-denies-systemic-racism-exists-in-police-departments/#x.

example, on May 29, 2020, three days after the protests began in Minneapolis, Defendant Trump issued a tweet stating, "Either the very weak Radical Left Mayor, Jacob Frey, get his act together and bring the City under control, or I will send in the National Guard & get the job done right."[5] He continued, "Any difficulty and we will assume control but, when the looting starts, the shooting starts."[6]  Similarly, on June 3, 2020, he claimed in a televised broadcast interview with Sean Spicer "the nation needs law and order because you have a bad group of people out there, and they're using George Floyd, and they're using a lot of other people to try and do some bad things," and that "super liberal mayors" were undermining local law enforcement, requiring his administration to bring in the National Guard.[7]

37.     On June 26, 2020, as the protests in Portland and elsewhere continued, Defendant Trump went further, issuing an Executive Order on Protecting American Monuments, Memorials, and Statues and Combating Recent Criminal Violence ("Executive Order").[8]  The Executive Order blamed "left-wing extremists" for "advanc[ing] a fringe ideology that paints the United States of America as fundamentally unjust and have sought to impose that ideology on Americans through violence and mob intimidation."[9]  In addition, it directed the Secretary of DHS to provide "personnel to assist with the protection of Federal monuments, memorials, statues, or property."[10]

---

[5] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:53 PM), https://twitter.com/realdonaldtrump/status/1266231100172615680.
[6] Donald J. Trump (@realDonaldTrump), Twitter (May 28, 2020, 9:53 PM), https://twitter.com/realDonaldTrump/status/1266231100780744704.
[7] Associated Press Video Transcript, *Trump: 'the nation needs law and order'* (June 4, 2020), https://news.yahoo.com/trump-nation-needs-law-order-093644124.html.
[8] Exec. Order No. 13,933, 85 Fed. Reg. 40,081 (June 26, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-protecting-american-monuments-memorials-statues-combating-recent-criminal-violence/.
[9] *Id.* at 40,081.
[10] *Id.* at 40,083.

Page 14   -   AMENDED COMPLAINT

38.    The Executive Order reflected Defendant Trump's consistent policy of defending racist monuments and institutions and attacking individuals who seek to dismantle them as lawless extremists.  For example, in a press conference on August 15, 2017, Defendant Trump criticized protesters who sought to confront white nationalist and neo-Nazi groups opposing the removal of a statue of Robert E. Lee in Charlottesville, Virginia as "alt-left" groups who were "very, very violent," suggesting that both sides were to blame for the clash, even though the principal violence was by a right-wing extremist who killed a woman by driving his car into her.[11]  Two days later, on August 17, 2017, Defendant Trump issues a tweet railing against those who sought to remove Confederate statues, saying "Sad to see the history and culture of our great country being ripped apart with the removal of our beautiful statues and monuments. You…can't change history but you can learn from it.  Robert E. Lee, Stonewall Jackson-who's next, Washington, Jefferson?  So foolish!"[12]  Similarly, on July 6, 2020, Defendant Trump mounted a defense of the Confederate flag and suggested NASCAR had made a mistake in banning it at racing events while accusing a well-known Black race driver, Darrell Wallace, Jr., of perpetrating a hoax involving a noose found in his garage.[13]

39.    Acting pursuant to Defendant Trump's Executive Order and consistent with his purpose of suppressing protests against racism and white nationalism, on July 1, 2020, Defendant

---

[11] Michael D. Shear, et al., *Trump Defends Initial Remarks on Charlottesville; Again Blames 'Both Sides'*, N.Y. Times, Aug. 15, 2017, https://www.nytimes.com/2017/08/15/us/politics/trump-press-conference-charlottesville.html.
[12] David Nakamura, *Trump mourns loss of 'beautiful statues and monuments' in wake of Charlottesville rally over Robert E. Lee statue*, Wash. Post, August 17, 2017, https://www.washingtonpost.com/news/post-politics/wp/2017/08/17/trump-mourns-loss-of-beautiful-statues-and-monuments-in-wake-of-charlottesville-rally-over-robert-e-lee-statue/.
[13] Maggie Haberman, *Trump Adds to Playbook of Stoking White Fear and Resentment*, N.Y. Times, July 6, 2020, https://www.nytimes.com/2020/07/06/us/politics/trump-bubba-wallace-nascar.html.

Page 15   -    AMENDED COMPLAINT

Wolf announced that DHS would form a special task force charged with "conduct[ing] ongoing assessments of potential civil unrest or destruction and allocat[ing] resources to protect people and property," and to engage in "potential surge activity to ensure the continuing protection of critical locations."[14]  He further stated that the federal government "won't stand idly by while violent anarchists and rioters seek not only to vandalize and destroy the symbols of our nation, but to disrupt law and order and sow chaos in our communities."[15]

40.    In accordance with his announcement, Defendant Wolf, FPS Director L. Eric Patterson, and other DHS officials created and sent a Rapid Deployment Force to Portland in advance of the July 4, 2020 holiday weekend as part of what they termed "Operation Diligent Valor."[16]  Defendant Wolf himself later confirmed to the U.S. Senate Committee on Homeland Security and Governmental Affairs that he had directed additional federal personnel to Portland.[17]  The Rapid Deployment Force, which was directed by Defendant Russell, was composed of approximately 114 CBP and ICE officers.  The CBP officers included members of the Border Patrol Tactical Unit, a quasi-militarized operations unit typically based on the United States-Mexico border or deployed overseas.[18]  As DHS itself has admitted, while such federal

---

[14] Press Release, U.S. Dep't of Homeland Sec., DHS Announces New Task Force to Protect American Monuments, Memorials, and Statues (July 1, 2020), https://www.dhs.gov/news/2020/07/01/dhs-announces-new-task-force-protect-american-monuments-memorials-and-statues.

[15] *Id.*

[16] Gabriella Borter, *Court Documents Reveal Secretive Federal Unit Deployed for 'Operation Diligent Valor' in Oregon*, Reuters, July 22, 2020, https://www.reuters.com/article/us-global-race-portland-valor/court-documents-reveal-secretive-federal-unit-deployed-for-operation-diligent-valor-in-oregon-idUSKCN24N2SH.

[17] *Oversight of DHS Personnel Deployments to Recent Protests: Hearing Before U.S. Senate Comm. on Homeland Sec. & Governmental Affairs*, 116th Cong. (Aug. 6, 2020) (testimony of Chad Wolf, Acting Sec. of U.S. Dep't of Homeland Sec.), https://www.hsgac.senate.gov/oversight-of-dhs-personnel-deployments-to-recent-protests.

[18] Ben Fox & Gillian Flaccus, *Homeland Security Gets New Role Under Trump Monument Order*, Associated Press, July 10, 2020,

officers are heavily armed, they do "not specifically [have] train[ing] in riot control or mass demonstrations," *e.g.*, in policing protests that are subject to First Amendment protections.[19]

41.     "Operation Diligent Valor" also relied on USMS officers who were present or brought to Portland and who conducted operations in concert with the DHS Rapid Deployment Force.  Tactical commanders of DHS—including Defendant Russell—and the tactical commanders of USMS coordinated the activities of their respective forces at a tactical command post in the Hatfield Courthouse.

42.     On information and belief, the DHS and USMS officers deployed in Portland were not adequately trained in First Amendment rights to assemble and protest, nor in lawfully responding to mass demonstrations or engaging in crowd control or riot control.

43.     Starting in the early morning hours of July 4, 2020, at the direction of Defendant Russell and others, the Rapid Deployment Force and affiliated USMS officers began to engage in tactical operations designed to crush the protests in Portland and to further Defendant Trump's stated political aim of appearing to take control over allegedly lawless cities run by Democratic mayors.  At a subsequent press conference, Defendant Wolf specifically confirmed that, in making arrests off federal property, DHS was "working with the entire federal presence in Portland."[20]  The tactics used by the officers went beyond what was required for their limited mission of protecting federal property and reflected a policy designed to retaliate against and to

---

https://apnews.com/4435a1f27cf85e087e112ba1224a2f1f; Ed Pilkington, *'These Are His People': Inside the Elite Border Patrol Unit Trump Sent to Portland*, The Guardian, July 27, 2020, https://www.theguardian.com/us-news/2020/jul/27/trump-border-patrol-troops-portland-bortac?CMP=Share_iOSApp_Other.
[19] Sergio Olmos et al., *Federal Officers Deployed in Portland Didn't Have Proper Training, D.H.S. Memo Said*, N.Y. Times, July 18, 2020, https://www.nytimes.com/2020/07/18/us/portland-protests.html.
[20] DHS/CBP Press Conference, *supra* note 1, at 9:45, https://www.youtube.com/watch?v=2XTYITCtFlc&feature=youtu.be.

deter the protesters because of their views and beliefs ("Policy").  Pursuant to the Policy,

Defendants' tactics included the use of surveillance, warrantless arrests, or custodial detentions

of protesters, and the indiscriminate use of excessive force, including shooting protesters in the

head and body with impact munitions and pepper balls, spraying them directly in the face with

pepper spray, shoving them to the ground, hitting and beating them with batons, and firing

massive clouds of tear gas at them, even when doing so was not necessary to protect federal

property or the persons on it.

44.    Many of these unlawful actions were captured on video or photographed by the

news media or other protesters as they occurred.  For example, on Saturday, July 11, 2020,

Oregon Public Broadcasting ("OPB") published a video showing federal law enforcement

officers shooting a 26-year-old protester, Donovan LaBella, in the head with impact munitions.

At the time Mr. LaBella was shot, he was standing across the street from the Hatfield Courthouse

protesting while holding a music speaker above his head.[21]  As a result of that shooting,

Mr. LaBella suffered severe injuries; he was initially in critical condition upon admission to a

hospital with a skull fracture, and he subsequently had facial reconstruction surgery for his

injuries.

45.    Beginning on July 21, 2020, *The New York Times* also issued a series of stories

documenting various violent actions by federal officers, including indiscriminate flooding of

---

[21] Jonathan Levinson, *Federal Officers Shoot Portland Protester in Head with 'Less Lethal' Munitions*, OPB, July 12, 2020, https://www.opb.org/news/article/federal-officers-portland-protester-shot-less-lethal-munitions/.

Page 18   -   AMENDED COMPLAINT

streets with tear gas,[22] throwing protesters to the ground to detain them,[23] firing off flash

grenades,[24] declaring a protest an unlawful assembly,[25] and pushing into the streets of Portland,

well away from the Hatfield Courthouse.[26]

46.    Other publications and members of the press have issued reports of federal

officers stopping drivers and pulling them out of vehicles.  Below is one such photo post from

Sergio Olmos, a freelance reporter who has covered the protests for *The New York Times*: [27]



---

[22] Mike Baker et al., *Federal Agents Push into Portland Streets, Stretching Limits of Their Authority*, N.Y. Times, July 25, 2020, https://www.nytimes.com/2020/07/25/us/portland-federal-legal-jurisdiction-courts.html.

[23] Mike Baker, *Chaotic Scenes in Portland as Backlash to Federal Deployment Grows*, N.Y. Times, July 21, 2020, https://www.nytimes.com/2020/07/21/us/portland-protests.html.

[24] Baker et al., *supra* note 22.

[25] *Id.*

[26] *Id.*; Jonathan Levinson et al., *50 Days of Protest in Portland. A Violent Police Response. This Is How We Got Here*, OPB, July 19, 2020, https://www.opb.org/news/article/police-violence-portland-protest-federal-officers/.

[27] Sergio Olmos (@MrOlmos), Twitter (July 22, 2020, 2:41 AM), https://twitter.com/MrOlmos/status/1285872637109866498.

Page 19  -   AMENDED COMPLAINT

47.     This practice of snatching protesters off the street was reported by OPB on July 16, 2020,[28] and by an individual protester on July 17, 2020, who posted an online video that showed two men in unidentifiable military-style uniforms seize an isolated individual on a sidewalk, then force him into an unmarked grey van and drive him away for no apparent reason.[29]

**B.     The Individual Defendants Confirm and Ratify Their Support for "Operation Diligent Valor" and the Policy Despite Denouncements by State and Local Officials.**

48.     Defendants' unlawful actions under "Operation Diligent Valor" and the Policy were condemned immediately by state and local officials.  For example, Oregon Governor Kate Brown denounced the shooting of Mr. LaBella as "the tragic and avoidable result of President Donald Trump, for weeks, continuing to push for force and violence in response to protests . . . . President Trump deploying armed federal officers to Portland only serves to escalate tensions and, as we saw yesterday, will inevitably lead to unnecessary violence and confrontation."[30] Portland Mayor Ted Wheeler echoed Governor Brown's concern, stating "the actions of federal officers last night escalated, rather than de-escalated, already heightened tensions in our city."[31]

49.     Individual Defendants Trump and Wolf nonetheless publicly proclaimed their firm support for the tactics employed as part of "Operation Diligent Valor" and the Policy and

---

[28] Jonathan Levinson & Conrad Wilson, *Federal Law Enforcement Use Unmarked Vehicles to Grab Protesters Off Portland Streets*, OPB, July 16, 2020, https://www.opb.org/news/article/federal-law-enforcement-unmarked-vehicles-portland-protesters/.

[29] Lasse Burholt, *Feds in Camo Grabs Antifa Suspects in Portland*, YouTube (July 17, 2020), https://www.youtube.com/watch?v=we7lYeNBgck.

[30] *Oregon Leaders React After Portland Protester Injured, in Serious Condition*, KATU, July 12, 2020, https://katu.com/news/local/oregon-leaders-react-to-federal-officer-arrests-in-downtown-portland.

