UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

MARK PETTIBONE, et al.,

              Plaintiffs,

    v.

JOSEPH R. BIDEN, et al.

              Defendants.

Case No. 3:20-cv-01464-YY

FINDINGS AND
RECOMMENDATIONS

YOU, Magistrate Judge.

## FINDINGS

    Plaintiffs are eight individuals ("individual plaintiffs") and two organizations who bring constitutional and statutory claims (eight total) against federal officials, agents, and agencies arising out of plaintiffs' participation in public protests that took place in Portland, Oregon in July 2020. Am. Compl. 5-8, ECF 18. Defendants are: (1) two federal agencies, the United States Department of Homeland Security ("DHS") and the United States Marshals Service ("USMS"); (2) three federal officials, President R. Joseph Biden, Chad F. Wolf ("Wolf") (former Acting Secretary of DHS), and Gabriel Russell ("Russell") (Region 10 Director of the Federal Protective Service ("FPS")); and (3) identified and unidentified "John

Doe" "officers, agents, or contract employees . . . deployed to Portland under color of federal authority" in July 2020. *Id*. at 8-11, ECF 18; *see also* Second Am. Compl., ECF 81.[1]

Individual plaintiffs bring their First, Seventh, and Eighth Claims against defendants Wolf and Russell in their individual capacities, seeking monetary damages and declaratory relief based on (1) violations of the Fourth Amendment for the alleged "use of excessive force and illegal detentions" against individual plaintiffs, Am. Compl. 4, ECF 18, and (2) violations of 42 U.S.C. § 1985(3) and § 1986 for allegedly conspiring to deprive individual plaintiffs of their civil rights. *Id.* at 78-79, ECF 18.

Defendants Wolf and Russell have filed a motion to dismiss plaintiffs' First, Seventh, and Eighth Claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted and qualified immunity. Mot., ECF 25.

For the reasons discussed below, the motion to dismiss should be GRANTED.

## I.    Legal Standard for Rule 12(b)(6) Motions

A Rule 12(b)(6) motion tests whether there is a cognizable legal theory or sufficient facts to support a cognizable legal theory. *Taylor v. Yee*, 780 F.3d 928, 935 (9th Cir. 2015). To survive a Rule 12(b)(6) motion, "the complaint must allege 'enough facts to state a claim to relief that is plausible on its face.'" *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

---

[1] After the motion to dismiss was filed, plaintiffs filed a Second Amended Complaint in which they identified some of the previously unidentified "John Doe" defendants. Second Am. Compl., ECF 81. The parties have stipulated that "[t]he Second Amended Complaint does not materially change the allegations relating to the grounds" for the motion to dismiss and that the court "may deem" the motion to dismiss to have been filed against the Second Amended Complaint. Stipulation 2-3, ECF 84. Given there is no material difference between the Amended Complaint and Second Amended Complaint, the court cites to the Amended Complaint to maintain consistency with the parties' briefing.

of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). A motion to dismiss for failure to state a claim under Rule 12(b)(6) may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015); *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

When evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the plaintiff. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 971 (9th Cir. 2018) (citing *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)); *Dowers v. Nationstar Mortg., LLC*, 852 F.3d 964, 969 (9th Cir. 2017) (citing *Iqbal*, 556 U.S. at 678).

## II.    Factual Background

The parties agree that, starting in late May 2020, and for more than 80 consecutive nights at the time this action was filed in August 2020, protestors gathered and marched in "large numbers" in the streets of Portland, including the area surrounding the Mark O. Hatfield United States Courthouse and the Multnomah County Justice Center. Am. Compl. 13, ECF 18.

The parties also agree on the following: On June 26, 2020, former President Trump issued Executive Order 13,933[2] on "Protecting American Monuments, Memorials, and Statutes and Combating Recent Criminal Violence," *id*. at 14, that directed cabinet officials and federal agency administrators, including defendant Wolf as Acting Secretary of DHS, to provide "personnel to assist with the protection of Federal monuments, memorials, statues, or

---

[2] 85 FR 40081 (June 26, 2020).

property." *Id*. at 16. Pursuant to that executive order, "Defendant Wolf and other DHS officials created and sent a Rapid Deployment Force ['RDF'] to Portland in advance of the July 4, 2020 holiday weekend as part of what they termed 'Operation Diligent Valor.'" *Id*. The RDF was directed by defendant Russell as Regional Director of FPS and was comprised of approximately 114 agents from Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE"). *Id*. The federal government's operations also included USMS officers who were present in or brought to Portland, and who assisted DHS. *Id*. at 17.

The Amended Complaint alleges that the individual plaintiffs participated in protests outside the Hatfield Courthouse during the month of July 2020, and that none of them were engaged in violent or unlawful activity. *Id*. at 39-65. It also alleges that federal agents subjected the individual plaintiffs to "excessive force and illegal detentions" in violation of their rights. *Id*. at 2.