[31] *U.S. Marshals to Investigate Incident That Injured Protester, Mayor Wheeler Says*, KATU, July 12, 2020, https://katu.com/news/local/us-marshals-to-investigate-incident-that-injured-protester-mayor-wheeler-says.

reiterated that the purpose of the operation was to crush the protests.  For example, as early as July 6, 2020, Defendant Wolf publicly asserted that "this is no longer about peaceful protesting," and Defendant Trump promptly amplified Defendant Wolf's statement by quoting it in a tweet.[32] On July 13, 2020, two days after Mr. LaBella's shooting, Defendant Trump lauded federal authorities for doing "a great job" in Portland.[33]  He stated that "Portland was totally out of control . . . .  [A]nd we very much quelled it, and if it starts again, we'll quell it again very easily."[34]

      50.     Similarly, on July 16, 2020, Defendant Wolf issued a statement while visiting Portland in which he referred to Portland's demonstrators as "lawless anarchists" and a "violent mob," and stated that "local and state leaders are . . . focusing on placing blame on law enforcement and requesting fewer officers in their community."[35]  In response to what he characterized as an invitation for DHS to pack up and go home, Defendant Wolf was blunt: "That's just not going to happen on my watch."[36]

---

[32] Joshua Nelson, *DHS Secretary Wolf says 'criminal mobs' taking over cities, not peaceful protesters*, Fox News (July 6, 2020) (Chad Wolf interview with Fox & Friends), https://www.foxnews.com/media/acting-dhs-secretary-criminal-mobs-are-taking-over-cities-federal-provide-assistance; Donald J. Trump (@realDonaldTrump), Twitter (July 6, 2020), https://twitter.com/realDonaldTrump/status/1280132362152693761?s=20.

[33] Noelle Crombie, *Trump Says Feds in Portland Have Done 'a Great Job' on Protests*, OregonLive.com, July 13, 2020, https://www.oregonlive.com/crime/2020/07/trump-says-feds-in-portland-have-done-a-great-job-on-protests.html; Remarks in a Roundtable Discussion on the Positive Impact of Law Enforcement and an Exchange with Reporters, 2009 Daily Comp. Pres. Doc., DCPD 202000512 (July 13, 2020), https://www.govinfo.gov/content/pkg/DCPD-202000512/pdf/DCPD-202000512.pdf.

[34] Crombie, *supra* note 33.

[35] Press Release, U.S. Dep't of Homeland Sec., Acting Secretary Wolf Condemns the Rampant Long-Lasting Violence in Portland (July 16, 2020), https://www.dhs.gov/news/2020/07/16/acting-secretary-wolf-condemns-rampant-long-lasting-violence-portland.

[36] Acting Secretary Chad Wolf (@DHS_Wolf), Twitter (July 17, 2020, 4:02 AM), https://twitter.com/DHS_Wolf/status/1284081029683257344.

51.    The next day, July 17, 2020, Defendant Wolf posted a photo on Twitter of federal agents in camouflage within the Hatfield Courthouse, writing that "[w]e will never surrender to violent extremists on my watch"; he later removed the post.[37]

52.    One day later, on July 18, 2020, Defendant Trump issued a Twitter post, stating, "We are trying to help Portland, not hurt it . . . .  Their leadership has, for months, lost control of the anarchists and agitators.  They are missing in action.  We must protect Federal property, AND OUR PEOPLE.  These were not merely protesters, these are the real deal!"[38]

53.    On July 20, 2020, Defendant Trump again criticized Portland as "totally out of control . . . the liberal Democrats running the place had no idea what they were doing."  He went still further, threatening to deploy federal law enforcement officers to other cities run by "liberal Democrats," specifically New York, Chicago, Philadelphia, Detroit, Baltimore, and Oakland.  He portrayed those cities as out of control, characterizing them as "run by very liberal Democrats. All run, really, by radical left."[39]

54.    At a press conference on July 21, 2020, Defendant Wolf specifically endorsed the practice of snatching protesters off the streets.  Referring to the widely circulated video of two men in unidentifiable military-style uniforms seizing an individual on a sidewalk, Defendant

---

[37] *DHS Chief: 'We Will Never Surrender to Violent Extremists' in Portland*, KOIN, July 27, 2020, https://www.koin.com/news/protests/dhs-chief-will-never-surrender-to-violent-extremists-in-portland.
[38] *House Leaders 'Alarmed' Federal Officers Policing Protests*, Associated Press, July 19, 2020, https://apnews.com/7c8c1a311b5c668a8cd4f757453bcf5c.
[39] The White House, Remarks by President Trump on Phase Four Negotiations, July 20, 2020, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-phase-four-negotiations/.

Page 22   -   AMENDED COMPLAINT

Wolf asserted that "what we've seen from the video is that they acted appropriately" and that he was confident they "operated within their authority."[40]

55.     In late July, the Director of USMS, Donald Washington, parroted Defendant Wolf's characterization of the Portland protests as being riddled with anarchy and violence.  In an interview with Fox News, Director Washington ventured that the peaceful protest "in many respects, has been hijacked by violent extremists who have no intent to arrive at any solution other than to continue to create chaos."[41]

56.     Defendant Wolf again endorsed DHS employees' conduct before the U.S. Senate Committee on Homeland Security and Governmental Affairs on August 6, 2020.  He asserted that DHS "had to start making arrests."[42]

57.     Defendant Wolf also suggested that individuals could be deemed violent merely because they were present near the Hatfield Courthouse.  On August 6, 2020, in his testimony to the U.S. Senate Committee on Homeland Security and Governmental Affairs, he referred to violence allegedly having occurred at the Hatfield Courthouse on multiple nights and asserted that "you know if you come there, that's what you're coming to do."  He categorically stated that "someone showing up" late at night "is *not* a peaceful protester."[43]

---

[40] DHS/CBP Press Conference, *supra* note 1, https://www.youtube.com/watch?t=2112&v=2XTYITCtFlc&feature=youtu.be.

[41] Julia Musto, US Marshals Service Director Says Portland Protests "Hijacked By Violent Extremists," Fox News Flash, July 29, 2020, https://www.foxnews.com/media/us-marshals-service-director-says-portland-protests-hijacked-by-violent-extremists.

[42] *Oversight of DHS Personnel Deployments to Recent Protests: Hearing Before U.S. Senate Comm. on Homeland Sec. & Governmental Affairs*, *supra* note 17, https://www.hsgac.senate.gov/oversight-of-dhs-personnel-deployments-to-recent-protests.

[43] *Id.*

C.    **Portland Police Assist Federal Forces in Suppressing Protesters.**

58.    Notwithstanding concerns expressed by Portland's elected officials, city police cooperated closely with federal forces deployed in Portland through at least July 22, 2020. The Portland Police Bureau acknowledged through a spokesperson on July 4, 2020, that the Portland Police Bureau was "coordinate[ing] as needed" with federal agencies.[44]  Portland Police Bureau Deputy Chief Chris Davis subsequently admitted that an FPS officer was present in the Portland Police Bureau's command post during demonstrations.  He also reported that the Portland Police Bureau offered suggestions to the federal forces.  Portland Police Chief Lovell similarly confirmed the "line of communication" with federal agencies.

59.    The Portland Police Bureau has a long history of shooting and killing unarmed Black people.  For example, in 2003, 21-year-old Kendra James was shot by police during a traffic stop.  In 2010, 25-year-old Aaron Campbell was killed by a police sharpshooter during a welfare check.  In 2017, officers shot 17-year-old Quanice Hayes with an AR-15 while he was on his knees during an arrest.  Prosecutors did not bring charges in any of these cases.  Moreover, the U.S. Department of Justice has supervised the Portland Police Bureau for much of the past decade for engaging in a pattern or practice of excessive force against the mentally ill, in violation of the Fourth Amendment.  Many of those targeted by the Portland Police Bureau were Black.  For example, Andre Gladen, a legally blind 36-year-old Black man with schizophrenia,

---

[44] K. Rambo, *Evidence shows Portland police working with federal officers at protests, contradicting city officials*, Oregonlive.com, July 18, 2020, https://www.oregonlive.com/news/2020/07/evidence-shows-portland-police-working-with-federal-officers-at-protests-contradicting-city-officials.html.

Page 24   -   AMENDED COMPLAINT

was found lying on a porch last year, triggering a call to 911.  Instead of removing him from the

porch, officers killed him after, they say, he grabbed an officer's knife.[45]

      60.     Eighty percent of Portland Police Bureau officers are white, and the bureau

continues to be linked to white supremacy. In 2010, the Portland Police Bureau had to discipline

an officer for having erected plaques celebrating Nazi-era German soldiers in a public park.

Incredibly, the officer kept his job.  And more recently, in 2019, an officer was discovered

sending texts to Patriot Prayer leader Joey Gibson, advising right-wing agitators how to avoid

arrest.  There is no question that the Portland Police Bureau is rife with racial animus against

Black persons and people of color.[46]

      61.     On July 16, 2020, when Defendant Wolf visited Portland, he met personally with

Portland Police Association President Daryl Turner.  Officer Turner said that his main objective

in the meeting was to have the federal officers "working alongside PPB Chief Lovell in

conjunction with and communicating with him and his command staff."[47]  Officer Turner had

already publicly claimed that the demonstrations were "no longer about George Floyd, social

justice, or police reform" and labeled the protesters as "defin[ing] the meaning of white

privilege."[48]

---

[45] Tim Dickinson, *RS Reports:  Progressive City, Brutal Police*, Rolling Stone, July 17, 2020, https://www.rollingstone.com/politics/politics-features/portand-oregon-police-brutality-history-1027677/.
[46] *Id*.
[47] Rebecca Ellis, *Portland Police Union Head Met with Federal Official Snubbed by City Leaders*, OPB.org, July 17, 2020, https://www.opb.org/news/article/portland-police-union-head-met-dhs-head-chad-wolf/.
[48] Press Release, Portland Police Association, *This Cannot Continue*, (July 6, 2020) (statement by Daryl Turner, President), https://www.ppavigil.org/wp-content/uploads/2020/07/07062020-This-Cannot-Continue.pdf.

Page 25   -   AMENDED COMPLAINT

62.    On information and belief, at least five federal officials including Defendant Wolf participated in the July 16, 2020 meeting with Officer Turner.  On information and belief, Defendant Wolf also spoke separately to at least two other Portland Police Bureau officers at the Hatfield Courthouse that day.

63.    The coordination between the federal and local forces manifested in concrete assistance provided by the Portland Police Bureau to the federal agencies and officers.  For example, in the early morning hours of July 12, 2020, after federal officers had shot Mr. LaBella in the head with impact munitions, the Portland Police Bureau "responded when federal officers called for help."[49]  Portland Police Bureau officers were seen talking with USMS officers in front of the Hatfield Courthouse,[50] ordered demonstrators to disperse,[51] marched shoulder-to-shoulder with federal officers to clear the street, and reportedly arrested an individual at the behest of FPS.[52]

64.    On multiple occasions, Portland Police Bureau officers worked together with federal agencies to remove protestors.  Portland Police Bureau officers and federal officers jointly advanced on protesters on at least July 4, July 12, and July 17, 2020.

65.    Portland's elected officials were troubled enough by the assistance that the Portland Police Bureau was providing to federal forces that the City Council on July 22, 2020,

---

[49] Portland Police Bureau, *Portland Police arrested one person during evening demonstration downtown*, July 12, 2020, https://www.portlandoregon.gov/police/news/read.cfm/read.cfm?id=250980.
[50] Rambo, *supra* note 44.
[51] Portland Police Bureau, *supra* note 49.
[52] Arun Gupta, *In Portland, Questions Swirl Around Local Police's Coordination with Federal Officers*, The Intercept, July 24, 2020, https://theintercept.com/2020/07/24/portland-federal-police-protests/.

Page 26   -   AMENDED COMPLAINT

ordered the Portland Police Bureau to cease providing operational support to any federal employee or agent deployed to Portland under President Trump's Executive Order.

**D.    Continued State and Local Opposition Finally Leads to a Stand Down, but Federal Officers Remain in Portland, Poised to Recommence Operations.**

66.    Despite the statements of Individual Defendants Trump and Wolf supporting "Operation Diligent Valor" and the Policy, state and local leaders continued to press their request that federal law enforcement officers leave Portland.  For example, Portland City Commissioner Jo Ann Hardesty stated that she was joining "the loud chorus of elected officials calling for the federal troops in Portland's streets to go home . . . . Their presence here has escalated tensions and put countless Portlanders exercising their First Amendment rights in greater danger."[53]

67.    These calls reflected the widely reported fact that the presence of federal officers was aggravating rather than diffusing tension at the protests and significantly increasing the number of protesters, many of whom were now protesting against the presence of the federal officers as well as in support of Black Lives Matter and in opposition to police violence against Black Americans.[54]  Indeed, federal law enforcement officers speaking on the condition of anonymity acknowledged to OPB that their actions "contributed to the quick escalation between law enforcement and groups of protesters, which had dwindled to a couple hundred people or less earlier this month [*i.e.*, before the attack on Mr. LaBella]."[55]  Such officers also

---

[53] Katie Shepherd & Mark Berman, *'It Was Like Being Preyed Upon': Portland Protesters Say Federal Officers in Unmarked Vans Are Detaining Them*, Wash. Post, July 17, 2020, https://www.washingtonpost.com/nation/2020/07/17/portland-protests-federal-arrests/.
[54] Giulia McDonnell Nieto del Rio, *What Do Portland Protesters Want, and How Have the Police Responded?*, N.Y. Times, July 31, 2020, https://www.nytimes.com/article/portland-protests-explained-protesters.html; Baker, *supra* note 17; Olmos et al., *supra* note 14.
[55] Conrad Wilson & Jonathan Levinson, *More Federal Officers Deploying to Portland as Protests Gain Momentum*, OPB, July 26, 2020, https://www.opb.org/news/article/more-federal-officers-deploying-portland/.

acknowledged that "the nature of the situation in Portland is a 'crisis' being watched and managed from the highest levels of the federal government."[56]

68.     Against this backdrop, on July 28, 2020, Governor Brown negotiated an agreement with Vice President Mike Pence and other senior federal administration officials under which CBP and ICE officers would "leave downtown Portland" and Oregon State Police would step in to keep the peace and allow protesters to refocus attention on racial justice and police accountability.[57]

69.     Although federal officials acknowledged this arrangement, they steadfastly refused to commit to a full disengagement.  For example, on July 28, 2020, Defendant Wolf acknowledged that Oregon State Police would step in, but informed the nation that DHS "will not back down" and "will continue to maintain our current, augmented federal law enforcement personnel in Portland until we are assured that the Hatfield Federal Courthouse and other federal properties will no longer be attacked and that the seat of justice in Portland will remain secure."[58]  Similarly, on July 29, 2020, Mark A. Morgan, the Acting Senior Official Performing the Duties of the Commissioner for CBP, reiterated that the federal officers "are not leaving Portland" until DHS deemed that "the violent criminal activity" was over.[59]

---

[56] *Id.*

[57] Governor Kate Brown (@OregonGovBrown), Twitter (July 29, 2020, 8:31 AM), https://twitter.com/OregonGovBrown/status/1288497309848702977.