## III.    Discussion

### A.    First Claim: *Bivens* Action

In their First Claim, individual plaintiffs seek monetary damages and declaratory relief against defendants Wolf and Russell in their individual capacities under *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), for alleged violations of their Fourth Amendment rights. The individual plaintiffs specifically allege that they were: (1) seized without a warrant or probable cause (plaintiff Mark Pettibone); and (2) injured by federal officers' use of impact munitions, tear gas, batons, canisters, rubber bullets, or similar implements (plaintiffs Mac Smiff, Andre Miller, Nichol Denison, Maureen Healy, James McNulty, Christopher David, and Duston Obermeyer). Am. Compl. 69, ECF 18.

Defendants Wolf and Russell argue that the *Bivens* claim should be dismissed because it presents a new context from prior *Bivens* cases and implicates the kind of separation-of-powers issues the United States Supreme Court has cautioned courts to avoid. Mot. 5-20, ECF 25. Defendants Wolf and Russell also argue that they are entitled to qualified immunity because the individual plaintiffs failed to sufficiently allege their personal participation in the violation of any constitutional right, and because federal agents "on the ground in Portland could have thought it reasonable to use significant force to control crowds surrounding federal buildings in order to further the government's interest in law enforcement and prevent bad actors from using the crowd as cover to endanger the officers." Mot. 29, ECF 25.

### 1.    *Bivens* Overview and Standards

In *Bivens*, the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). The Court held that the plaintiff was entitled to sue Federal Bureau of Narcotics agents for monetary damages arising out of a warrantless entry into his apartment and subsequent search and arrest. *Bivens*, 403 U.S. 389-90. Since *Bivens*, the Supreme Court has extended a private right of action against federal officials for constitutional violations only twice. *See Davis v. Passman*, 442 U.S. 228 (1979) (recognizing a damages remedy against a United States congressman under the Fifth Amendment due process clause for gender discrimination); *Carlson v. Green*, 446 U.S. 14 (1980) (recognizing a damages remedy against federal prison officials under the Eighth Amendment for failure to treat).

Since *Carlson* was decided in 1980, however, the Supreme Court has become increasingly cautious about finding new implied causes of action stemming from constitutional violations. *See Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) ("[F]or almost 40 years, we have

consistently rebuffed requests to add to the claims allowed under *Bivens*."); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) ("In cases decided after *Bivens* . . . the Court adopted a far more cautious course before finding implied causes of action."); *Iqbal*, 556 U.S. at 676 ("[T]he Court has been reluctant to extend *Bivens* liability to any new context or new category of defendant.") (internal quotations marks and citation omitted); *see also Quintero Perez v. United States*, No. 17-56610, 2021 WL 3612108, at *7 (9th Cir. Aug. 16, 2021) ("the [Supreme] Court has counseled that the 'watchword is caution' in extending a *Bivens* remedy to 'new' contexts"). As the Court summed up in *Abbasi*, "[g]iven the notable change in the Court's approach to recognizing implied causes of action . . . the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." 137 S. Ct. at 1857 (citing *Iqbal*, 556 U.S. at 675).

When a court is "asked to extend *Bivens*," it must engage in a "two-step inquiry," first asking "whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants.'" *Hernandez*, 140 S. Ct. at 743 (citation omitted). If the claim presents 'a new *Bivens* context,' the court next considers whether there are "special factors counselling hesitation about granting the extension." *Id.* at 743 (internal quotation marks and citation omitted). The "most important question" guiding this analysis is, "'who should decide whether to provide for a damages remedy, Congress or the courts?'" *Id.* at 750 (quoting *Abbasi*, 137 S. Ct. at 1857) (internal quotation marks omitted).

2.    *Bivens* **'New Context' Analysis**

Under this two-part framework, defendants Wolf and Russell argue that plaintiffs' *Bivens* claim presents a new context involving a new category of defendants and that special factors "preclude extending a *Bivens* remedy into this new context." Mot. 12, ECF 25.

The Supreme Court has noted that "the new-context inquiry is easily satisfied." *Abbasi*, 137 S. Ct. at 1865. A case presents a new context "[i]f the case is different in a meaningful way from previous *Bivens* cases decided by the [Supreme] Court." *Id.* at 1859. Courts approach this inquiry through a succinct comparison of the specific claims and facts at issue in the asserted *Bivens* claim and those involved in the three previous U.S. Supreme Court cases. *See id.* at 1860 (describing the asserted claims as "challeng[ing] the confinement conditions imposed on illegal aliens pursuant to a high-level executive policy created in the wake of a major terrorist attack on American soil[,]" and finding they "bear little resemblance to the three *Bivens* claims the Court has approved in the past"); *see also Quintero Perez*, 2021 WL 3612108 at *7 (describing the asserted *Bivens* claim as "involv[ing] a fatal shooting, at the border, by a federal agent, of a Mexican national who crossed into the United States . . . [that] allegedly occurred pursuant to . . . an executive policy authorizing deadly force in response to rock throwing[,]" and finding "the differences [from *Bivens*] suffice to satisfy the [Supreme] Court's permissive test for what makes a context 'new'")