[58] Press Release, U.S. Dep't of Homeland Sec., Acting Secretary Wolf's Statement on Oregon Agreeing to Cooperate in Quelling Portland Violence (July 29, 2020), https://www.dhs.gov/news/2020/07/29/acting-secretary-wolfs-statement-oregon-agreeing-cooperate-quelling-portland?fbclid=IwAR12Gszc5r4WHfv_ngO0BWlck3aDkG6TlZQkAx5j6lHcBfSAmQP9ms6rv6g.

[59] CBP Mark Morgan (@CBPMarkMorgan), Twitter (July 29, 2020, 11:33 AM), https://twitter.com/CBPMarkMorgan/status/1288543305769406465).

Page 28   -   AMENDED COMPLAINT

70.     Defendant Trump also issued similar statements refusing to disengage.  For example on July 29, 2020, he tweeted that Governor Brown "isn't doing her job" and proclaimed that "[w]e will not be leaving until there is safety!"[60]  The next day, July 30, 2020, he went a step further, characterized the situation as an "emergency," and publicly threatened even further escalation if local authorities do not "clean out this beehive of – of terrorists.  …  If they don't do it, we'll be sending in the National Guard. …  We're telling [protesters], right now, that we're coming in very soon – the National Guard."[61]  Finally, on July 31, 2020, he tweeted that "Homeland Security is not leaving Portland until local police complete cleanup of Anarchists and Agitators!"[62]

71.     Along these same lines, on August 4, 2020, DHS confirmed that although federal officers had not interfered with peaceful protesters during the preceding days, "[t]here has been no reduction in federal presence; federal law enforcement officers remain in Portland at augmented levels."[63]  "[T]he increased federal presence in Portland will remain until [DHS] is certain that federal property is safe."[64]  DHS characterized the situation as "dynamic and volatile" and stated that "no determination of timetables for reduction of protective forces has yet been made."[65]

---

[60] Donald J. Trump (@realDonaldTrump), Twitter (July 30, 2020, 6:20 AM), https://twitter.com/realDonaldTrump/status/1288826742539464707.
[61] The White House, Remarks by President Trump in Press Briefing, July 30, 2020, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-press-briefing-july-30-2020/.
[62] Donald J. Trump (@realDonaldTrump), Twitter (July 31, 2020, 8:52 PM), https://twitter.com/realDonaldTrump/status/1289408673324777472.
[63] Press Release, U.S. Dep't of Homeland Sec., *MYTHS VS. FACTS: Cooperation and Receding Riot Activity in Portland, OREGON* (Aug. 4, 2020), https://www.dhs.gov/news/2020/08/04/myths-vs-facts-cooperation-and-receding-riot-activity-portland-oregon.
[64] *Id.*
[65] *Id.*

72.     On August 7, 2020, OPB also reported that federal officials speaking off the record said that some of the forces might be drawn down, depending on how the weekend went, but an elevated force would likely remain in Portland through the November election.[66]

73.     Subsequently, Defendant Trump continued to defend and reward the actions of Defendant Wolf and DHS.  On August 21, 2020, Defendant Trump thanked Defendant Wolf "very much," commenting that "[y]ou're right in the heart of it, and you've got some very big things coming.  Very big things.  Good job."[67]

74.     Defendant Wolf likewise continues to express animosity toward Black Lives Matter and to work to marshal federal agencies to act against them.  During a press interview on August 31, 2020, Defendant Wolf indicated that he was personally talking to the United States Attorney General almost on a weekly basis about targeting the heads of Black Lives Matter for investigations and arrests.[68]

75.     Given these statements, there is a continuing risk that Defendants' illegal actions will recommence and an ongoing need to address them through this lawsuit.  The Trump Administration's replacement by the Biden Administration on January 20, 2021, does not diminish this risk.  No matter who is president, protests in support of racial justice will continue as long as systemic racism is not dismantled, and protesters will continue to face illegal actions by the federal government unless they are addressed by the Court.

---

[66] Conrad Wilson & Jonathan Levinson, *Some Federal Forces Poised to Leave Portland, Others Could Remain Through Election*, OPB, Aug. 7, 2020, https://www.opb.org/article/2020/08/07/federal-officers-leave-portland-election/.

[67] The White House, Remarks by President Trump at the 2020 Council for National Policy Meeting, Aug. 21, 2020, https://www.whitehouse.gov/briefings-statements/remarks-president-trump-2020-council-national-policy-meeting/.

[68] Yael Halon, *DOJ 'targeting and investigating' leaders, funders of far-left groups and rioters, Wolf tells Tucker*, Fox News (Aug. 31, 2020) (Chad Wolf interview), https://www.foxnews.com/politics/chad-wolf-doj-investigating-far-left-rioters.

Page 30   -   AMENDED COMPLAINT

E.     **The Deployment and Continued Presence of Federal Officers in Portland as Part of "Operation Diligent Valor" Was Not Lawfully Authorized or Executed.**

76.     In addition to violating Plaintiffs' constitutional rights, the deployment of federal officers to Portland as part of "Operation Diligent Valor" was unlawful because Defendant Wolf and FPS Director Patterson lacked the authority to designate DHS employees to protect the Hatfield Courthouse, because the federal officers who were deployed had not been designated by the purported designation, because the federal officers' actions exceeded the scope and terms of the purported designation, and because the operation was not executed in accordance with the federal statute under which Defendants claimed to be acting.

1.     **Defendant Wolf and FPS Director Patterson Lacked the Authority to Deploy Federal Officers to Portland Because Neither Defendant Wolf Nor Kevin McAleenan Were Properly Serving as Acting Secretary of DHS.**

77.     FPS Director Patterson, purporting to exercise the delegated authority of the Secretary of DHS, supposedly designated DHS officers to protect the Hatfield Courthouse pursuant to 40 U.S.C. § 1315, which grants the Secretary of DHS (or properly serving Acting Secretary) limited statutory authority to designate DHS employees to "protect the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property."  This supposed designation on behalf of Defendant Wolf, however, was not lawful, valid, or effective because, among other things, Defendant Wolf was not legally serving as the Acting Secretary of DHS when he commenced "Operation Diligent Valor."  As a result, he and those purporting to exercise delegated authority on his behalf, including FPS Director Patterson, had and still have no power under 40 U.S.C. § 1315 and there was no lawful basis for the deployment of the Rapid Deployment Force to Portland and DHS employees' actions alleged herein.

Page 31   -   AMENDED COMPLAINT

78.     By way of background, the Secretary of DHS normally is appointed by the President, by and with the advice and consent of the Senate.  6 U.S.C. §§ 112(a)(1), 113(a)(1)(A).  In the event of a vacancy, the Homeland Security Act of 2002 provides an order of succession to fill the position pending the presidential appointment of a replacement.  *Id.* § 113(g).  Pursuant to this order of succession, the Deputy Secretary and Under Secretary for Management of DHS are next in line to serve in an acting capacity when there is a vacancy.  *Id.* § 113(g)(1).  Beyond this mandated order, "the Secretary may designate such other officers of the Department in further order of succession to serve as Acting Secretary."  *Id.* § 113(g)(2).

79.     Defendant Wolf assumed the role of Acting Secretary through a series of events following the resignation of DHS Secretary Kristjen Nielsen on April 10, 2019.  At that time, the Deputy Secretary position had been vacant since April 14, 2018, and the Under Secretary for Management had resigned on April 10, 2019.  The list of further successors signed by Secretary Nielsen on that date, which was set forth in Delegation 00106, Revision No 08.5 (Apr. 10, 2019), provided that vacancies due to the Secretary's death, resignation, or inability to perform the functions of the position were to be filled in the following order: (1) Deputy Secretary, (2) Under Secretary for Management, (3) Administrator of Federal Emergency Management Agency, and (4) Director of the Cybersecurity and Infrastructure Security Agency.

80.     Although this was the required order of succession, it was not followed.  Instead, the person who purported to assume the Acting Secretary position was Kevin McAleenan, who had been serving as the Commissioner of CBP.  While Mr. McAleenan had been identified in Delegation 00106 as a potential successor to Secretary Nielsen in the event of a disaster or catastrophic emergency, he was not properly in line to assume her role in the event of her

Page 32   -   AMENDED COMPLAINT

resignation.  As a result, Mr. McAleenan's assumption of the role of Acting Secretary was not lawful and all orders that he issued in that capacity are null and void.

81.     One of the orders that Mr. McAleenan issued while purporting to serve as Acting Secretary was Revision 00.3 to DHS Delegation No. 00002, Delegation to the Under Secretary for Management.  This revision purported to delegate to the Under Secretary of Management the authority to designate DHS employees pursuant to 40 U.S.C. § 1315.  In DHS Delegation No. 02500, the Senior Official Performing the Duties of the Under Secretary for Management later purported to sub-delegate this authority to the Director of the Federal Protective Service, the office currently filled by Mr. Patterson.  FPS Director Patterson subsequently issued memoranda purporting to designate DHS employees pursuant to 40 U.S.C. § 1315.

82.     Because Mr. McAleenan's assumption of the role of Acting Secretary was not lawful, his attempted delegation of authority to designate DHS employees pursuant to 40 U.S.C. § 1315 was null and void.  All orders and actions by FPS Director Patterson and any other DHS officials purporting to exercise authority delegated by Revision 00.3 to DHS Delegation 00002, including any sub-delegated authority, should therefore be declared unauthorized and unlawful. Any designation of DHS officers to protect federal property and persons in Portland that relies on authority supposedly delegated by Revision 00.3 to DHS Delegation 00002, including any sub-delegation therefrom, should be declared null and void.

83.     Defendant Wolf assumed the position of Acting Secretary following Mr. McAleenan's resignation as of November 13, 2019.  Defendant Wolf took the position based on a new version of Delegation 00106, Revision No. 08.6, that Mr. McAleenan issued on November 8, 2019, to create a new order of succession.  However, given that Mr. McAleenan had not properly assumed the role of Acting Secretary in the first instance, he lacked the

Page 33   -   AMENDED COMPLAINT

authority to modify Delegation 00106, rendering his modifications invalid and making

Defendant Wolf's designation as Acting Secretary pursuant to such modifications similarly

invalid.  Revision No. 08.6 to Delegation 00106 was further invalid because 6 U.S.C. § 113(g)(2)

authorizes only the Secretary of DHS, and not an Acting Secretary, to designate other DHS

officers in further order of succession to serve as Acting Secretary.

84.    Defendant Wolf was also barred at the time from lawfully serving or issuing valid

orders as Acting Secretary by a separate statute, the Federal Vacancies Reform Act ("FVRA").

Pursuant to the FVRA, the power of any acting official to perform the functions and duties of the

office expires 210 days after the office first became vacant.  5 U.S.C. § 3346.  Moreover, if 210

days pass without a Senate-confirmed officer or a nomination for the office, the FVRA requires

the office to remain vacant.  *Id.* § 3348(b)(1).  When Mr. McAleenan issued his revision of

Delegation 00106, under which Defendant Wolf assumed the Acting Secretary role, more than

210 days had passed since Secretary Nielsen resigned on April 10, 2019, and the President had

not appointed a successor.  As a result, even if Mr. McAleenan had properly assumed his

position, he lacked the authority to modify Delegation 00106 so that Defendant Wolf could

become Acting Secretary.  Passage of the 210-day deadline also meant that the office had to

remain open and that it could not be filled with anyone serving in an acting capacity, including

Defendant Wolf.

85.    The invalidity of Defendant Wolf's claim to serve as Acting Secretary was

confirmed on August 14, 2020, in an analysis by the United States Government Accountability

Office ("GAO").[69]  The GAO concluded that, for the reasons summarized above,

---

[69] GAO, Decision in the Matter of Department of Homeland Security—Legality of Service of
Acting Secretary of Homeland Security and Service of Senior Official Performing the Duties of

Mr. McAleenan was the "incorrect" official to have assumed the title of Acting DHS Secretary following the resignation of Secretary Nielsen and that his subsequent amendments to the order of succession "were invalid." As such, Defendant Wolf's purported assumption of the role was "improper" and pursuant to "an invalid order of succession."

86.    Given that Defendant Wolf did not lawfully assume the role of Acting Secretary of DHS and that more than 210 days had passed since the office became vacant, he and those purporting to exercise delegated authority on his behalf, including FPS Director Patterson, were without any authority to designate employees of DHS to protect federal property pursuant to 40 U.S.C. § 1315. Defendants' orders deploying DHS officers to Portland as part of "Operation Diligent Valor" and maintaining such officers in the city and purporting to designate authority to them under 40 U.S.C. § 1315 should therefore be declared unauthorized and unlawful.

87.    The actions and orders of Kevin McAleenan, Defendant Wolf, and FPS Director Patterson alleged herein have not been subsequently ratified. Indeed, the FVRA prescribes that they "may not be ratified." 5 U.S.C. § 3348(d)(2).