Here, the claims against defendants Wolf and Russell clearly differ in a meaningful way from prior *Bivens* cases. The most analogous Supreme Court case—and the only one of the *Bivens* trilogy to approve a remedy for a Fourth Amendment claim—is *Bivens* itself. There, the plaintiff alleged that federal narcotics agents violated his Fourth Amendment rights by arresting him and searching his home without probable cause or a search warrant. *Bivens*, 403 U.S. at 389–90. Plaintiffs in this case, by contrast, allege Fourth Amendment violations based on "unconstitutional seizures and physical attacks undertaken by federal officers," Resp. 3, ECF 48, as part of a "federal mission known as 'Operation Diligent Valor[.]'" Am. Compl. 2, ECF 48. Plaintiffs assert that the 'mission' was "spurred by President Donald J. Trump," "directed by"

Acting DHS Secretary Chad Wolf, and involved "more than a hundred federal law enforcement officers or agents employed by a variety of federal agencies." *Id.* at 2-3. Plaintiffs also state that defendant Russell "commanded the DHS Rapid Deployment Force" in his capacity as Regional Director for Region 10 of the FPS. *Id.* at 9.

While plaintiffs insist these claims are "conventional Fourth Amendment claims," Resp. 2, ECF 48, they overlook the stark difference between the discrete law enforcement situation in *Bivens* that took place in a private residence versus the large-scale events in this case that took place in public areas in and around a federal courthouse over multiple days. Plaintiffs also overlook the clear contrast between the high-level positions and non-direct roles held by defendants Wolf and Russell in this case and those held by the line-level agents in *Bivens*—a contrast plaintiffs incorrectly minimize as "not a material difference in the context of this case." *Id.* 4. They also fail to recognize the line of Supreme Court cases that found a "new *Bivens* context" where the defendants were officials or entities with no direct involvement in the contested actions. *See Abbasi*, 137 S. Ct. at 1860 (declining to recognize a *Bivens* action against three cabinet-level officials, and stating, "*Bivens* is not designed to hold officers responsible for the acts of their subordinates"); *Malesko*, 534 U.S. at 68 (declining to allow a *Bivens* claim against "a private corporation operating a halfway house under contract with the Bureau of Prisons," as it constituted a "marked extension of *Bivens* . . . that would not advance *Bivens'* core purpose of deterring individual officers from engaging in unconstitutional wrongdoing"); *F.D.I.C. v. Meyer*, 510 U.S. 471, 484 (1994) (declining "to expand the category of defendants against whom *Bivens*-type actions may be brought to include not only federal *agents*, but federal *agencies* as well[,]" as it would constitute "a significant extension of *Bivens*") (emphasis in original).

Because none of the three Supreme Court *Bivens* cases involved large-scale law enforcement operations, or cabinet-level officials like defendant Wolf, or high-level bureau directors like defendant Russell, plaintiffs' claims against these defendants present a clear extension of *Bivens. See Clark v. Wolf,* No. 3:20-CV-01436-IM, 2021 WL 2386115, at *1 (D. Or. June 10, 2021) (granting defendants' motion to dismiss *Bivens* claims against "high-level Executive Branch officials creating and carrying out Executive Branch policy," as the claims "clearly present a new *Bivens* context"); *Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir.), *cert. denied*, 141 S. Ct. 180 (2020) (finding *Bivens* claims against bureau officials from the U.S. Department of Treasury constituted a new context because, *inter alia*, the plaintiff sought "damages from a new category of defendants"); *LKQ Corp. v. United States*, No. 18-CV-1562 (DLF), 2019 WL 3304708, at *11 (D.D.C. July 23, 2019) (noting the defendants were "high-ranking, government officials within the Executive Branch, rather than the line-level FBI agents sued in *Bivens*," and finding a new *Bivens* context).

### 3.    *Bivens* 'Special Factors' Analysis

Because plaintiffs' claims present a new *Bivens* context, the second inquiry is whether there are "special factors that counsel hesitation about granting the extension." *Hernandez*, 140 S. Ct. at 743 (internal quotation marks and citation omitted). If there are "special factors," the Supreme Court has made "clear that a *Bivens* remedy will not be available . . . in the absence of affirmative action by Congress." *Abbasi*, 137 S. Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18). The Supreme Court also has made clear that "separation of powers principles" are "central to [this] analysis," so courts must "consider the risk of interfering with the authority of the other branches" and ask "whether 'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy.'" *Hernandez*, 140 S. Ct. at 743 (citation omitted). Further, the

Supreme Court has explained, "if we have reason to pause before applying *Bivens* in a new context or to a new class of defendants—we reject the request." *Id*.