**2.    Even if Defendant Wolf and FPS Director Patterson Had Possessed Authority to Designate Officers, the Federal Officers Deployed in "Operation Diligent Valor" Were Not Designated.**

88.    Even if Defendant Wolf and those purporting to exercise delegated authority on his behalf, including FPS Director Patterson, had possessed authority to designate officers pursuant to 40 U.S.C. § 1315, the federal officers deployed to Portland as part of "Operation Diligent Valor" were not so designated by the memoranda on which Defendants rely. Copies of these memoranda signed by FPS Director Patterson are attached as Exhibits 1-10 hereto.

---

Deputy Secretary of Homeland Security, File No. B-331650 (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf.

Page 35   -   AMENDED COMPLAINT

89.     The memoranda that purported to designate federal officers pursuant to 40 U.S.C. § 1315 did not identify the individuals who were supposedly being designated, either within the body of the instrument or in any attachment thereto.  The memoranda refer to an attached distribution list but, on information and belief, no list was attached when the memoranda were issued.  On information and belief, no such list existed at the time.  Because the memoranda did not identify the officers supposedly being designated, no officers were designated.

90.     The conclusion that the memoranda did not designate any DHS employees was confirmed on November 2, 2020, by the Inspector General for the Department of Homeland Security.[70]  The DHS Inspector General noted that "it is impossible to identify which particular employees [FPS Director Patterson] designated, or, stated differently, indicated, set apart, or chose, to exercise authority under 40 U.S.C. § 1315."  The DHS Inspector General concluded that, "[a]s a result, his memoranda did not designate anyone under this statute."

91.     Because the memoranda did not designate any DHS employees, no federal officer deployed to Portland has been designated pursuant to 40 U.S.C. § 1315.  Defendants' actions that are supposedly authorized by these memoranda should be declared unlawful.

**3.      Even if Defendant Wolf and FPS Director Patterson Had Possessed Authority to Designate Officers and Even if Federal Officers Had Been So Designated, the Officers Exceeded the Scope and Terms of the Designation.**

92.     Even if Defendant Wolf and FPS Director Patterson had the authority to authorize "Operation Diligent Valor" and even if the federal officers deployed to Portland as part of "Operation Diligent Valor" had been validly designated pursuant to 40 U.S.C. § 1315, the

---

[70] Joseph Cuffari, Inspector General of DHS, *Management Alert – FPS Did Not Properly Designate DHS Employees Deployed to Protect Federal Properties under 40 U.S.C. § 1315(b)(1)*, OIG 21-05 (Nov. 2, 2020), at 6, https://www.oig.dhs.gov/sites/default/files/assets/2020-11/OIG-21-05-Nov20.pdf.

Page 36   -   AMENDED COMPLAINT

officers' actions exceeded the scope and terms of the purported designation, including by using force against Plaintiffs and arresting Mr. Pettibone off federal property and by using force against Plaintiffs and arresting Mr. Pettibone without having first received legal briefings.

93.     The memoranda that purported to designate federal officers for duty in connection with the protection of federal property expressly provide that the designation "is limited to law enforcement functions on the federal property assigned to you."

94.     The memoranda that purport to designate federal officers for duty in connection with the protection of federal property expressly provided that "[p]rior to utilizing" the designated authority, the federal officers "are required to receive legal briefings provided by FPS legal advisors on 40 U.S.C. § 1315 authorities and jurisdiction, to include relevant criminal statutory and regulatory provisions enforceable on the federal property."

95.     On information and belief, DHS failed to provide the required legal briefings to some or all of the federal officers deployed to Portland as part of "Operation Diligent Valor" before they purported to exercise the authority supposedly granted.

96.     Defendants exceeded the scope and terms of the purported designation by performing law enforcement functions off federal property and/or prior to receiving the legal briefings mandated by the purported designation.  Defendants' actions in excess of the authority purportedly designated to them should be declared unlawful.

**4.     Even if "Operation Diligent Valor" Had Been Validly Authorized and Even if Validly Designated Officers Had Been Within the Scope and Terms of the Designation, "Operation Diligent Valor" Has Been Conducted in a Manner Exceeding DHS's Limited Authority Under 40 U.S.C. § 1315.**

97.     Even if "Operation Diligent Valor" had been properly authorized and even if validly designated officers had acted within the scope and terms of their designation, "Operation Diligent Valor" has been conducted in a manner that exceeded DHS's limited authority under 40

Page 37   -   AMENDED COMPLAINT

U.S.C. § 1315. Pursuant to 40 U.S.C. § 1315(b)(2), DHS employees properly designated to protect federal property and persons on the property have limited enumerated powers, including the powers to:

a.    "enforce Federal laws and regulations for the protection of persons and property," 40 U.S.C. § 1315(b)(2)(A);

b.    "make arrests without a warrant for any offense against the United States committed in the presence of the officer or agent or for any felony cognizable under the laws of the United States if the officer or agent has reasonable grounds to believe that the person to be arrested has committed or is committing a felony," *id.* § 1315(b)(2)(C); and

c.    "conduct investigations, on and off the property in question, of offenses that may have been committed against property owned or occupied by the Federal Government or persons on the property," *id.* § 1315(b)(2)(E).

98.    Defendants have exceeded these limited powers by (a) engaging in the warrantless arrest of multiple individuals well away from any federal property and without probable cause to believe they were committing or had committed a felony; (b) using excessive force to suppress protesters who were exercising their First Amendment rights and who were not posing any threat to federal property or persons on federal property; and (c) engaging in surveillance and intelligence gathering directed at suppressing protests rather than protecting federal property or persons on federal property.

99.    Defendants' employment of such tactics in excess of their statutory authority should be declared unlawful.

**F.      Factual Allegations Relating to Individual Plaintiffs.**

      **1.      Plaintiff Mark Pettibone**

      100.      Mr. Pettibone has attended the protests outside the Hatfield Courthouse on multiple occasions since they initially commenced in late May 2020.  While attending the protests, he has repeatedly witnessed the use of excessive force by federal officers, including the use of impact munitions, pushing and shoving, and the indiscriminate use of tear gas on individuals protesting in a peaceful and lawful manner.  In the early morning hours of July 15, 2020, after having attended the protests and non-violently protesting in support of Black Lives Matter, he was personally subjected to such unlawful tactics when he was snatched off the street by unidentified federal officers, who arrested him and detained him in jail for hours without ever informing him of the reasons for their actions, much less charging him with an offense.

      101.      The incident began when Mr. Pettibone and a friend were walking home from the protests a block west of Chapman Square on Main Street.  They were not on federal property nor engaged in any violent or unlawful behavior.  Nor were they in or near a crowd of people engaging in any violent or unlawful behavior.  Earlier in the evening, they had not engaged in any violent or threatening behavior and had not damaged federal property, nor had they been near anyone engaged in such behavior.  They did not hear any orders to disperse given by federal officers earlier in the vicinity of the Hatfield Courthouse.  They were approached by a group of people who warned them that unidentified men in camouflage were driving around the area in unmarked minivans and grabbing people off the street.  Almost immediately thereafter, an unmarked dark-colored minivan stopped in front of Mr. Pettibone and four to five men in camouflaged military garb jumped out of the van and sought to detain him.

Page 39   -   AMENDED COMPLAINT

102.    Mr. Pettibone could not see any specific agency badges or identification on the clothing worn by the men, particularly given the darkness at the time, and the men did not identify themselves as law enforcement officers.  Uncertain about who the men were and afraid of what they might do, Mr. Pettibone ran west on Main Street and then turned south on Broadway with one of the camouflaged men chasing him.  As he ran down Broadway, the same or a similar unmarked van pulled up and stopped in front of him and several men wearing the same clothing jumped out in front of him.  Mr. Pettibone thought that if they were federal agents, they might be retaliating against him for participating in the protest earlier that evening near the Hatfield Courthouse.

103.    Mr. Pettibone still did not know who the men were but felt that he was not free to leave.  He sank to his knees on the public sidewalk on Broadway and asked "Why?" several times.  The men did not respond and offered no explanation for their actions.  Instead, they firmly led him into the unmarked van, where he was put on the floor.  One of the men restrained Mr. Pettibone's hands above his head and put pressure on his head and neck to force his head down.  The men then pulled his hat down over his eyes to temporarily blind him, determined that he had no weapons, and drove him into the garage of a building that he later learned was the Hatfield Courthouse.

104.    Once Mr. Pettibone was inside the Hatfield Courthouse, a second group of unidentified men wearing fatigue pants and tee shirts photographed him, searched the contents of his backpack without asking consent, cuffed his hands and ankles, and placed him in a cell.  While Mr. Pettibone was in the cell, two officers approached him, represented that they were recording their interaction with him, and read Mr. Pettibone his *Miranda* rights.  The officers asked Mr. Pettibone to waive his *Miranda* rights.  Mr. Pettibone refused to answer questions and

requested a lawyer.  No lawyer was provided.  Instead, the officers left, saying, "This interview is terminated."

105.    At the time of his arrest, Mr. Pettibone had not committed and was not committing any federal offense and he was blocks away from the Hatfield Courthouse.  In addition, the federal officers who detained him did not have either probable cause or a warrant for his arrest.  After being held in the jail cell for more than an hour, Mr. Pettibone was released without being given any paperwork indicating that he had even been arrested, much less charged with any crime.  He was given his belongings back in a garbage bag, but a respirator that was in his backpack had been damaged, and it was unclear whether his cell phone had been accessed.

106.    Not surprisingly, the experience of being snatched off the street and put in an unmarked van by unidentified men in military-style uniforms who did not explain their actions, searched his possessions without consent, and held him in jail with no explanation has injured Mr. Pettibone and caused him significant emotional distress and anxiety.  Even after his arrest, Mr. Pettibone has continued to experience anxiety about the potential of being arrested or stopped again for exercising his lawful right to peacefully protest.  In the wake of his arrest, Mr. Pettibone was concerned for his safety; he attended only three additional protests in Portland after his arrest because he was worried he would be targeted by federal forces.  Although Mr. Pettibone would like to exercise his right to protest even after Joseph R. Biden, Jr., is inaugurated as president on January 20, 2021, he is concerned that he will be targeted by the federal government.  Mr. Pettibone believes Defendants used unlawful and excessive force to intimidate peaceful protesters and, accordingly, feels chilled in his ability to exercise his constitutional right to peacefully protest near and at federal facilities.

Page 41   -   AMENDED COMPLAINT

107.    On information and belief, some or all of the federal officers who arrested Mr. Pettibone were DHS employees, and the federal officers who photographed him, searched his possessions, and imprisoned him were USMS employees.

108.    On information and belief, Mr. Pettibone was arrested and detained because of his participation in the protests at the Hatfield Courthouse, which was nonviolent and lawful in nature.

109.    Pursuant to the Policy, Defendants have made multiple warrantless arrests of individuals in Portland who had not committed and were not committing any federal offenses, including arrests of individuals who were not in the immediate vicinity of the Hatfield Courthouse.

110.    At a July 21, 2020 press conference, FPS Deputy Director Richard "Kris" Cline discussed such a warrantless arrest caught on video and stated that the individual in the video was released because the CBP officers "did not have what they needed."[71]

111.    In an interview with Fox News, Defendant Wolf proclaimed that federal officers "are having to go out and proactively arrest individuals." He criticized as "ridiculous" the suggestion that DHS employees lacked the authority to arrest individuals off federal property.

112.    On information and belief, the warrantless arrests, including Mr. Pettibone's arrest, were made pursuant to the Policy and were part of officially sanctioned behavior and reflected a policy, practice, or custom that was directed or sanctioned by high-ranking officials, including Defendants Wolf and Russell, in support of Defendant Trump's policy of targeting

---

[71] DHS/CPB Press Conference, *supra* note 1,
https://www.youtube.com/watch?t=2112&v=2XTYITCtFlc&feature=youtu.be.

protesters supporting Black Lives Matter and opposing police violence on Black Americans as violent left-wing extremists or anarchists undermining white nationalist values.

### 3.    Plaintiff Mac Smiff.

113.    Mr. Smiff, a Black Oregonian, has attended the protests outside the Hatfield Courthouse on numerous occasions since they initially commenced in late May 2020, and has repeatedly witnessed the use of excessive force by federal officers, including the use of impact munitions, pushing and shoving, and the indiscriminate use of tear gas on individuals protesting in a peaceful and lawful manner.  In the evening of July 24, 2020, Mr. Smiff attended the protests outside the Hatfield Courthouse as a member of the press.  He wore distinctive clothing that identified him as a member of the press, including highly visible "PRESS" signage on his helmet, and tried to interview federal officers from the public sidewalk and street.  While Mr. Smiff tried to ask questions, a federal officer instructed another officer to photograph Mr. Smiff with a camera attached to a large, 35-mm extended lens.

114.    Later, in the early morning hours of July 25, 2020, Mr. Smiff was personally subjected to unlawful actions such as he had witnessed on other dates when an unidentified federal officer shot him in the head with an impact munition while he was lawfully attending the protests.  Upon information and belief, federal officers used the photograph taken hours earlier to target and retaliate against Mr. Smiff for asking questions of the federal contingent surrounding the Hatfield Courthouse.

115.    At the time he was shot in the early hours of July 25, Mr. Smiff was standing in Lownsdale Square, which is separated from the Hatfield Courthouse by SW Third Avenue.  Federal officials did not have probable cause to believe that he had committed any crime.  He was not on federal property and had not engaged in any violent or unlawful activity or damaged

109205877.2 0099880- 01343

federal property.  He did not see anyone else damaging federal property that evening either, and no one around him was engaged in any violent behavior.  Mr. Smiff was wearing a helmet which had a conspicuous sign on it indicating that he was a member of the press, and federal officials knew or reasonably should have known that he was a journalist.