In this case, the special factors that provide 'reason to pause' start with the Supreme Court's repeated admonition that "a *Bivens* action is not a proper vehicle for altering an entity's policy." *Abbasi*, 137 S. Ct. at 1860 (citing *Malesko,* 534 S. Ct. at 74). While plaintiffs argue that their *Bivens* claim "does *not* 'seek to attack a federal policy,'" Resp. 9-10, ECF 48 (emphasis in original), it is difficult to square that claim with the allegations in plaintiffs' Amended Complaint, which describe myriad actions taken by defendants Wolf and Russell and others, "pursuant to" one or more contested executive branch policies. *See* Am. Compl., ECF 18.

To start, plaintiffs themselves explain that the federal agents, officials, and entities involved in the protection of the Hatfield Courthouse during the time period in question, July 2020, were acting under former President Trump's Executive Order 13,933, which provided in part:

> *It is the policy* of the United States to prosecute to the fullest extent permitted under Federal law, and as appropriate, any person or any entity that destroys, damages, vandalizes, or desecrates a monument, memorial, or statue within the United States or otherwise vandalizes government property. . .

> *It is the policy* of the United States to prosecute to the fullest extent permitted under Federal law, and as appropriate, any person or entity that participates in efforts to incite violence or other illegal activity in connection with the riots and acts of vandalism described in Section 1 of this order.

85 FR 40081, § 2(a)-(b) (emphasis added). Further, the executive order directed "the Secretary of Homeland Security," among other cabinet officials, to "provide . . . personnel to assist with the protection of Federal monuments, memorials, statutes, or property," *id.* at § 5, and then, according to plaintiffs, defendant Wolf—"acting *pursuant to* Trump's Executive Order"— announced that DHS would form a special task force known as "Operation Diligent Valor." Am.

10 – FINDINGS AND RECOMMENDATIONS

Compl. 15-16, ECF 18 (emphasis added). Plaintiffs also contend that Operation Diligent Valor was executed by "Defendant Wolf, FPS Director L. Eric Patterson, and other DHS officials [who] created and sent a Rapid Deployment Force to Portland," *id*. at 16, and allege further that the RDF agents were "deployed to Portland . . . *pursuant to* an unconstitutional policy." *Id.* at 11 (emphasis added). Plaintiffs' *Bivens* claim also seeks to hold defendant Russell liable "for the actions of [RDF agents] who . . . acted *pursuant to* an unconstitutional policy," and similarly seek to hold defendant Wolf liable for "ratifying" the actions of RDF agents in Portland—undertaken, allegedly, "*pursuant to* an unconstitutional policy." *Id*. at 8-9 (emphasis added). As these allegations in plaintiffs' Amended Complaint make clear, the *Bivens* claim against defendants Wolf and Russell directly implicate executive-level policy as embodied in the executive order and in the steps taken to effectuate the executive order.

Additionally, while plaintiffs insist that defendants "mischaracterize" their *Bivens* claim as a "'direct challenge to high-level policy,'" Resp. 16, ECF 48, they allege, at the same time, that Wolf deployed RDF officers who used tactics that "reflected *a policy*"—dubbed by plaintiffs as "the Policy"—that was "designed to retaliate against and to deter the protestors because of their views and beliefs." Am. Compl. 17-18, ECF 18 (emphasis added). Plaintiffs further claim that both Wolf and Russell "confirm[ed] and ratif[ied] their support for 'Operation Diligent Valor' and *the Policy*," while state and local officials "condemned" both. *Id*. at 20 (emphasis added). Lastly, plaintiffs' Prayer for Relief resolves any lingering doubt as to whether they seek "to alter[] an entity's policy," *Abbasi,* 137 S. Ct. at 1860, given their explicit requests that the court issue, *inter alia,* "a declaration that *the Policy* under which excessive force was indiscriminately deployed against Plaintiffs was . . . unlawful," and "a declaration that *the Policy* under which Mr. Pettibone was arrested was . . . unlawful." Am. Compl. 82, ECF 18 (emphasis

added). Thus, it is completely clear that plaintiffs' allegations of an unlawful or unconstitutional

policy or policies are integral to their Fourth Amendment *Bivens* claims against defendants Wolf

and Russell.[3]

It is also completely clear that in *Abbasi*, the Supreme Court declined to allow a similar

*Bivens* claim that sought to challenge "a high-level executive policy," 137 S. Ct. at 1860, and

that in *Hernandez*, the Supreme Court cautioned courts from recognizing this type of claim

because of the "risk of interfering with the authority of the other branches." 140 S. Ct. at 743. In