116.     Federal officials were clearing nonviolent protesters in SW Third Avenue immediately in front of the Hatfield Courthouse, some 15 to 20 yards away from where Mr. Smiff was standing.  Mr. Smiff cannot recall hearing any dispersal orders from the federal officials.  When Mr. Smiff looked down at his phone to send a tweet, he was shot in the right side of his face with an indelible hard-cap paintball, just below the line of his helmet and just above a face mask he was wearing.  He was standing by himself, approximately 10 feet away from other people, with no other individuals close by.

117.     The impact of the shot and resulting shock caused Mr. Smiff to fall to the ground. He got up and retreated as well as he could towards SW Fourth Avenue where there was an ambulance and volunteers providing medical care.  Mr. Smiff was partly blinded by the paint on his face and had a large contusion on his head, which restricted his mobility.  He received treatment from the volunteer medics, who told him that he may have suffered a concussion.

118.     At the time that Mr. Smiff was shot, DHS, USMS, and all their agents and employees were enjoined by the District of Oregon from using physical force directed against any person whom they knew or reasonably should have known was a journalist, unless the federal officers had probable cause to believe that the person had committed a crime.  The temporary restraining order provided that wearing a professional or authorized press badge or distinctive clothing that identifies the wearer as a member of the press would be considered

Page 44   -   AMENDED COMPLAINT

indicia of being a journalist.  A copy of the temporary restraining order is attached hereto as

Exhibit 11.

119.    The District Court entered the temporary restraining order on July 23, 2020 at

5:00 p.m., and ordered DHS and USMS to provide notice of it to all their employees, officers,

and agents deployed in Portland within 24 hours.  On information and belief, within hours of the

order's entry, Kenneth Cuccinelli, purportedly the acting Deputy Secretary of DHS, emailed a

group of DHS officials, including Defendant Wolf, to inform them of the temporary restraining

order.  Mr. Cuccinelli told them that the temporary restraining order is "offensive, but shouldn't

affect anything we're doing."  Mark Morgan, the head of CBP, concurred: "My thoughts as

well."

120.    On information and belief, Defendant Wolf did not correct Mr. Cuccinelli or Mr.

Morgan's belief that DHS could ignore the temporary restraining order and continue using force

against journalists such as Mr. Smiff, nor did he order them or any other DHS official to ensure

that no DHS agent or employee in Portland used force against journalists going forward.

121.    The District of Oregon ordered that any willful violation of the temporary

restraining order would be considered to be a violation of a clearly established constitutional

right and not subject to qualified immunity in any *Bivens* action brought against any individual

employee, officer, or agent of DHS and USMS.

122.    The federal officers that shot Mr. Smiff knew or reasonably should have known

that he was a journalist, and they lacked probable cause to believe that he had committed a

crime.  On information and belief, the targeting and shooting of Mr. Smiff was a willful violation

of the temporary restraining order.  On information and belief, Defendants Wolf and Russell set

in motion the use of force or knowingly refused to ensure that federal officials were complying

**Page 45   -   AMENDED COMPLAINT**

with the temporary restraining order, when they knew or reasonably should have known that their actions and omissions would result in the use of force against journalists like Mr. Smiff. Defendants Wolf, Russell, and Does are therefore not entitled to qualified immunity against his claims.

123.    As a result of being shot by the federal officers, Mr. Smiff suffered physical pain as well as anxiety that his concussion could leave him vulnerable to more serious adverse health consequences if he were injured again. This trauma affected Mr. Sniff's ability to work in the days following his injuries and the potential of repeated injury left him fearful of exercising his lawful right to peacefully protest during his recovery. Although Mr. Smiff would like to exercise his right to protest even after Joseph R. Biden, Jr., is inaugurated as president on January 20, 2021, he is concerned that he will be targeted by the federal government. Mr. Smiff believes Defendants used unlawful and excessive force to intimidate peaceful protesters and, accordingly, feels chilled in his ability to exercise his constitutional right to peacefully protest near and at federal facilities.

**4.    Plaintiff Andre Miller.**

124.    Mr. Miller, a Black Oregonian, attended the protests outside the Hatfield Courthouse on numerous occasions since they initially commenced in late May 2020. Mr. Miller has been involved in documenting the protests and providing volunteer crowd-safety and medic services at the protests. While at the protests, he has repeatedly witnessed the use of excessive force by federal officers, including spraying peaceful protesters in the face with chemical irritants, hitting protesters with batons, and firing cannisters of tear gas indiscriminately into crowds of individuals protesting in a peaceful and lawful manner.

Page 46  -  AMENDED COMPLAINT

125.     On July 22, 2020, he was personally subjected to such unlawful actions when an unidentified federal officer shot him in the head with a tear gas cannister, causing a gash in his head that required seven stitches and a concussion that continues to have lingering effects.  At the time he was injured, Mr. Miller was standing on the sidewalk in a crowd of individuals on Main Street, between SW Fourth and Fifth Avenues.  He was not on federal property and was not engaged in violent or unlawful behavior or damaging federal property.  He did not see anyone around him engaged in any threatening or violent behavior or property damage either. The crowd was peacefully protesting when federal officers began marching up Main Street while firing tear gas cannisters and impact munitions into the crowd without any advance warning or instructions.  Mr. Miller did not hear the federal officers issue any dispersal order before they took action against the protesters.

126.     The crowd began to fall back in response to the tear gas and shooting.  Mr. Miller turned and began to move back as well.  As he retreated west on Main Street, he looked to his right and left and was then hit on the forehead.  He exclaimed, "I got hit! I got hit!" to his fiancée who was standing next to him.  She said she had been hit as well, apparently with the cannister that ricocheted off of Mr. Miller.  Mr. Miller looked down at his phone and saw that blood was streaming from his head.  His eye closest to the wound then filled with blood and he could not see.  He was deeply frightened by the volume of blood as he remembered the wound suffered at the protests by Donovan LaBella and he was unsure how badly he had been wounded.

127.     Mr. Miller's fiancée applied pressure to his forehead to stanch the bleeding.  She then led him in the same direction with the crowd, moving west on Main Street towards SW Fifth Avenue.  Mr. Miller and his fiancée then turned north on SW Fifth Avenue, at which point Mr. Miller could not walk further.  He sat down and his fiancée continued to apply pressure to

Page 47   -   AMENDED COMPLAINT

the wound on his head and called for an ambulance. They then walked to try to locate the emergency vehicle, but Mr. Miller passed out momentarily and was unable to continue walking. He was then helped into a safe vehicle where he laid down and then vomited twice. Eventually, he was transported to the hospital where he received treatment, including the removal of metal fragments from his wound, seven stitches, and a CAT scan.

128.   As a result of his injury, Mr. Miller has suffered significant pain, emotional trauma, memory loss and confusion, and irritability. He has been unable to work and the potential of further injury has left him fearful of exercising his lawful right to peacefully protest during his recovery.

129.   Mr. Miller would like to continue to participate in similar protests even after Joseph R. Biden, Jr., becomes president on January 20, 2021. Mr. Miller, however, believes Defendants used unlawful and excessive force to intimidate peaceful protesters and, accordingly, feels chilled in his ability to exercise his constitutional right to peacefully protest near and at federal facilities.

**5.   Plaintiff Nichol Denison.**

130.   Ms. Denison attended the protests at the Hatfield Courthouse on several occasions in June and July 2020. She witnessed the use of excessive force by federal officers, including the use of impact munitions, pushing and shoving, and the indiscriminate use of tear gas on individuals protesting in a peaceful and lawful manner.

131.   On July 24, 2020, she was personally subjected to such unlawful tactics when she had a tear gas cannister hurled into her head, causing a three-inch gash to her forehead that ultimately required 11 stitches. Ms. Denison was not on federal property and was not engaged in violent or unlawful behavior or damaging federal property; nor did she see anyone damaging

Page 48   -   AMENDED COMPLAINT

federal property before she was attacked by federal officers.  Ms. Denison had come to the

protests that evening as a member of the Wall of Moms, an unincorporated association with a

mission to support Black Lives Matter, and to protect protesters supporting Black Lives Matter

from being subject to excessive use of force by the federal government.  She wore a bright

yellow short-sleeved tee shirt over a long-sleeved shirt, a respirator, and a bright yellow plastic

hard hat with "BLM" written on it in black marker.

132.    Shortly before she was hit by the tear gas cannister, Ms. Denison was standing

with the Wall of Moms in the street outside the fence surrounding the Hatfield Courthouse.  The

fence encroached on the public street and, on information and belief, the fence was not itself

federal property.  People in Ms. Denison's vicinity were chanting and yelling, and some were

banging on the fence, but there were no lasers, no fireworks, and no items being thrown at the

Hatfield Courthouse anywhere near where she was standing.  Ms. Denison herself did not engage

in any violence or destruction of property.  She merely stood in a line of women with arms

linked, facing the fence, which was approximately eight feet in front of them.

133.    As she and others were chanting, Ms. Denison saw federal officers emerge from

the Hatfield Courthouse.  They made no announcement or order to disperse.  Instead, they simply

began launching cannisters of tear gas at the peaceful protesters without warning.  Some of the

protesters who had leaf blowers tried to blow the gas back towards the federal agents.

134.    While this was occurring, approximately five additional federal officers dressed in

black with the label "DHS" on their chests came out from the Hatfield Courthouse and rushed up

to the fence line.  They had their weapons drawn and pointing directly at the women who were

standing in the line with Ms. Denison.  Without any warning, the officers then began firing at

Ms. Denison and the other women through gaps in the fence.  The weapons appeared to be

Page 49   -   AMENDED COMPLAINT

shooting pepper balls or bullets the size of paint balls.  The officers were close enough that Ms. Denison could see them looking for people to shoot, including her.

135.    Ms. Denison was hit repeatedly and was then struck far more forcefully in the head by a tear gas cannister that was, on information and belief, thrown or shot from a position well above her in the Hatfield Courthouse.  Although she was wearing a yellow hard hat, the blow stunned her.  She tried to back away through the crowd, but the blow to her head made it difficult to move.  As she removed her mask to check her injury, she was exposed to additional tear gas, burning her face and eyes.  As she touched her head, she realized she was bleeding profusely.  Meanwhile, federal officers were discharging more gas cannisters at the protesters.

136.    Ms. Denison then worked her way as best she could to a medic van where volunteers were offering treatment to injured protesters.  When she removed her hard hat and respirator to receive treatment, she found that she had a three-inch v-shaped gash that was gushing blood and was exposed to a significant amount of tear gas.  The wound was too severe to be treated on site, and Ms. Denison was taken to the VA hospital by some friends, where she received 11 stiches before being taken home.  A photo showing the wound on Ms. Denison's head taken at the hospital is below:

Page 50  -  AMENDED COMPLAINT



CS gas canister to the head.
7/24/20

137.    Once she was at home, Ms. Denison developed a black eye and major swelling from the injury.  Although she was exhausted by the incident, she was unable to sleep and suffered extreme anxiety, reliving the event in her mind and finding herself unable to stop crying.

138.    As a result of her injury, Ms. Denison has suffered pain and ongoing anxiety and irritability consistent with having received a concussion.  She has also incurred medical

expenses, and suffered limitations on her ability to perform her daily tasks during her recovery and fear of repeated injury for exercising her lawful right to peacefully protest.

139.    Ms. Denison would like to continue protesting in the future on and near federal properties.  For example, Ms. Denison would like to continue to protest near and at the federal ICE facility in Portland.  Ms. Denison understands that protests near the Portland ICE facility are planned to continue in the future, including after Joseph R. Biden, Jr., becomes president on January 20, 2021.  However, because of Defendants' unlawful actions and because of the injuries she incurred as a result of those actions, Ms. Dennison feels chilled from exercising her constitutional right to peacefully protest at or near federal facilities, including the ICE facility, because she fears that federal agents will again employ excessive and unlawful force against protesters near federal facilities and that she may again be injured as a result.

**6.    Plaintiff Maureen Healy.**

140.    Ms. Healy has attended protests supporting Black Lives Matter and opposing police violence against Black Americans at multiple locations in Portland, including the Hatfield Courthouse.

141.    On July 20, 2020, Ms. Healy was among a large group of protesters in Lownsdale Square in front of the Hatfield Courthouse who were peacefully protesting and chanting.  She was not on federal property and was not engaged in any violent or unlawful behavior or damaging federal property.  Just after midnight, she saw a small number of protesters trying to remove plywood from around the Hatfield Courthouse, but she did not engage with those protesters, and the majority of protesters in Lownsdale Square were peaceful.

142.    Without warning or issuing a dispersal order, federal officers then appeared and began firing flash-bangs, impact munitions, and tear gas cannisters into the crowd.  The federal

Page 52   -   AMENDED COMPLAINT

officers were approaching the Hatfield Courthouse and the crowd from the south, either from the Justice Center or the Federal Building.  Ms. Healy was between Third and Fourth Avenues, north of the elk statue on Main Street.  The crowd began to fall back, and Ms. Healy heard other protesters telling people to walk and not run to avoid trampling each other.  Many people, however, including Ms. Healy, began to turn and run.  Just as she did so, Ms. Healy was hit in the head with a projectile that felt metallic and the size of a small can.  Although she was wearing a bike helmet at the time, the impact cut her face and gave her a black eye and concussion as shown below:



143.    Ms. Healy realized she had been hit and was bleeding profusely.  After calling out for help, Ms. Healy was helped to some volunteer medics who sought to treat her injuries.  But federal officers continued to fire tear gas into the area, forcing them all to move farther away to a

Page 53   -   AMENDED COMPLAINT

van where Ms. Healy was bandaged.  She was then driven to a location where her husband was able to pick her up and take her to the hospital for additional treatment.

144.    The actions of the federal officers caused Ms. Healy to suffer pain, fear, and anxiety.  Ms. Healy has been forced to take time off from work owing to her concussion and outsource work to colleagues.  She has had multiple medical appointments and still does not know what substance is trapped under her skin as a result of being struck by the metallic can. Although she would have liked to continue attending protests while the federal officers were deployed in and around the Hatfield Courthouse, she was afraid for her safety and did not do so. In other words, she has suffered a fear of repeated injury for exercising her lawful right to peacefully protest.