*Abbasi*, "six men of Arab or South Asian descent" brought *Bivens* claims against the former

director of the Federal Bureau of Investigation, the former United States Attorney General, and

the former Immigration and Naturalization Service Commissioner, challenging "the conditions

of confinement imposed on [them] pursuant to the formal policy adopted by the Executive

Officials in the wake of the September 11 attacks." 137 S. Ct. at 1858. The Supreme Court noted

that such claims "call into question the formulation and implementation of a general policy[,]"

and expressed serious concerns about the "burden and demand of litigation" and the potential for

"inquiry and discovery into the whole course of the discussions and deliberations that led to the

policies and governmental acts being challenged." *Id*. at 1860. Such consequences, explained the

Court, "counsel against allowing *Bivens* actions against . . . Executive Officials" who could be

---

[3] For purposes of this analysis, it makes no difference that plaintiffs in the current action seek to hold defendants Wolf and Russell liable for their own, personal conduct in allegedly violating plaintiffs' Fourth Amendment rights, and that plaintiffs in *Abbasi* apparently sought to hold high-level officials liable for a contested policy and not their own actions. As the Supreme Court stated in *Abbasi*: "Even if the action is confined to the conduct of a particular Executive Official in a discrete instance, these claims would [still] call into question the formulation and implementation of a general policy." 137 S. Ct. at 1860. In other words, when plaintiffs assert a *Bivens* claim alleging that high-level officials personally engaged in unlawful acts pursuant to a specific, contested policy—as plaintiffs do in this action—executive policy is still implicated.

prevented "from devoting the time and effort required for the proper discharge of their duties."

*Id*. (citing *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 382 (2004) (noting "the paramount necessity of protecting the Executive Branch for vexatious litigation that might distract it from . . . its constitutional duties")). Ultimately, the Court held that allowing a *Bivens* action "in this context, or in a like context in other circumstances, would require courts to interfere in an intrusive way with the sensitive functions of the Executive Branch." *Id.* at 1861.

Here, in this "like context," similar concerns about intrusion into executive branch policies and operations attend recognition of plaintiffs' *Bivens* claim. The executive order itself authorizes no fewer than four executive-level agencies—DHS, the Department of Justice, the Department of Defense, and the Department of the Interior—to either request or provide personnel "to assist with the protection of Federal monuments, memorials, statutes, or property." 85 FR 40081, § 5. In addition, the extensive, real-time coordination necessary to effectuate the executive order is made evident through the actions, decisions, and statements that plaintiffs specifically attribute to a number of agency and bureau officials purportedly involved in Operation Diligent Valor. *See, e.g.,* Am. Compl. 10, 16, 31, 33, 35; ECF 18 (referring to actions or statements allegedly made by Eric Patterson, FPS Director); *see also id.* at 10, 28, 45 (referring to actions or statements allegedly made by Mark Morgan, Acting Commissioner of Customs Border Protection); *id.* at 45, 57 (referring to actions or statements allegedly made by Ken Cuccinelli, Acting Deputy DHS Secretary); *id.* at 30 (referring to alleged "weekly" conversations between defendant Wolf and the former United States Attorney General). These references to other executive officials also demonstrate how allowing a *Bivens* claim against defendants Wolf and Russell could lead to broad "discovery and litigation" that could "implicate the discussions and deliberations that led to the formation of the policy" and "'inhibit the free

flow of advice . . . and expression of opinion within an agency'"—all of which constitute

"special factors that counsel against" allowing plaintiffs' *Bivens* to go forward. *Abbasi,* 137 S.

Ct. at 1861 (quoting *Fed. Open Mkt. Comm. of Fed. Rsrv. Sys. v. Merrill*, 443 U.S. 340, 351

(1979)). As the Supreme Court cautioned in *Abbasi,* if "*Bivens* liability were to be imposed, high

officers who face personal liability for damages might refrain from taking urgent and lawful

action in time of crisis." 137 S. Ct. at 1863.

In *Abbasi*, the Supreme Court also warned that a *Bivens* claim against high-level officials

could constitute "congressionally uninvited intrusion" into a policy area that is the "prerogative

of the Congress and President"—like national security. 137 S. Ct. at 1861. Indeed, where

Congress has shown "frequent and intense" interest in a particular area of government action and

policy—like the federal government's response to the September 11, 2001 attacks—the failure of

Congress to provide a specific right of action for damages that might arise from that policy area

is less likely to be "inadvertent." *Id*. at 1862 (citation omitted).