145.    Although Ms. Healy would like to exercise her right to protest even after Joseph R. Biden, Jr., is inaugurated as president on January 20, 2021, she is concerned that she will be targeted by the federal government.  She believes that the federal officers targeted the crowd she was in on July 20 because they were exercising their right to peacefully assemble and protest. Ms. Healy believes Defendants used unlawful and excessive force to intimidate peaceful protesters and, accordingly, feels chilled in her ability to exercise her constitutional right to peacefully protest near and at federal facilities.

**7.    Plaintiff Christopher David.**

146.    On July 18, 2020, Mr. David attended the protests at the Hatfield Courthouse for the first time.  He decided to attend after seeing news and online video footage of protesters being attacked by federal officers, as well as the online video of an unknown person being abducted in an unmarked van by officers without any readily apparent identifying insignia.  He

Page 54   -   AMENDED COMPLAINT

wanted to support the voices of the protesters in support of Black Lives Matter and against police violence.

147.    Mr. David arrived downtown at around 8:15 p.m. on July 18, 2020.  Mr. David was wearing a sweatshirt that said "NAVY" on the front.  He was also wearing a disposable surgical cloth facemask, but he was not wearing a respirator, helmet, or any other protective clothing.

148.    At around 10:45 p.m., as he was about to leave the protest, Mr. David saw federal officers emerging from the Hatfield Courthouse.  The federal officers did not issue a dispersal order before they attacked.  Mr. David saw them launch tear gas cannisters and rush a line of protesters standing in the intersection, knocking several to the ground.

149.    Mr. David was standing in Lownsdale Square at the time.  He was not on federal property and was not engaged in violent or unlawful activity or property damage.  Mr. David was shocked by the federal officers' actions and walked into SW Third Avenue to talk to the officers, as shown below:

Page 55   -   AMENDED COMPLAINT



150.    Mr. David then attempted to ask the officers what they were doing and why they were not honoring their oath to support the Constitution.  The officers did not verbally respond or instruct Mr. David to move, but one of the officers trained his firearm on Mr. David's chest and then lowered it, after which another officer plowed into Mr. David to knock him back.

151.    Mr. David stumbled backwards in the street to recover his balance.  Two federal officers then approached Mr. David, one after the other, and struck him with their batons while one of them deployed a canister of chemical irritant spray directly into Mr. David's face.  Mr. David was able to knock the cannister away in self-defense only to have another officer approach and spray him in the face again.

152.    In addition to being sprayed twice in the face, Mr. David believes that he was struck with a baton at least five times, including a blow to his right hand.  Mr. David tried to

Page 56  -   AMENDED COMPLAINT

move away, but the officers kept hitting him and spraying him with irritant.  An officer struck him across the back with a baton after he had completely turned around and begun walking away.

153.    Each of those acts of violence were specifically targeted and directed at Mr. David, who was standing away from other protesters (except for Mr. Obermeyer).

154.    Mr. David was unable to see or move freely as a result of the chemicals deployed directly in his eyes and face.  He moved away gingerly, walking through a cloud of tear gas, and sat down on a park bench, where a volunteer street medic helped him with his injuries before locating an ambulance for him.

155.    The ambulance took Mr. David to Portland's VA hospital, where he learned that his right hand had been broken in two places as a result of the baton beating from the federal officers.  His ring finger required surgery.  Mr. David is still in pain every day from his hand injury, which has adversely affected his dexterity and thus hampered his ability to perform his work in the chemistry and toxicology section of the laboratory at the Portland VA hospital.

156.    Even Defendant Russell, after reviewing a video of the federal officers beating Mr. David, concluded that it appeared they had used excessive force against him.

157.    At the time of the incident, Mr. David did not know which federal agency employed the officers who beat and gassed him.  Subsequently, however, Kenneth Cuccinelli (purportedly Acting Deputy Secretary of the DHS) indicated that officers involved in beating Mr. David were USMS officers.[72]

---

[72] Deborah Bloom, *Navy Veteran Says He Was Beaten 'Like a Punching Bag' in Portland*, Reuters, July 20, 2020, https://www.reuters.com/article/us-global-race-protests-portland-veteran/navy-veteran-says-he-was-beaten-like-a-punching-bag-in-portland-idUSKCN24L2CP; Video, *Navy Vet Says Authorities Beat Him at Portland Protest*, CNN (July 21, 2020),

158.    Mr. David would like to return to the protests but has not done so because of the beating that he received and the concerns of his family members that he will be further injured if he returns.  "[S]ometimes I have to listen to better advice from other people," he was forced to conclude.  "I am 53 and am not indestructible."[73]  In other words, he is fearful of repeated injury for exercising his lawful right to peacefully protest.

159.    Although Mr. David would like to exercise his right to protest even after Joseph R. Biden, Jr., is inaugurated as president on January 20, 2021, he is concerned that he will be targeted by the federal government or by right-wing domestic terrorists such as the Proud Boys. He believes that the federal officers targeted him because he exercised his right to peacefully protest and speak to the federal officers.  Moreover, federal officials continue to target and retaliate against him.  After Mr. David was identified as a protester and spoke publicly about his participation in the July 18 protest, the White House directed the Department of Veterans Affairs (his employer) to put a note in his file chastising him for not wearing a face mask at the protest—notwithstanding the fact that there are numerous photographs showing him fully masked to protect himself against COVID-19.  Mr. David's superior at the VA successfully quashed the White House's ploy.

160.    Mr. David believes Defendants used unlawful and excessive force to intimidate peaceful protesters and that they and other federal actors continue to do so, as described above.

---

https://www.cnn.com/videos/us/2020/07/21/portland-protest-chris-david-navy-vet-ken-cuccinelli-response-sot-vpx.cnn.
[73] Danielle Zoellner, *'They Just Started Whaling on Me': Veteran Speaks Out After Video of Federal Officers Beating Him at Portland Protests Goes Viral*, The Independent, July 20, 2020, https://www.independent.co.uk/news/world/americas/portland-protests-trump-veteran-christopher-david-federal-officers-oregon-a9627466.html.

109205877.2 0099880- 01343

Accordingly, Mr. David feels chilled in his ability to exercise his constitutional right to peacefully protest near and at federal facilities.

**8.    Plaintiff Duston Obermeyer.**

161.    Like Mr. David, Mr. Obermeyer attended the protests outside the Hatfield Courthouse for the first time on July 18, 2020.  He was motivated by press reports that federal officers were using excessive force to suppress the protests.  He believed the protesters should be free to express their views in favor of Black Lives Matter and against systemic racism—views he supported himself.  Mr. Obermeyer was dressed in ordinary clothes with a cotton mask on his face.  He was not wearing any protective gear.

162.    When Mr. Obermeyer arrived at the protests, he witnessed a large number of people talking and chanting emotionally about Black Lives Matter, police reform, and more general government reform.  The protests were generally very peaceful, and Mr. Obermeyer did not observe protesters engaged in any actions that would appear to justify a harsh response from law enforcement.

163.    At close to 11:00 p.m., as Mr. Obermeyer was standing in Lownsdale Square facing the Hatfield Courthouse, he noticed a commotion on the right side of the front of the building.  He was not on federal property and he was not engaged in violent or unlawful behavior or property damage.  Mr. Obermeyer then saw a phalanx of federal officers begin marching north towards a group of protesters who were chanting in the middle of SW Third Avenue.  The federal officers did not issue a dispersal order before they began to march.  Mr. Obermeyer did not see any identification on the officers' fatigues, but he did note that they were heavily armed, with batons and automatic weapons.

Page 59   -   AMENDED COMPLAINT

164.    Mr. Obermeyer then saw the officers shoot tear gas into the crowd without any advance warning and push a woman to the ground.  The woman was thrown to the ground with such force that she slid across the pavement.  Mr. Obermeyer saw no provocation for this use of force by the federal officers.

165.    Mr. Obermeyer was shocked by what he saw and approached the federal officers in front of the Hatfield Courthouse.  While he was standing in SW Third Avenue with his hands up in a gesture showing that he meant no harm, Mr. Obermeyer heard a man to his left—whom he did not know, but whom he later learned to be Mr. David—ask the officers if they understood their oath of office.  They did not respond.  Mr. Obermeyer then repeated Mr. David's question, and asked the federal officers whether they understood what an illegal order was.

166.    The federal officers did not respond verbally to the questions that either Mr. David or he had posed, but one of them came up to Mr. David and struck him with a baton.  The same officer then tried to strike Mr. Obermeyer.  Other officers then approached, and one pointed an automatic weapon in Mr. Obermeyer's face while another shot him at point-blank range with an orange chemical irritant.  One of the officers also struck Mr. Obermeyer in the face and chest with a baton.  A photograph of Mr. Obermeyer being sprayed in the face is set forth below:



Page 60   -   AMENDED COMPLAINT

167.    Mr. Obermeyer's eyes and nose burned terribly from the chemical and immediately closed up.  The burning spread to every part of his body touched by the chemical. He was blinded, had difficulty breathing, and required the assistance of other protesters to guide him away and flush out his eyes.  While medics attended to him, he listened to the sounds of gunfire, artillery simulation rounds, CS gas canisters being deployed, and protesters screaming. To Mr. Obermeyer, a veteran of the wars in Iraq and Afghanistan, it sounded like a combat zone.

168.    The injuries Mr. Obermeyer suffered initially left him unable to walk.  After some time, he was able to make it a block or so away from the scene where he continued to use eye-wash solution and water to flush his eyes and head.  After still more time, he was able to walk to his car, but he still did not feel that he could drive and he called his wife who came and picked him up.  When he got home, Mr. Obermeyer took multiple showers but was unable to completely rinse off the chemical that the officers had sprayed on him, which continued to burn his skin and eyes, as well as the inside of his chest.

169.    Mr. Obermeyer's injuries persisted, and it was three days before he felt well enough to resume his normal activities or to return to the protests, which he has only been able to do on a limited basis.  Even in subsequent days, he has continued to have breathing problems and felt pain in his chest and lungs.  He has had cognitive difficulties since the federal officers attacked him, which also trigged PTSD and rheumatoid arthritis.  Mr. Obermeyer, too, has suffered a fear of repeated injury if he exercises his lawful right to peacefully protest.

170.    As a result of Defendants' unlawful actions and the injuries that Defendants inflicted upon him, Mr. Obermeyer feels chilled from exercising his constitutional right to peacefully protest at or near federal facilities including after Joseph R. Biden, Jr., becomes president on January 20, 2021.

Page 61   -   AMENDED COMPLAINT

9.    **Plaintiff James McNulty.**

171.    Mr. McNulty attended the protests outside the Hatfield Courthouse on July 21, 2020.  He went because he believed that the federal officers were preventing demonstrators from expressing their legitimate grievances about systemic racism.  He wanted to be another voice to stand up and say that what was happening is unacceptable.

172.    Mr. McNulty arrived at the protests shortly after 9:00 p.m.  He saw no vandalism, no fires, and nothing being thrown.  The protests were peaceful.

173.    At approximately 11:15 p.m., Mr. McNulty was standing with other protesters on SW Third Avenue near the intersection with Madison Street when he heard flash-bang grenades. No dispersal order was issued.  Mr. McNulty was not on federal property and was not engaged in violent or unlawful behavior or property damage.  Nor was anyone around him doing anything violent or threatening or damaging to property.  When he looked towards the Hatfield Courthouse, he saw federal officers wearing camouflage uniforms marching up Main Street towards the intersection with SW Third Avenue, launching tear gas cannisters and smoke grenades.  The officers came without any warning, and Mr. McNulty did not hear them issue any dispersal orders of any kind.  The group of protesters standing next to him began to retreat, and Mr. McNulty followed them as the federal officers advanced up Main Street.

174.    A flash-bang grenade then went off at Mr. McNulty's feet, and the area began to fill with tear gas, which was blowing towards Mr. McNulty.  To escape from the tear gas, Mr. McNulty moved through the intersection of Main Street and SW Third Avenue, crossing in front of the federal officers.  As he crossed the intersection, his eyes and face began to burn.  The federal officers then shot Mr. McNulty four times: three times with rubber bullets and one time

with a pepper ball.  He was given no warning and was not disobeying any orders or engaging in any violence before he was shot in the back.

175.    Mr. McNulty was bleeding, in considerable pain, and unable to move easily.  He sought out volunteer medics who could assist him.  The medics provided Mr. McNulty with short-term treatment and sent him to a hospital emergency room.  At the emergency room, Mr. McNulty learned that one of the munitions that struck him in the back had not only gone through his clothes, but had pierced his skin, fat layer, and at least one layer of muscle.  The wound was severe enough that Mr. McNulty had to have a CT scan to confirm that it had not punctured his peritoneal cavity.  A photograph showing two of his wounds taken at the emergency room where he received treatment is set forth below (with personal identifying information redacted):

Page 63   -   AMENDED COMPLAINT



176.    Mr. McNulty's injuries caused him considerable pain, suffering, and emotional

trauma, as well as medical expenses, and an inability to conduct his daily activities in a normal

manner during the period of his recovery.  In addition, they have made him fearful of repeated

injury for exercising his lawful right to peacefully protest.

109205877.2 0099880- 01343

177.    Mr. McNulty would consider attending future protests at or near federal facilities including after Joseph R. Biden, Jr., becomes president on January 20, 2021.  Because of the unlawful actions of Defendants, however, Mr. McNulty feels chilled from exercising his right to peacefully protest at or near federal facilities.

**10.    Plaintiff Black Millennial Movement.**

178.    On June 5, 2020, a group of younger Black citizens in the Portland area gathered together to create the Black Millennial Movement.  These individuals came together in response to the killings of George Floyd and so many other Black citizens at the hands of the police.  With national attention finally being focused on racial justice, these individuals sought to uplift the concerns shared by many Black Millennials, including student debt, economic opportunity, housing and home ownership, and political representation.