Here, the extent of congressional prerogative starts with the executive order's reliance on

congressional authorization under 18 U.S.C. § 1361, regarding the protection of federal property,

and is reinforced by numerous other provisions of the United States Code cited in the executive

order pertaining to law enforcement, public monuments and systems, and conspiratorial acts

against the government. *See* 85 FR 40081, § 2(a)-(b) (containing citations).[4] In addition, the

---

[4] The operative sections of the EO provide as follows:

Sec. 2. Policy. (a) It is the policy of the United States to prosecute to the fullest
extent permitted under Federal law, and as appropriate, any person or any entity
that destroys, damages, vandalizes, or desecrates a monument, memorial, or statue
within the United States or otherwise vandalizes government property. The desire
of the Congress to protect Federal property is clearly reflected in section 1361 of
title 18, United States Code, which authorizes a penalty of up to 10 years'
imprisonment for the willful injury of Federal property. More recently, under the

authority under 40 U.S.C. § 1315[5], allegedly invoked by defendants Wolf and Russell in

conducting Operation Diligent Valor, is strongly contested by plaintiffs who cite, in support of

their arguments, an August 2020 report from the United States Government Accountability

Office[6] ("GAO") and a November 2020 report prepared by the Inspector General ("IG") of

---

Veterans' Memorial Preservation and Recognition Act of 2003, section 1369 of
title 18, United States Code, the Congress punished with the same penalties the
destruction of Federal and in some cases State-maintained monuments that honor
military veterans. Other criminal statutes, such as the Travel Act, section 1952 of
title 18, United States Code, permit prosecutions of arson damaging monuments,
memorials, and statues on State grounds in some cases. Civil statutes like the
Public System Resource Protection Act, section 100722 of title 54, United States
Code, also hold those who destroy certain Federal property accountable for their
offenses. The Federal Government will not tolerate violations of these and other
laws.
(b) It is the policy of the United States to prosecute to the fullest extent permitted
under Federal law, and as appropriate, any person or any entity that participates in
efforts to incite violence or other illegal activity in connection with the riots and
acts of vandalism described in section 1 of this order. Numerous Federal laws,
including section 2101 of title 18, United States Code, prohibit the violence that
has typified the past few weeks in some cities. Other statutes punish those who
participate in or assist the agitators who have coordinated these lawless acts. Such
laws include section 371 of title 18, United States Code, which criminalizes
certain conspiracies to violate Federal law, section 2 of title 18, United States
Code, which punishes those who aid or abet the commission of Federal crimes,
and section 2339A of title 18, United States Code, which prohibits as material
support to terrorism efforts to support a defined set of Federal crimes. Those who
have joined in recent violent acts around the United States will be held
accountable.
85 FR 40081.

[5] 40 U.S.C. § 1315 provides in part:
(a) In general. To the extent provided for by transfers made pursuant to the
Homeland Security Act of 2002, the Secretary of Homeland Security (in this
section referred to as the "Secretary") shall protect the buildings, grounds, and
property that are owned, occupied, or secured by the Federal Government
(including any agency, instrumentality, or wholly owned or mixed-ownership
corporation thereof) and the persons on the property.

[6] See Am. Compl. 34-35, ECF 18 (citing GAO, Decision in the Matter of Homeland Security—
Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official

DHS[7]—both of which apparently investigate the very issues presented by plaintiffs in connection with defendants' authority under § 1315. Am. Compl. 34-36, ECF 18. Plaintiffs also point to a Senate hearing on August 6, 2020, "Oversight of DHS Personnel Deployments to Recent Protests," during which defendant Wolf was purportedly questioned about Operation Diligent Valor. *See id*. at 16.

Given the level of executive branch scrutiny suggested by the GAO and IG reports and given "it is likely that high-level policies will attract the attention of Congress," *Abbasi,* 137 S. Ct. at 1862, it is also particularly noteworthy that two United States congressional representatives recently introduced a bill to amend 40 U.S.C. § 1315 and issued a July 31, 2021 press release entitled, "Chairs DeFazio and Thompson Introduce Legislation to Rein in Federal Protection Statute that Trump Administration is Using as Cover for Civil Rights Abuses in Portland, Oregon." This is exactly the kind of "intense" interest on the part of Congress, *Abbasi,* 137 S. Ct. at 1862, that provides "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" created by the judiciary, and makes it "less likely that Congress would want the Judiciary to interfere." *Id.* at 1859.

In short, plaintiffs' *Bivens* claim against defendants Wolf and Russell "challenge more than standard 'law enforcement operations.'" *Abbasi,* 137 S. Ct. at 1861 (citation omitted). Rather, it challenges the actions of high-level officials acting pursuant to a high-level policy and thereby risks encroachment into executive policy, legislative prerogatives, and oversight from

---

Performing the Duties of Deputy Secretary of Homeland Security, File No. B-331650 (Aug. 14, 2020).

[7] *See* Am. Compl. 36, ECF 18 (citing Joseph Cuffari, Inspector General of DHS, *Management Alert – FPS Did Not Properly Designate DHS Employees Deployed to Protect Federal Properties under 40 U.S.C. sec. 1315(b)(1)*, OIG 21-05 (Nov. 2, 2020) at 6.

both branches. Where similar separation-of-powers concerns counseled hesitation in *Abbasi* and *Hernandez*, the same conclusion is warranted here. Therefore, plaintiffs' *Bivens* claim against defendants Wolf and Russell should be dismissed.