179.    The group was organized by Cameron Whitten, a 29-year old Oregonian, who created a Facebook group and invited several other young Black leaders in the Portland community to join him, including Gregory McKelvey, Shanice Clarke, and Candace Avalos. The Black Millennial Movement originated in that Facebook group.

180.    Traditionally, the press has focused on only one segment of Black leadership; the Black Millennial Movement seeks to provide an alternate voice and educate others about the disproportionate use of force used by law enforcement towards largely nonviolent protesters—a perspective that has not traditionally received media attention.

181.    Portland-area media, such as television station KATU, have looked to members of the Black Millennial Movement to understand the opinions on the Portland protests held by

younger Black leaders in Portland, including how the public pressure caused by the protests is forcing local leaders to be more responsive than they have been previously.[74]

182.    Members of the Black Millennial Movement were regular participants in the nonviolent protests outside of the Hatfield Courthouse.  While attending those protests, members of the Black Millennial Movement have been repeatedly tear-gassed when federal officers deploy tear gas in an effort to disperse the largely peaceful crowds.  Members of the Black Millennial Movement have suffered injuries from the tear gas used by the federal officers, including vomiting, debilitating pain, and irritation to their eyes, skin, and respiratory systems lasting nearly a week after the respective protest in which they were inflicted.

183.    Being subjected to tear-gassing by federal officials further adversely affected Black Millennial Movement's ability to engage in free speech and to raise its concerns about the racial violence and injustice faced by the Black community.  After experiencing the harm caused by the tear gas deployed by federal officers and seeing video footage of disproportionate violence deployed against nonviolent protesters on a nightly basis, members of the Black Millennial Movement have been fearful of exercising their lawful right to peacefully protest at the Hatfield Courthouse.

184.    Black Millennial Movement has been forced to use its limited financial resources to purchase safety equipment, including to protect against the tear gas deployed by federal officers.  The diversion of its funds to purchasing protective equipment has impeded and continues to impede Black Millennial Movement's ability to engage in its mission of advocacy and education.

---

[74] Lincoln Graves, *Black Millennial Movement seeks to offer different perspective among Black leaders*, KATU, July 30, 2020, https://katu.com/news/local/black-millennial-movement-seeks-to-offer-different-perspective-among-black-leaders.

109205877.2 0099880- 01343

185.    Lingering health issues from the federal officers' use of force and tear gas during the demonstrations, as well as the chilling effects of the federal officers' conduct, have created and continue to create more difficulty for Black Millennial Movement in recruiting and engaging in its advocacy mission.

186.    The effects of the federal officers' use of tear gas and force during the summer of 2020 continue to impede Black Millennial Movement's current activities and its planned work going forward.

187.    The Black Millennial Movement plans to continue its activism and protests regarding racial, social, and economic justice issues, including after Joseph R. Biden, Jr., becomes president on January 20, 2021.  The Black Millennial Movement regards the Hatfield Courthouse and the area around the Hatfield Courthouse to be an important location for their activism and would like to return to that area in the future for events and peaceful protests.  The area surrounding the Hatfield Courthouse contains the Multnomah County Justice Center, Portland City Hall, other federal and local government buildings, and parks under the jurisdiction of both the City of Portland and the federal government that are used frequently as sites for protests.

188.    Because of the unlawful actions of the Defendants, the Black Millennial Movement and its members are fearful of returning to the area around the federal courthouse for events and peaceful protests because they fear that law enforcement—both local and federal— will again use unlawful, excessive force against them.

189.    This fear has chilled the Black Millennial Movement's and its members' exercise of their constitutional rights to peaceful protest at various locations, but particularly in the critical area surrounding the Hatfield Courthouse.  Defendants' unlawful actions, therefore, are

Page 67   -   AMENDED COMPLAINT

interfering with the Black Millennial Movement's ongoing activism and protest activities, which the Black Millennial Movement wants to continue into the foreseeable future, including after the inauguration of Joseph R. Biden, Jr., as president on January 20, 2021.

**11.     Plaintiff Rose City Justice, Inc.**

190.     Rose City Justice, Inc. ("Rose City Justice") is a Black-led, BIPOC-supported, grassroots organization committed to unifying local activism efforts in response to historical racial inequities by the justice system.  Although Rose City Justice initially operated as an informal group following the murder of George Floyd, it incorporated as an Oregon nonprofit corporation in June 2020.  Rose City Justice has organized peaceful protests in various neighborhoods in Portland, including ones in front of the Multnomah County Justice Center and adjacent to the Hatfield Courthouse, and participated in the Black Lives Matter protests outside the Hatfield Courthouse.

191.     After the presence of federal officers and their use of excessive force against protesters increased in early July, Rose City Justice focused its efforts on providing support and safety equipment to protesters outside the Hatfield Courthouse, including helmets, goggles, and masks.  Its members assisted protesters who were injured by the use of tear gas, rubber bullets, and concussion grenades by federal officers against peaceful protesters and were injured themselves by the officers' tactics.  Several members of Rose City Justice have bruises from being shot with rubber bullets and experienced the adverse effects of tear gas.

192.     Being subjected to federal officers' excessive use of force against protesters caused Rose City Justice to utilize its resources to support the peaceful protesters and deterred their ability to organize and engage in other protest activities.  The federal officers' presence in

Page 68   -   AMENDED COMPLAINT

Portland also inhibited its ability to advocate for ending racial inequities, especially as it related to its efforts to divert funds from the Portland Police Bureau to other community activities.

193.     Rose City Justice plans to continue its activism and protest activities in the future, including after Joseph R. Biden, Jr., becomes president on January 20, 2021.  The racial, economic, and social justice issues on which Rose City Justice focuses stem from longstanding policies, practices, and conditions in the United States, are not tied specifically to the Trump Administration, and will not be resolved by Mr. Biden's election or inauguration as president.

## FIRST CLAIM FOR RELIEF

**(Violation of Fourth Amendment Right Against Unlawful Search and Seizure – *Bivens* Claim)**

**(Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against Defendants Wolf, Russell, and Does in Their Individual Capacities)**

194.     Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1 through 193 as though fully set forth herein.

195.     Plaintiffs bring this claim against Defendants Wolf, Russell, and Does in their individual capacities.

196.     The actions of Defendants Does—including (1) the use of unjustifiable and excessive physical force against Plaintiffs Smiff, Miller, Denison, Healy, David, Obermeyer, and McNulty in an effort to move them from public spaces in which they gathered to express their political opinion and/or in retaliation against Plaintiffs for their viewpoints, (2) the seizure of Mr. Pettibone without probable cause or a judicially authorized warrant, or, alternatively, (3) the extraordinary manner of Mr. Pettibone's seizure (an abduction off a public street in the early hours of the morning without stated justification by unidentified individuals who emerged from an unmarked van, whose clothing did not identify their name or agency or government, who did

Page 69   -   AMENDED COMPLAINT

not identify themselves, who Congress had not authorized to make warrantless arrests in the first place, and who were violating the express scope and terms of their ostensible designation)—and the actions of Defendants Wolf and Russell in ordering or approving such actions deprived Plaintiffs of their rights to be free from unlawful searches and seizures secured to them under the Fourth Amendment to the United States Constitution.

197.    Defendants Wolf, Russell, and Does acted in clear violation of well-settled law with regard to standards for seizure of which a reasonable law enforcement officer in Defendants' positions should have been aware.  They are not entitled to qualified or official immunity.

198.    The actions of Defendants Wolf, Russell, and Does were intentional, malicious, and reckless and showed a callous disregard for, or indifference to, the federally protected civil rights of Plaintiffs.

199.    Defendants Wolf, Russell, and Does are jointly and severally liable to Plaintiffs pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Plaintiffs have no adequate alternative remedy.

200.    As a direct and proximate result of the unlawful actions of these Defendants, Plaintiffs are entitled to recover damages from Defendants Wolf, Russell, and Does, and each of them.

Page 70   -   AMENDED COMPLAINT

## SECOND CLAIM FOR RELIEF

### (Violation of First Amendment (Violation of Freedom of Speech and Assembly))

### (Plaintiffs Black Millennial Movement and Rose City Justice Against Individual Defendants Wolf and Russell and Does in Their Official Capacities)

201.    Plaintiffs Black Millennial Movement and Rose City Justice hereby reallege and incorporate by reference the allegations in paragraphs 1 through 200 as though fully set forth herein.

202.    The actions of Defendants Wolf and Russell in ordering and/or approving the indiscriminate use of excessive force against Plaintiffs Black Millennial Movement and Rose City Justice and their members as set forth above—violated and threatens to continue to violate the First Amendment rights of freedom of speech and assembly of Plaintiffs Black Millennial Movement and Rose City Justice and their members.

203.    Defendants Wolf and Russell's actions were based on the viewpoint being expressed by Plaintiffs Black Millennial Movement's and Rose City Justice's members. Defendants would not have ordered the indiscriminate deployment of tear gas and other chemical agents, flash-bangs, and less-lethal impact munitions, which caused injury to Black Millennial Movement's and Rose City Justice's members, but for their members' participation in the protests at the Hatfield Courthouse in support of Black Lives Matter and against police violence towards Black Americans.

204.    Defendants' actions of ordering and/or approving violence and/or deployment of tear gas and other chemical agents, flash-bangs, and impact munitions against protesters, including members of Plaintiffs Black Millennial Movement and Rose City Justice, were in retaliation against Plaintiffs Black Millennial Movement's and Rose City Justice's members' expression of their viewpoints and exercise of their First Amendment rights.  Based on

Page 71  -   AMENDED COMPLAINT

Defendants' past actions and the continued presence of federal law enforcement officials deployed as part of "Operation Diligent Valor," Defendants are reasonably likely to take similar actions against Plaintiffs Black Millennial Movement's and Rose City Justice's members in the future.

205.    By depriving Plaintiffs Black Millennial Movement and Rose City Justice of the opportunity to express their views and retaliating against them and their members on the basis of their views, Defendants have violated Plaintiff Black Millennial Movement's and Rose City Justice's First Amendment rights and are imposing ongoing irreparable harm upon Plaintiffs. Plaintiff Black Millennial Movement's effectiveness as an organization will be irreparably harmed by its inability to generate participation at protest events because potential participants will have been deterred from participation by the threat of unjustified use of violence and/or tear gas.  Rose City Justice's ability to advocate for racial justice and to advance its mission was irreparably harmed by forcing it to divert resources to protect its members and supporters at protests in front of the Hatfield Courthouse and preventing it from engaging in free speech and assembly, in responses to Defendants' practices.

### THIRD CLAIM FOR RELIEF

**(Unlawful Agency Action Exceeding Statutory Authority Under
40 U.S.C. § 1315 – 5 U.S.C. §§ 702, 706)**

**(Plaintiff Pettibone Against Defendants Wolf and Russell in Their Official Capacities, and
DHS and USMS)**

206.    Mr. Pettibone hereby realleges and incorporates by reference the allegations in paragraphs 1 through 205 as if fully set forth herein.

207.    The arrest of Mr. Pettibone was pursuant to the Policy adopted by Defendants DHS, USMS, Wolf, and Russell.

Page 72   -   AMENDED COMPLAINT

208.    The Policy pursuant to which Mr. Pettibone was arrested is an agency action, within the meaning of 5 U.S.C. § 551.

209.    The Policy pursuant to which Mr. Pettibone was arrested is a final action, ripe for judicial review, within the meaning of 5 U.S.C. § 704.

210.    Mr. Pettibone's arrest also constitutes a final agency action.

211.    Federal government officials have issued statements approving of the Policy leading to the arrest of Mr. Pettibone.

212.    Defendants DHS, USMS Wolf, Russell, and Defendant Does, acting pursuant to the Policy they had put in place, had no statutory authority to arrest Mr. Pettibone without a warrant, for one or more of the reasons set forth below.

      a.    There has been no valid designation of Defendants Does for duty in Portland in connection with the protection of property owned or occupied by the federal government or persons on such property pursuant to 40 U.S.C. § 1315(b)(1) because Defendant Wolf and those purporting to exercise delegated authority on his behalf, including FPS Director Patterson, lacked the authority to make that designation and the purported designation has no force or effect.

      b.    No DHS employees have been designated pursuant to 40 U.S.C. § 1315(b)(1) to protect federal property in Portland.

      c.    Defendants Does who arrested Mr. Pettibone did so without having first received legal briefings provided by FPS legal advisors on 40 U.S.C. § 1315 authorities and jurisdiction.

Page 73   -   AMENDED COMPLAINT

d.      The arrest of Mr. Pettibone by Defendants Does occurred blocks away from the Hatfield Courthouse and was not "on the federal property assigned" to Defendants Does.

e.      The arrest of Mr. Pettibone by Defendants Does occurred beyond the geographic limit of "areas outside the property" within the meaning of 40 U.S.C. § 1315(b)(1).

f.      Defendants Does' patrol of the area where they arrested Mr. Pettibone, blocks away from the Hatfield Courthouse, was beyond "the extent necessary to protect" the property or persons on the property within the meaning of 40 U.S.C. § 1315(b)(1).

g.      Employees of DHS, including Defendants Does, do not possess any power under 40 U.S.C. § 1315(b)(2) to make warrantless arrests, let alone warrantless arrests without probable cause that a crime has been committed, while off the federal property.

h.      Mr. Pettibone did not commit a federal offense in the presence of Defendants Does.

i.      Defendants Does did not have "reasonable grounds," within the meaning of 40 U.S.C. § 1315(b)(2)(C), to believe that Mr. Pettibone had committed or was committing a felony under the laws of the United States.

j.      Even assuming Defendants Does had "reasonable grounds" within the meaning of 40 U.S.C. § 1315(b)(2)(C), to believe that Mr. Pettibone had committed or was committing a felony under the laws of the United States, such "reasonable grounds" do not constitute probable cause sufficient to justify an arrest.