Because plaintiffs' *Bivens* claim should be dismissed, there is no reason to address defendants' qualified immunity arguments. *See Clark*, 2021 WL 2386115, at *5 (declining to reach the issue of qualified immunity after dismissing the plaintiffs' *Bivens* claims).

### B.    Seventh and Eighth Claims: Conspiracy

In the Seventh Claim, plaintiffs allege that defendants Wolf, Russell, and the RDF agents assigned to Operation Diligent Valor "conspired together with the USMS, USMS officers and agents, and officers of the City of Portland to deprive plaintiffs of their civil rights in violation of 42 U.S.C. § 1985(3)." Am. Compl. 79, ECF 18. Plaintiffs further allege that the "conspiracy targeted Black Americans and their supporters, who were protesting on behalf of Black Lives Matter and in opposition to disproportionate police violence against Black Americans." *Id.* Plaintiffs' Eighth Claim alleges that the same defendants had knowledge of the conspiracy and failed to prevent it in violation of 42 U.S.C. § 1986. *Id.*

Defendants Wolf and Russell argue that the conspiracy claims should be dismissed because "plaintiffs do not plausibly allege, let alone allege with any specificity, any agreement between Wolf and Russell (or other persons) to abridge the constitutional rights of 'Black Americans and their supporters.'" Mot. 30, ECF 25.

Under § 1985(3), an action may be brought by an individual who has been injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class or persons of the equal protection of the laws, or of equal privileges and immunity under the laws." 42 U.S.C. § 1985(3). To state a cause of action under § 1985(3), plaintiffs must "allege

and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1059-60 (9th Cir. 2020), *cert. granted sub nom. FBI v. Fazaga*, No. 20-828, 2021 WL 2301971 (U.S. June 7, 2021) (citing *United Bhd. of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983)).

The "principal" element in alleging a civil conspiracy is an "*agreement* between the parties to inflict a wrong against or injury upon another." *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 74 (D.D.C. 2007) (citation omitted) (emphasis in original). Stating a civil conspiracy claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. The plaintiff must also show that "the conspiring parties 'reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" *Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) (citation omitted), *as amended on denial of reh'g* (July 15, 1999). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (en banc). To survive a motion to dismiss a claim alleging an unlawful conspiracy, a plaintiff must set forth more than just conclusory allegations of an agreement. *See Twombly*, 550 U.S. at 556-57 ("a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality"); *Dixie v. Virga*, No. 2:12-CV-2626-MCE-DAD, 2015 WL 412298, at *10 (E.D. Cal.

Jan. 30, 2015) ("Conclusory statements regarding the existence of a conspiracy are insufficient to state a claim under § 1985(3).").

Here, plaintiffs make numerous assertions regarding "communications and coordination between Defendant Wolf; federal forces commanded by Defendant Russell; USMS; and PPB officers." Resp. 30, ECF 48 (citing Am. Compl. 24-27, ECF 18). The problem, however, is that none of plaintiffs' assertions indicate in any way that defendants Wolf and Russell entered into an unlawful agreement. While plaintiffs contend they have made the requisite allegations under § 1985(3), the sum total of plaintiffs' factual assertions regarding the existence of an unlawful agreement are as follows:

> [C]ity police cooperated closely with federal forces deployed in Portland through at least July 22, 2020. The Portland Police Bureau was 'coordinat[ing] as needed with federal agencies. Portland Police Bureau Deputy Chief Chris Davis subsequently admitted that an FPS officer was present in the Portland Police Bureau's command post during demonstrations. He also reported that Portland Police Bureau offered suggestions to the federal forces. Portland Police Chief Lovell similarly confirmed the 'line of communication' with federal agencies.

> On July 16, 2020, when Defendant Wolf visited Portland, he met personally with Portland Police Association President Daryl Turner. Office Turner said his main objective in the meeting was to have the federal officers "working alongside PPB Chief Lovell in conjunction with and communicating with him and his command staff." Officer Turner had already publicly claimed that the demonstrations were "no longer about George Floyd, social justice, or police reform" and labeled the protestors as "defining the meaning of white privilege."

> [A]t least federal officials including Defendant Wolf participated in the July 16, 2020 meeting with Officer Turner. . . . Defendant Wolf also spoke separately to at least two other Portland Police Bureau officers at the Hatfield Courthouse that day.

> The coordination between the federal and local forces manifested in concrete assistance provided by the Portland Police Bureau to the federal agencies and officer. For example . . . after federal agent had shot Mr. LaBella in the head with impact munitions, the Portland Police Bureau "responded when federal officers called for help." Portland Police Bureau officers were seen talking with USMS officers in front of the Hatfield Courthouse, ordered demonstrators to disperse,

19 – FINDINGS AND RECOMMENDATIONS

marched shoulder-to-shoulder with federal officers to clear the street, and reportedly arrested an individual at the behest of FPS.