Page 74   -   AMENDED COMPLAINT

213.    The Policy that led to the arrest of Mr. Pettibone was an agency action (a) not in accordance with law, (b) contrary to constitutional right, power, privilege, or immunity, (c) in excess of statutory authority, and/or (d) without observance of procedure required by law.

214.    The Court should hold the Policy that led to the arrest of Mr. Pettibone to be unlawful.

215.    As a direct and proximate cause of his arrest, Mr. Pettibone has suffered legal wrong and/or was aggrieved and is realistically threatened by a repetition of Defendants' unlawful acts.

### FOURTH CLAIM FOR RELIEF

**(Unlawful Agency Action by Deployment of Force Against Protesters Exceeding Authority Under 40 U.S.C. § 1315 – 5 U.S.C. §§ 702, 706)**

**(Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against Defendants Wolf and Russell in Their Official Capacities, and DHS and USMS)**

216.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1 through 215 as though fully set forth herein.

217.    As alleged herein, Defendants Wolf, Russell, DHS, and USMS ordered, supervised and implemented the Policy, which authorized the deployment of excessive physical force—including use of pepper spray, impact munitions, batons, chemical agents, and/or physical "charges" by law enforcement officers against Plaintiffs—to forcibly remove them from public spaces in which they gathered with others to lawfully express their political opinions, or in retaliation against Plaintiffs and other protesters for their viewpoints, purportedly pursuant to their statutory authority under 40 U.S.C. § 1315.

218.    The Policy, pursuant to which excessive physical force was deployed against Plaintiffs, was an agency action, within the meaning of 5 U.S.C. § 551.

Page 75   -   AMENDED COMPLAINT

219.    The Policy, pursuant to which excessive physical force was deployed against Plaintiffs, was a final action, ripe for judicial review, within the meaning of 5 U.S.C. § 704.

220.    Defendants Wolf, Russell, Does, DHS, and USMS had no statutory authority to deploy excessive physical force against Plaintiffs, as set forth below:

a.    There has been no valid designation by Defendant Wolf of Defendants Does for duty in Portland in connection with the protection of property owned or occupied by the federal government or persons on such property pursuant to 40 U.S.C. § 1315(b)(1), because Defendant Wolf and those purporting to exercise delegated authority on his behalf, including FPS Director Patterson, lacked the authority to make that designation and the purported designation therefore has no force or effect.

b.    No DHS employees have been designated pursuant to 40 U.S.C. § 1315(b)(1) to protect federal property in Portland.

c.    Defendants Does who used force against Plaintiffs did so without having first received legal briefings provided by FPS legal advisors on 40 U.S.C. § 1315 authorities and jurisdiction.

d.    Defendants Does used force against Plaintiffs while not "on the federal property assigned" to Defendants Does.

e.    Defendants Does deployed force against Plaintiffs while off federal government property in a manner that was not "necessary to protect the property and persons on the property," 40 U.S.C. § 1315(b)(1), often forcing protesters to move blocks away from the Hatfield Courthouse.

f.    Defendants Does deployed force to arrest Mr. Pettibone and others without the authority or grounds to make any such arrest.

Page 76  -   AMENDED COMPLAINT

221.    The Policy pursuant to which excessive force was deployed against Plaintiffs was an agency action (a) not in accordance with law, (b) contrary to constitutional right, power, privilege, or immunity, (c) in excess of statutory authority, and/or (d) without observance of procedure required by law.

222.    The Court should hold the Policy, pursuant to which excessive force was deployed against Plaintiffs, unlawful.

223.    As a direct and proximate cause of deployment of force against Plaintiffs, Plaintiffs have suffered legal wrong and/or are aggrieved and are realistically threatened by a repetition of the unlawful acts of Defendants Wolf, Russell, Does, and DHS.

## FIFTH CLAIM FOR RELIEF

### (Violation of Fourth Amendment (Right to be Free from Unreasonable Search and Seizures))

### (Plaintiff Mark Pettibone Against Defendants Wolf and Russell in Their Official Capacities, and DHS and USMS)

224.    Mr. Pettibone hereby realleges and incorporates by reference the allegations in paragraphs 1 through 223 as if fully set forth herein.

225.    The actions of Defendants in (a) ordering and/or approving the arrest of Mr. Pettibone and (b) the search of his belongings while in federal custody, both of which were done without probable cause or pursuant to any applicable exception under the Fourth Amendment of the United States Constitution, violated Mr. Pettibone's rights to be free from unlawful searches and seizures.

226.    This Court has inherent equitable power to issue declaratory and injunctive relief, including to enjoin violations of federal law by federal officials. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015).

Page 77   -   AMENDED COMPLAINT

## SIXTH CLAIM FOR RELIEF

### (*Ultra Vires* Action)

### (Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against Defendants Trump, Wolf, and Russell in Their Official Capacities, and DHS and USMS)

227.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1 through 226 as if fully set forth herein.

228.    To the extent any of Defendants' actions are unreviewable under any of the preceding causes of action, this Court has jurisdiction to review Defendants' actions under the doctrine of non-statutory review.

229.    As alleged herein, Defendants' actions exceeded the authority conferred on Defendants by Congress.

230.    As alleged herein, Defendants' actions were contrary to the United States Constitution.

231.    Plaintiffs are entitled to a declaration that Defendants' actions were *ultra vires*.

232.    As a direct and proximate cause of Defendants' *ultra vires* actions, Plaintiffs have suffered legal wrong and are realistically threatened by a repetition of Defendants' unlawful acts.

## SEVENTH CLAIM FOR RELIEF

### (Violation of 42 U.S.C. § 1985(3) (Conspiracy to Deprive Rights))

### (Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against Defendants Wolf, Russell, and Does in Their Individual Capacities)

233.    Plaintiffs hereby reallege and incorporate by reference the allegations in paragraphs 1 through 232 as if fully set forth herein.

234.    Plaintiffs bring this claim against Defendants Wolf, Russell, and Does in their individual capacities.

Page 78   -   AMENDED COMPLAINT

235.    Defendants Wolf, Russell, and Does conspired together with the USMS, USMS officers and agents, and officers of the City of Portland to deprive Plaintiffs of their civil rights in violation of 42 U.S.C. § 1985(3).

236.    The conspiracy included those involved in ordering and executing "Operation Diligent Valor" and conducting law enforcement actions in connection with that operation, including Defendants Wolf, Russell, and Does and USMS and its officers and agents and officers of the City of Portland.

237.    The conspirators engaged in overt acts in furtherance of the conspiracy, including, but not limited to, using excessive force against civil rights activists outside the Hatfield Courthouse and in the surrounding area between July 4, 2020 and July 29, 2020, including shooting them in the head and body with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting and beating them with batons, firing massive clouds of tear gas at them, and, in some instances, arresting and detaining them without any lawful basis.

238.    The conspiracy targeted Black Americans and their supporters, who were protesting on behalf of Black Lives Matter and in opposition to disproportionate police violence against Black Americans.  Both groups are protected classes under 42 U.S.C. § 1985(3).

239.    Defendants Wolf and Russell directed the conspiracy to take these actions because of their adverse effects upon an identifiable group—namely, civil rights activists protesting on behalf of Black Lives Matter and in opposition to Defendants Trump, Wolf, Russell, and Does.

240.    The conspiracy targeted Plaintiffs' protected First Amendment activities because Defendants held animus towards Plaintiffs' viewpoints as reflected in, but not limited to, the

Page 79   -   AMENDED COMPLAINT

public statements of Defendants Trump and Wolf, USMS Director Washington, and Portland

Police Association President Turner.  The violent actions of the conspirators directly interfered

with Plaintiffs' protected First Amendment activities.

241.    The conspiracy violently interfered with Plaintiffs' rights to use public

accommodations, and therefore, their right to be free from the badges and incidents of slavery.

Lownsdale Square, Chapman Square, SW Third Avenue, and the surrounding environs are

places of public accommodation.

242.    Defendants Wolf, Russell, and Does are liable in their individual capacities under

42 U.S.C. § 1985(3) for damages.

243.    Defendants Wolf, Russell, and Does are liable for punitive damages due to their

willfully or recklessly depriving Plaintiffs of the equal protection of the laws and/or equal

privileges and immunities under the laws.

## EIGHTH CLAIM FOR RELIEF

**(Violation of 42 U.S.C. § 1986 (Failure to Prevent a Conspiracy to Deprive Rights))**

**(Plaintiffs (Excluding Black Millennial Movement and Rose City Justice) Against
Defendants Wolf, Russell, and Does in Their Individual Capacities)**

244.    Plaintiffs hereby reallege and incorporate by reference the allegations in

paragraphs 1 through 243 as if fully set forth herein.

245.    Plaintiffs bring this claim against Defendants Wolf, Russell, and Does in their

individual capacities.

246.    Defendants Wolf, Russell, and Does violated 42 U.S.C. § 1986 by failing to meet

their duty to prevent or aid in preventing a conspiracy to deprive civil rights.

Page 80  -   AMENDED COMPLAINT

247.    Defendants Wolf, Russell, and Does knew that a Section 1985 violation was about to occur or was occurring, had the power to prevent or aid in preventing it, and neglected or refused to prevent or aid in preventing it.

248.    As set forth above, the Section 1985 conspiracy consisted of using excessive force against civil rights activists outside the Hatfield Courthouse and in the surrounding area between July 4, 2020 and July 29, 2020, including shooting them in the head and body with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting and beating them with batons, firing massive clouds of tear gas at them, and, in some instances, arresting and detaining them without any lawful basis, for the purpose of depriving them of equal privileges and immunities under the laws.  Defendants Wolf, Russell, and Does knew such violence was planned and could have taken actions to stop or limit that violence.  Defendants Wolf, Russell, and Does willfully or negligently took no such action.

249.    Defendants Wolf, Russell, and Does could have and should have refused to issue or comply with unlawful orders, refused to use unlawful force against Plaintiffs, refused to order or allow officers under their command to carry out unlawful acts against Plaintiffs, and/or attempted to appeal to superiors to take a different course of action.

250.    As a result of Defendants Wolf, Russell, and Does' failure to prevent the Section 1985 conspiracy, Plaintiffs were injured and their rights were violated.

251.    Defendants Wolf, Russell, and Does acted with reckless or callous indifference to the federally protected rights of Plaintiffs and are therefore liable for punitive damages.

Page 81   -   AMENDED COMPLAINT

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court:

1.      Issue a declaration that the acts of Defendants Wolf, Russell, and Does described

herein violated the Fourth Amendment to the United States Constitution as well as

42 U.S.C. § 1985 and 42 U.S.C. § 1986;

2.      Issue a declaration that Defendants Wolf and Russell's actions in ordering and/or

supervising the indiscriminate use of excessive force against Plaintiffs Black

Millennial Movement and Rose City Justice violated the First Amendment to the

United States Constitution;

3.      Issue a declaration that the Policy under which Mr. Pettibone was arrested was an

unlawful agency action (a) not in accordance with law, (b) contrary to

constitutional right, power, privilege, or immunity, (c) in excess of statutory

authority, and/or (d) without observance of procedure required by law;

4.      Issue a declaration that the Policy under which excessive force was

indiscriminately deployed against Plaintiffs was an unlawful agency action (a) not

in accordance with law, (b) contrary to constitutional right, power, privilege, or

immunity, (c) in excess of statutory authority, and/or (d) without observance of

procedure required by law;

5.      Issue a declaration that Defendants' unlawful arrest of Mr. Pettibone violated the

Fourth Amendment;

6.      Enjoin Defendants to inform Mr. Pettibone whether Defendants maintain records

relating to his unlawful arrest, including without limitation, photographs, notes

Page 82   -   AMENDED COMPLAINT

and/or records of the arrest, and any information collected from Mr. Pettibone's cell phone;

7.    Enjoin Defendants to inform Mr. Pettibone whether Defendants disseminated records relating to Mr. Pettibone's arrest to other individuals and/or agencies;

8.    Enjoin Defendants to expunge all records and information they have retained about Mr. Pettibone collected during his unlawful arrest, including any information collected from his cell phone;

9.    Issue a declaration that Defendants' actions were *ultra vires*;

10.   Award compensatory and punitive damages to Plaintiffs according to proof at trial, including damages for pain and suffering;

11.   Award costs of suit and attorneys' fees; and

12.   Provide such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

13.   Plaintiffs demand a jury trial.

109205877.2 0099880- 01343

DATED:  January 8, 2021.

STOEL RIVES LLP

*s/ Per A. Ramfjord*
Per A. Ramfjord, OSB No. 934024
per.ramfjord@stoel.com
Jeremy D. Sacks, OSB No. 994262
jeremy.sacks@stoel.com
Crystal S. Chase, OSB No. 093104
crystal.chase@stoel.com
Joel A. Mullin, OSB No. 862533
joel.mullin@stoel.com
Todd A. Hanchett, OSB No. 992787
todd.hanchett@stoel.com
Amy Edwards, OSB No. 012492
amy.Edwards@stoel.com
Geoffrey B. Tichenor, OSB No. 050958
geoffrey.tichenor@stoel.com
Rachel C. Lee, OSB No. 102944
rachel.lee@stoel.com
Jacob Goldberg, OSB No. 162565
jacob.goldberg@stoel.com
Telephone:  (503) 224-3380

and

ACLU FOUNDATION OF OREGON
Kelly K. Simon, OSB No. 154213
ksimon@aclu-or.org
Telephone:   (503) 227-3986

*Attorneys for Plaintiffs Mark Pettibone,
  Fabiym Acuay (a.k.a. Mac Smiff), Andre
  Miller, Nichol Denison, Maureen Healy,
  Christopher David, Duston Obermeyer,
  James McNulty, Black Millennial
  Movement, and Rose City Justice, Inc.*

109205877.2 0099880- 01343