On multiple occasions, Portland Police Bureau officers worked together with federal agencies to remove protestors. Portland Police Bureau officers and federal officers jointly advanced on protesters on at least July 4, July 12, and July 17, 2020.

Am. Compl. 24-26, ECF 18. These allegations, taken as true, do not show sufficient "events, conversations, or documents indicating an agreement or 'meeting of the minds' amongst the defendants to violate [plaintiffs'] rights." *Black Lives Matter D.C. v. Trump*, No. 20-CV-1469 (DLF), 2021 WL 2530722, at *12 (D.D.C. June 21, 2021). There is simply no allegation regarding, or evidence of, an "*agreement* between the parties to inflict a wrong against or injury upon another." *McManus*, 530 F. Supp. 2d at 74 (citation omitted) (emphasis in original). In fact, neither the word "agreement," nor any derivation thereof, appears in plaintiffs' 84-page Amended Complaint. While plaintiffs correctly point out that they are entitled to "all reasonable inferences" in their favor, they must still "point to at least some facts which would suggest that [defendants] 'reached an understanding' to violate [their] rights." *Nelson v. City of McGehee,* 876 F.2d 56, 59 (8th Cir. 1989) (citation omitted). Without such facts, it is not possible to infer or extrapolate from plaintiffs' multiple references to "coordination" between federal and local law enforcement, that "Defendants Wolf and Russell conspired with other federal agents and with officers of the City of Portland to forcefully quash the constitutionally protected speech of Black Americans and their supporters." Resp. 4, ECF 48.

Plaintiffs rely, in part, on *DeWalt Prods., Inc. v. City of Portland*, No. 3:14-CV-1017-AC, 2016 WL 6089718, at *1 (D. Or. Oct. 17, 2016), a case in which the court denied a motion to dismiss a § 1985(3) claim. In *DeWalt*, however, the court discussed at great length the plaintiff's extensive and detailed allegations and specifically found that they included evidence of

conversations among the defendants about the plaintiff and evidence of a shared objective to deprive the plaintiff of his civil rights. *Id.* at *16-17*. The court was therefore able to conclude that the plaintiff "clearly" alleged the requisite elements of a §1985(3) claim.

Here, however, plaintiffs' general descriptions of communication and coordination between federal and local law enforcement officials does not meet the pleading standard under § 1985(3) that requires plaintiffs to "allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 685 (8th Cir. 2012). Indeed, plaintiffs cite no verbal or written communications that might suggest that defendants Wolf and Russell and local officials "'reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" *Gilbrook*, 177 F.3d at 856 (citation omitted). Without that kind of specificity, it is difficult to contest defendants' assertion that plaintiffs, "[a]t best," "have simply described lawful (and anticipated) coordination between federal and local officials for the purposes of formulating a law-enforcement response" to the events in Portland. Reply 26, ECF 70.

Plaintiffs have therefore failed to alleged sufficient facts to state a claim for relief under § 1985(3). *See Seung v. Beardmoro*, No. CV1506663JAKDTB, 2017 WL 426871, at *8 (C.D. Cal. Jan. 9, 2017), *report and recommendation adopted*, No. CV1506663JAKDTB, 2017 WL 427143 (C.D. Cal. Jan. 31, 2017) ("Plaintiff has alleged no facts in support of his § 1985(3) claim, but rather, has alleged only conclusions of law. . . . The Court therefore finds that plaintiff has not alleged facts sufficient to state a claim under § 1985(3)"); *Brady v. Livingood*, 360 F. Supp. 2d 94, 104 (D.D.C. 2004) (dismissing § 1985(3) conspiracy claim where the plaintiff "put[] forth no facts suggesting that the defendants were acting in concert in furtherance of a

shared goal of discriminating against him"). Accordingly, plaintiffs' Seventh Claim against defendants Wolf and Russell must be dismissed.

Further, "plaintiff's failure to state a viable claim under § 1985(3) defeats the plaintiff's claim under § 1986 as well." *DeWalt*, 2016 WL 6089718, at *16 (citing *Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988) ("A claim can be stated under section 1986 only if the complaint contains a valid claim under section 1985(3).")). Therefore, plaintiffs' Eighth Claim against defendants Wolf and Russell also must be dismissed.

## RECOMMENDATIONS

The Motion to Dismiss filed by defendants Wolf and Russell (ECF 25) should be GRANTED, and the First, Seventh, and Eighth claims asserted against them in their individual capacities should be dismissed.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge. Objections, if any, are due Monday, September 27, 2021. If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

//

//

//

//

//

**NOTICE**

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED September 13, 2021.

/s/ Youlee Yim You
Youlee Yim You<br>United States Magistrate Judge