IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MARK PETTIBONE, *et al*. | Case No. 3:20-cv-1464-YY |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| JOSEPH R. BIDEN, Jr., *et al.*, | |
| Defendants. | |

**Michael H. Simon, District Judge.**

United States Magistrate Judge Youlee Yim You issued Findings and Recommendations in this case on September 13, 2021. ECF 95. Judge You recommended that the Court grant the motion to dismiss filed by Defendants Chad Wolf, former Acting Secretary of the Department of Homeland Security (DHS), and Gabriel Russell, Federal Protective Services (FPS) Regional Director for Region 10 (collectively, Individual-Capacity Defendants). Judge You also recommended that the Court dismiss the First, Seventh, and Eighth Claims asserted against these two Defendants in their individual capacities. For the reasons stated below, the Court adopts in part Judge You's Findings and Recommendation and grants in part the motion to dismiss. The Court dismisses the First Claim as against Defendant Wolf and the Seventh and Eighth Claims as against both Defendants Wolf and Russell in their individual capacities. The Court denies Defendant Russell's motion to dismiss the First Claim as against him.

## STANDARDS

### A.  Review of Findings and Recommendation

Under the Federal Magistrates Act (Act), the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." 28 U.S.C. § 636(b)(1). If a party objects to a magistrate judge's findings and recommendations, "the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *Id.*; Fed. R. Civ. P. 72(b)(3).

For those portions of a magistrate judge's findings and recommendations to which neither party has objected, the Act does not prescribe any standard of review. *See Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting [the Act], intended to require a district judge to review a magistrate's report to which no objections are filed."); *United States. v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc) (holding that the court must review *de novo* magistrate judge's findings and recommendations if objection is made, "but not otherwise"). Although in the absence of objections no review is required, the Act "does not preclude further review by the district judge[] *sua sponte* . . . under a *de novo* or any other standard." *Thomas*, 474 U.S. at 154. Indeed, the Advisory Committee Notes to Fed. R. Civ. P. 72(b) recommend that "[w]hen no timely objection is filed," the Court review the magistrate judge's recommendations for "clear error on the face of the record."

### B.  Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint

and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epstein Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## DISCUSSION

Plaintiffs timely filed objections, to which Defendants Wolf and Russell timely responded. Plaintiffs argue that the Findings and Recommendations erred in recommending dismissal of Plaintiffs' First Claim for relief as an improper extension of *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiffs also argue that

Defendants Wolf and Russell are not entitled to qualified immunity, an issue Judge You did not

address based on her determination that Plaintiffs' *Bivens* claims must be dismissed. Plaintiffs

additionally contend that the Findings and Recommendations erred by concluding that Plaintiffs

have not adequately alleged an agreement between the Defendants Wolf and Russell and

Portland Police Bureau (PPB) officers to deprive Plaintiffs of their civil rights sufficient to

support a claim under 42 U.S.C. § 1985(3).[1] Finally, Plaintiffs argue that Judge You erred in not

granting Plaintiffs leave to amend.

## A. *Bivens*

The Supreme Court "has made clear that expanding the *Bivens* remedy is now a

'disfavored' judicial activity." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017). Extending *Bivens*

"is a significant step under separation-of-powers principles," and Congress is the branch of

government with the "substantial responsibility to determine whether, and the extent to which,

monetary and other liabilities should be imposed upon individual officers and employees of the

Federal Government." *Id.* at 1856. The Supreme Court "has 'consistently refused to extend

*Bivens* [liability] to any new context or new category of defendants.' . . . for the past 30 years."

*Id.* at 1857 (quoting *Corr. Svcs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (first alteration text in

*Malesko*, omitted in *Abbasi*)). "The [Supreme] Court's precedents now make clear that a *Bivens*

remedy will not be available if there are 'special factors counselling hesitation in the absence of

affirmative action by Congress.'" *Id.* (quoting *Carlson v. Green*, 446 U.S. 14, 18 (1980)). Thus,

in considering possible extensions of *Bivens*, courts "engage in a two-step inquiry." *Hernandez v.*

*Mesa*, 140 S. Ct. 735, 743 (2020). The first step is to "inquire whether the request involves a

claim that arises in a 'new context' or involves a 'new category of defendants.'" *Id.* (quoting

---

[1] Because Judge You found that Plaintiffs' failed to state a claim under 42 U.S.C.
§ 1985(3), Judge You also recommended dismissing Plaintiffs' claim under 42 U.S.C. § 1986.

*Malesko*, 534 U.S. at 68). If so, the second step is to "ask whether there are any special factors that counsel hesitation about granting the extension." *Id.* (simplified). Defendants Wolf and Russell argue that allowing claims against them would be extending claims to both a new context and new category of defendants, and that special factors counsel against extending *Bivens* under these circumstances.

### 1. New Context

Plaintiffs disagree with Judge You's *Bivens* "new context" analysis. Plaintiffs argue that the Findings and Recommendations created a large-scale law enforcement operations exception to *Bivens*. Plaintiffs contend that their claims are regular Fourth Amendment claims for illegal search, seizure, and excessive force, and are appropriate under *Bivens*, particularly considering *Ioane v. Hodges*, 939 F.3d 945 (9th Cir. 2018).

The Court does not read the Findings and Recommendations as concluding that Plaintiffs' claims present a new context for purposes of *Bivens* simply because of the large-scale operation of the federal officers' response to the Portland protests. Judge You referred to the scope of the operation, but she did so in the context of describing the difference between "line-level agents" in *Bivens* and the "high-level positions and non-direct roles held by Defendants Wolf and Russell in this case." ECF 95 at 8. Moreover, even if the Findings and Recommendations could be construed as creating a large-scale operation exception to *Bivens*, the Court does not adopt such an interpretation. The Court agrees with Judge You, however, that Plaintiffs seek to create supervisory or general agency liability under *Bivens* for Defendant Wolf, and that is a new context under *Bivens*. *See, e.g.*, *Wolfe v. City of Portland*, 2021 WL 4713237, at *12 (D. Or. Oct. 8, 2021).

Plaintiffs' reliance on *Ioane* is unavailing as to Defendant Wolf. In *Ioane*, the Ninth Circuit concluded that a plaintiff's claim was "similar to *Bivens* and therefore does not present a

'new context'" because "[b]oth cases concern an individual's Fourth Amendment right to be free from unreasonable searches and seizures." *Ioane*, 939 F.3d at 952. The federal agent in *Ioane*, however, was one who personally performed a warrantless search of the plaintiff's person in her home. *Id.* at 950. As the Ninth Circuit explained, "[t]here is no difference between [*Ioane* and *Bivens*] with respect to the rank of the officers involved," and the "case also does not result in any intrusion by the judiciary into the functioning of other branches." *Id.* at 952. Here, as alleged by Plaintiffs, Defendant Wolf did not personally participate in the alleged illegal conduct[2] and is of significantly higher rank. Instead, Plaintiffs allege that Defendant Wolf established high-level policy at DHS, generally was involved in sending a large federal response to Portland, made statements to the press and on Twitter, and held one meeting in Portland with the PPB union President and several officers of the PPB. These allegations are insufficient to show direct conduct in the alleged misconduct by the federal officers, but simply seek to impose liability for high-level agency supervisory conduct. This is a new context under *Bivens*.

Plaintiffs' allegations against Defendant Russell, however, are different. Plaintiffs allege that Defendant Russell, who is the Regional Director for Region 10,[3] commanded "Operation

---

[2] Claims against the federal agents who allegedly grabbed Pettibone from a public street, placed him in an unmarked van, restrained him, took him to the federal courthouse where other federal agents allegedly searched, restrained, detained, and interrogated Pettibone for at least an hour before releasing him, all allegedly without a warrant or probable cause, are more analogous to the claim raised in *Ioane*. Those defendants and those claims, however, are not the subject of the current motion to dismiss. Defendant Wolf is not alleged to have grabbed Plaintiff Pettibone and placed in him an unmarked van or engaged in any of the acts that followed. Nor is Wolf alleged to have specifically ordered that Pettibone be grabbed and placed in the unmarked van, restrained, detained, and questioned, or to have specific knowledge of that incident when such conduct occurred, or to have ratified that specific conduct. Similarly, Defendant Wolf is not alleged to have struck or used chemical irritants on Plaintiffs Obermeyer or David, or specifically ordered that those Plaintiffs be struck or attacked with chemical irritants, and the federal agent defendants who allegedly engaged in that conduct are not included in the pending motion to dismiss.

[3] Region 10 of FPS includes the states of Washington, Oregon, Idaho, and Alaska.

Diligent Valor," which was the expanded federal response to the protests in Portland. Specifically, Plaintiffs allege that Defendant Russell personally was in Portland and present in the command center during much of the alleged misconduct. Plaintiffs further allege that Defendant Russell had tactical control of the operations during the relevant period, that the federal officers engaged in the alleged misconduct were in Russell's chain of command, that he knew that federal officers were engaged in using excessive force and making illegal arrests, that he personally watched by video from the command center and on social media the federal officers' alleged misconduct, that from at least July 12, 2020 through July 29, 2020 he personally observed protestors and the responses by federal officers, that he was aware of the use of force by federal officers, and the he was specifically aware of the use of force by federal officers against Plaintiff Christopher David. Second Am. Compl. ¶¶ 23-25.

Plaintiffs also allege, albeit on information and belief, that Defendant Russell directed or was aware of the arrest of persons without probable cause, including the arrest of Plaintiff Mark Pettibone. *Id.* at ¶ 25. Plaintiffs further allege that despite Defendant Russell's personal knowledge of the alleged excessive force used and unlawful arrests conducted by the federal officers under Defendant Russell's command, he did not change tactics, discipline officers, speak out against the misconduct, or take any steps to stop the unlawful conduct. *Id.* at ¶ 26. Thus, Plaintiffs argue, Defendant Russell directed, facilitated, condoned, ratified, and is otherwise properly held responsible for the alleged misconduct under *Bivens* and its progeny.

Further, Plaintiffs contend that the mere fact that Russell held a supervisory role does not present a new context or a new type of defendant for *Bivens* purposes. For this argument, Plaintiffs rely on *Carlson*. In *Carlson*, the plaintiff, the mother of a prisoner who died in custody and administratrix of her son's estate, sued the Director of the Federal Bureau of Prisons (BOP),

the Assistant Surgeon General of the United States, and the chief medical officer of the prison in

which the prisoner died, among others. The district court previously had dismissed the Director

of the BOP and the Assistant Surgeon General for lack of proper service and then dismissed the

complaint for lack of subject matter jurisdiction. *Green v. Carlson*, 581 F.2d 669, 670, 676 (7th

Cir. 1978). The Seventh Circuit reversed, holding that the Director of BOP and Assistant

Surgeon General had been properly served and that the plaintiff had a remedy under *Bivens*

against the various defendants. *Id.* at 675-76.

       In affirming the Seventh Circuit and holding that *Bivens* provided a remedy, the Supreme

Court did not parse the defendants against whom the plaintiff could pursue her causes of action.

The Supreme Court in *Carlson* characterized the petitioners as "federal prison officials" and

described the allegations against the federal officers as follows:

> More specifically, respondent alleged that petitioners, being fully
> apprised of the gross inadequacy of medical facilities and staff at
> the Federal Correction Center in Terre Haute, Ind., and of the
> seriousness of Jones' chronic asthmatic condition, nonetheless kept
> him in that facility against the advice of doctors, failed to give him
> competent medical attention for some eight hours after he had an
> asthmatic attack, administered contra-indicated drugs which made
> his attack more severe, attempted to use a respirator known to be
> inoperative which further impeded his breathing, and delayed for
> too long a time his transfer to an outside hospital. The complaint
> further alleges that Jones' death resulted from these acts and
> omissions, that petitioners were deliberately indifferent to Jones'
> serious medical needs, and that their indifference was in part
> attributable to racial prejudice.

*Carlson*, 446 U.S. at 17 n.1. It does not appear that the Supreme Court considered the Assistant

Surgeon General and the Director of the BOP to be persons fully apprised of the gross

inadequacy of the facilities and staff at the specific Terre Haute, Indiana institution and of the

decedent prisoner's specific condition, but the Supreme Court did not expressly discuss that

question. The Supreme Court, however, did consider sufficient the allegations asserted against

the prison's chief medical officer, which were simply that he was "directly responsible for the

prison medical services" and that he "did not provide any emergency procedure for those times

when a physician was not present." *Carlson*, 581 F.2d at 671. There also was no indication that

the chief medical officer was onsite at the prison during the decedent prisoner's medical crisis.

Here, the allegations against Defendant Russell are more similar to the allegations in *Carlson*

that were asserted against the chief medical officer than to the allegations asserted in that case

against the Assistant Surgeon General or the Director of the BOP.

A plaintiff may bring a claim under the Fourth Amendment for illegal search and seizure

and excessive force under *Bivens*. *See Ioane*, 939 F.3d at 952; *see also Martinez-Aguero v.

Gonzalez*, 459 F.3d 618 (5th Cir. 2006) ("It follows that she may bring a *Bivens* claim for

unlawful arrest and the excessive use of force under the Fourth Amendment."). The Ninth Circuit

has described the necessary allegations for supervisor liability for a Fourth Amendment claim

under *Bivens*:

> Because *Iqbal* requires courts to apply an equivalent standard to
> supervisors and subordinates, we hold that, taking qualified
> immunity into account, a supervisor faces liability under the Fourth
> Amendment only where "it would be clear to a reasonable
> [supervisor] that his conduct was unlawful in the situation he
> confronted." A lower standard would impose vicarious liability on
> supervisors based on their subordinates' clearly unlawful conduct.

*Chavez v. United States*, 683 F.3d 1102, 1110 (9th Cir. 2012) (alteration in original); *see also

Morales v. Chadbourne*, 793 F.3d 208, 221 (1st Cir. 2015) ("A supervisor may be held liable for

the constitutional violations committed by his subordinates where an affirmative link between

the behavior of a subordinate and the action or inaction of his supervisor exists such that the

supervisor's conduct led inexorably to the constitutional violation. A plaintiff can establish that

'affirmative link' by alleging that the supervisor was a primary violator or direct participant in

the rights-violating incident, or that a responsible official supervises, trains or hires a subordinate

with deliberate indifference toward the possibility that deficient performance of the task

eventually may contribute to a civil rights deprivation." (quotation marks and citations omitted)).

In the § 1983 context, in which vicarious liability also is not imposed, the Ninth Circuit

has explained that for a supervisor to be liable the supervisor must be "personally involved in the

constitutional deprivation" or there must be "a sufficient causal connection" between the

supervisor's alleged wrongful conduct and the constitutional violation.[4] *Felarca v.*

*Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018) (citing *Starr*, 652 F.3d at 1207). This "causal

connection can be established by setting in motion a series of acts by others, or by knowingly

refusing to terminate a series of acts by others, which the supervisor knew or reasonably should

have known would cause others to inflict a constitutional injury." *Id.* (quoting *Starr*, 652 F.3d

at 1207-08).

In *Chavez*, the Ninth Circuit explained that a court should not accept "wholly conclusory"

allegations that a supervisor reviewed and approved operation plans and enforcement programs

of Border Patrol agents as sufficient to show that those plans and programs resulted in

unconstitutional conduct known by the supervisor. *Chavez*, 683 F.3d at 1110 (stating that alleged

review and approval of general plans, absent allegations of facts that "would have alerted [the

supervisor] to the allegedly unconstitutional searches," was insufficient to plausibly state

supervisor liability). The Ninth Circuit also held that an allegation that a supervisor had direct

control over line agents who committed constitutional violations was insufficient in the absence

---

[4] Courts look to § 1983 and *Bivens* standards for vicarious liability interchangeably, because "[a]lthough 'more limited in some respects,' a *Bivens* action is the federal analog to an action against state or local officials under § 1983." *Starr*, 652 F.3d at 1206 (quoting *Hartman v. Moore*, 547 U.S. 250, 254 n. 2 (2006)); *see also Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir. 1994) ("The decisional law is clear that there must be individual participation and involvement by a defendant, and that the concept of *respondeat superior* cannot be the basis of a claim under § 1983. In general, Section 1983 cases and *Bivens* cases are parallel in this regard." (citations omitted)).

of additional allegations plausibly showing that the supervisor had "reason to know that Border Patrol agents, who presumably conduct numerous stops, had frequently stopped plaintiffs, much less that they did so without reasonable suspicion." *Id.* at 1111. The Ninth Circuit stated that the plaintiffs in *Chavez* did not allege any "factual basis" for "imputing any such knowledge" to the supervisory defendants. *Id.*

Here, Plaintiffs allege more than "wholly conclusory" allegations that Defendant Russell reviewed and approved general operation plans that resulted in constitutional violations or simply had authority over agents who committed constitutional violations. Plaintiffs allege that Defendant Russell watched from the command center the alleged constitutional violations *as they were happening*. Plaintiffs also allege that Defendant Russell monitored social media video posts and watched the alleged constitutional violations. Plaintiffs further allege that Defendant Russell had specific knowledge of the conduct against Plaintiffs Christopher David and Mark Pettibone. Plaintiffs also allege that Defendant Russell directed or ordered some of the alleged misconduct, including some of the unlawful arrests. Plaintiffs allege that Defendant Russell was in Portland from at least July 12, 2020 through July 29, 2020. These allegations plausibly show that Defendant Russell was more directly involved in the alleged misconduct than was the chief medical officer in *Carlson* or the supervisory defendants dismissed in *Chavez*. Thus, Plaintiffs have sufficiently alleged facts that plausibly show that the alleged constitutional violations were caused by officers under Defendant Russell's command and that Defendant Russell either set in motion a series of acts by others or knowingly refused to terminate a series of acts by others that he "knew or reasonably should have known would cause others to inflict a constitutional injury." *Felarca*, 891 F.3d at 820 (quoting *Starr*, 652 F.3d at 1207).

At this stage of the litigation, accepting Plaintiffs' well-pleaded allegations as true, as the Court must, Plaintiffs have alleged facts showing direct personal conduct by Defendant Russell that are sufficient to state a claim under *Bivens*. *See Carlson*, 446 U.S. at 17; *Felarca*, 891 F.3d at 820; *Chavez*, 683 F.3d at 1110-11; *see also Morales*, 793 F.3d at 221 (describing the "affirmative link" required for supervisor liability); *Del Raine v. Williford*, 32 F.3d 1024, 1052 (7th Cir. 1994) (Manion, J, concurring) ("While supervisors cannot be held liable [under *Bivens*] under the doctrine of *respondeat superior*, they can be liable for the conduct of their subordinates if they were personally involved in that conduct. A superior may be personally involved by . . . knowing about unconstitutional conduct and facilitate[ing] it, approv[ing] it, condon[ing] it, or turn[ing] a blind eye for fear of what they might see." (simplified)); *Coleman v. Lappin*, 2011 WL 4586922, at *6 (E.D. Ky. Sept. 29, 2011) ("Under *Bivens*, a plaintiff must allege that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it. . . . Thus, Wilson's former position as Warden of USP-McCreary does not render him liable in a *Bivens* action for the decisions which subordinates or medical professionals at USP-McCreary made absent some allegation that he was either directly or personally involved in those medical decisions, *or condoned the allegedly unconstitutional actions*." (gathering cases) (emphasis added)). Plaintiffs' claims about Defendant Russell also do not simply focus on high-level policy decisions, unlike their claims against Defendant Wolf and the claims that were the focus of the Supreme Court's analysis in *Abbasi*. Instead, Plaintiffs' claims against Defendant Russell largely focus on his personal conduct in Portland. Additionally, Defendant Russell's rank is not meaningfully different from the rank of the defendants in *Carlson* against whom claims were properly stated.

Further, although the Individual-Capacity Defendants try to distinguish this case based on the fact that the alleged unlawful conduct took place in public instead of inside a home, courts have regularly applied *Bivens* to Fourth Amendment cases that arise in public. *See, e.g.*, *Chavez*, 683 F.3d at 1106; *Martinez-Aguero*, 459 F.3d at 625. This is true even after *Abbasi*. *See Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 709 (S.D.N.Y. 2020) ("Last, the Court rejects Defendant's argument that the location of Plaintiff's arrest—in public, rather than in his home—constitutes a meaningful difference from *Bivens*[.]" (collecting cases)); *Castellanos v. United States*, 438 F. Supp. 3d 1120, 1129-30 (S.D. Cal. 2020) ("But the consistent standard for all of these applications of force, whether at the international border or otherwise, is the fundamental Constitutional mandate: reasonable force at all times and in all relevant contexts. On balance, the context in which force and seizure were employed against Plaintiff tips in favor of the court concluding the circumstances of this case do not comprise a new *Bivens* context."); *id.* at 1130-31 (gathering cases); *Lehal v. Cent. Falls Det. Facility Corp.*, 2019 WL 1447261, at *12 (S.D.N.Y. Mar. 15, 2019) ("Further—although without engaging in a specific *Abbasi* analysis – recent decisions by courts in this Circuit have continued to find [Fourth Amendment] claims to be viable under *Bivens*, regardless of whether the arrests in question were made outside of the plaintiffs' homes. Similarly, and after consideration of *Abbasi*, courts in other jurisdictions around the county have also continued to permit such claims, under *Bivens*." (citations omitted) (gathering cases)). Thus, Plaintiffs claims against Defendant Russell do not involve a new context or a new type of defendant for purposes of *Bivens*.

## 2. Special Factors

### a. Claims against Defendant Wolf

The Court agrees with Judge You that several of the special factors the Supreme Court identified counsel against extending *Bivens* to the type of claims alleged against Defendant Wolf.

Of particular concern are separation of powers principles that permeate Plaintiffs' allegations. Plaintiffs argue that the Findings and Recommendations improperly conclude that Plaintiffs' operative complaint alleges that Defendant Wolf was acting pursuant to an executive policy, either Executive Order No. 13,933 or some other high-level policy. Plaintiffs contend that references in the complaint to the Executive Order and to the term "policy" did not intend to allege that Defendant Wolf's actions were pursuant to a policy and, in any event, Plaintiffs ask for leave to amend to remove such references if the Court were to find that the references suggest that Plaintiffs' claims are based on an executive policy. These objections are unavailing. Whatever label Plaintiffs try to put on their claims against Defendant Wolf, and no matter if Plaintiffs use the word "policy" in their allegations, it is evident from the substance of their claims that the claims are based on allegations that Defendant Wolf created, and had others implement, a high-level policy that Plaintiffs allege resulted in the unlawful conduct by line-level officers.

Based on the centrality of separation of powers concerns in the *Bivens* special factors analysis, courts must "consider the risk of interfering with the authority of the other branches." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020). Judge You correctly recognized the Supreme Court's "repeated admonition" that "a *Bivens* action is not a proper vehicle for altering an entity's policy." ECF 95 at 10 (citing *Abbasi*, 137 St. Ct. at 1860). Plaintiffs' allegations center on Defendant Wolf as a high-level official acting under a high-level policy and this creates significant separation of powers concerns. *See Wolfe*, 2021 WL 4713237, at *12. Additionally, as discussed by Judge You, Plaintiffs' claims against Defendant Wolf risk an uninvited intrusion into executive branch policymaking and operations, and risk intrusive discovery of a former high-ranking cabinet-level official. *Id.* The Court adopts Judge You's analysis as applied to

Defendant Wolf. Because the Court dismisses Plaintiffs' claims against Defendant Wolf, the Court need not address Defendant Wolf's qualified immunity argument.

### b. Claims against Defendant Russell

Assuming, *arguendo*, that the claims against Defendant Russell arose in a new context, the Court still would find a *Bivens* remedy appropriate against Defendant Russell based on the special factors analysis. The Individual-Capacity Defendants argue as special factors those that relate to Defendant Wolf—that the claims challenge a high-level policy and that claims against cabinet-level officials risk intrusive discovery into communications with the former President. These concerns, however, are not applicable to the Fourth Amendment claim the Court finds sufficiently stated against Defendant Russell. That claim focuses on Defendant Russell's personal involvement and direct causal connection to the alleged constitutional violations while he was in Portland, specifically observing federal officers while Defendant Russell was in the command center, directing federal officers, and setting in motion and failing to stop the alleged constitutional violations that he observed. That claim is not based on Defendant Russell's purported high level policy decisions or communications with then-President Trump.

The Individual-Capacity Defendants also argue that the availability of other remedies, including injunctive and declaratory relief, the Federal Tort Claims Act (FTCA), and the fact that there is a process under which an Inspector General can review alleged misconduct, provides sufficient alternative remedies for Plaintiffs to preclude *Bivens* liability for Plaintiffs' Fourth Amendment claim. When there exists "any alternative, existing process for protecting" for protecting a plaintiff's interests, then a court should refrain from "providing a new and freestanding remedy in damages." *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007). The alternative remedy, however, must provide "adequate" protection. *Minneci v. Pollard*, 565 U.S. 118, 120 (2012).

Both the Supreme Court and the Ninth Circuit have held that the FTCA is not an adequate alternative remedy to preclude a *Bivens* claim, and the Court is bound by that precedent. *See Carlson*, 446 U.S. at 23; *Boule v. Egbert*, 998 F.3d 370, 391 (9th Cir.), *cert. granted in part*, 142 S. Ct. 457 (2021). The Court also does not find that an Inspector General's *post hoc* review of potential Fourth Amendment excessive force and unlawful arrests by federal officers, in which the Inspector General considers the agency's conduct and reports to Congress, is an adequate remedy *for Plaintiffs*. Finally, injunctive and declaratory relief is not an adequate remedy for the harm caused by completed acts against Plaintiffs, rather than preventing future harm. *See Boule*, 998 F.3d at 392 ("Finally, injunctive relief is an inadequate remedy, for Boule is seeking damages for Agent Egbert's completed actions rather than protection against some future act."). Accordingly, the Court must address Defendant Russell's arguments based on qualified immunity, to which the Court turns next.

## B. Qualified Immunity

### 1. Standards

"The doctrine of qualified immunity protects government officials from liability for civil damages." *Wood v. Moss*, 134 S. Ct. 2056, 2066-67 (2014); *Krainski v. Nevada ex rel. Bd. of Regents*, 616 F.3d 963, 968 (9th Cir. 2010). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Whether qualified immunity can be invoked turns on the objective legal reasonableness of the official's acts. And reasonableness of official action, in turn, must be assessed in light of the legal rules that were clearly established at the time the action was taken.'" *Abbasi*, 137 S. Ct. at 1866 (simplified). "The privilege is an *immunity from suit* rather than a mere defense to liability; . . . it is effectively

lost if a case is erroneously permitted to go to trial." *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (quotation marks omitted) (emphasis in original). For this reason, the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). Qualified immunity, however, is only an immunity from suit for damages, it is not an immunity from suit for declaratory or injunctive relief. *See L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).

In *Saucier*, the Supreme Court outlined a two-step process for determining the applicability of the qualified immunity doctrine. 533 U.S. at 200. The first step is to determine "whether a constitutional right would have been violated on the facts alleged." *Id*. The second step is to determine "whether the right was clearly established." *Id*. The constitutional issue, however, need not be addressed first in every case. *Pearson*, 555 U.S. at 227. Regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not clearly established or the officer could have reasonably believed that his particular conduct was lawful. *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627 (9th Cir. 1991).

To determine whether a government official's conduct violates clearly established law, "a court must ask whether it would have been clear to a reasonable officer that the alleged conduct was unlawful in the situation he confronted." *Abbasi*, 137 S. Ct. at 1867. To be clearly established, "[i]t is not necessary . . . that the very action in question has previously been held unlawful. That is, an officer might lose qualified immunity even if there is no reported case directly on point. But in the light of pre-existing law, the unlawfulness of the officer's conduct must be apparent." *Id.* (citations and quotation marks omitted). "The 'clearly established' requirement 'operates to ensure that before they are subject to suit, [government officials] are on

notice their conduct is unlawful.'" *Eng v. Cooley*, 552 F.3d 1062, 1075 (9th Cir. 2009) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (alteration in original). Thus, the key inquiry in determining whether an officer has qualified immunity is whether the officer had "fair warning" that his conduct was unconstitutional. *Hope*, 536 U.S. at 741; *see also Saucier*, 533 U.S. at 202 (noting that the law need not be a "precise formulation of the standard" as long as "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand"); *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013) ("Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" (quoting *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964, 1003 (9th Cir. 2010) (en banc) ("[T]he specific facts of previous cases need not be materially or fundamentally similar to the situation in question."))). A court in this circuit first looks to binding precedent from the Supreme Court or the Ninth Circuit. *Boyd v. Benton Cnty.*, 374 F.3d 773, 781 (9th Cir. 2004). After that, "in the absence of binding precedent, [courts] look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts." *Id.* (quotation marks omitted).

A plaintiff bears the burden of making a showing that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002). When considering whether qualified immunity applies, the court must resolve all factual disputes in favor of the party asserting the injury. *Ellins*, 710 F.3d at 1064.

### 2. Application

Defendant Russell raises two primary arguments for why he is entitled to qualified immunity. The first argument is that he is entitled to qualified immunity because he did not

personally participate in any of the alleged constitutional violations. Defendant Russell contends that Plaintiffs offer no more than conclusory allegations that he approved or directed the alleged conduct by the federal officers or that the alleged officers were in his chain of command. The Court rejects this argument for the reasons discussed above.

Defendant Russell's second argument is that Plaintiffs fail to allege any clearly established violation of the Fourth Amendment. He argues that using the balancing test established in *Graham v. Connor*, 490 U.S. (1989), Plaintiffs fail to allege any Fourth Amendment violation at the first step of the qualified immunity analysis. Defendant Russell also argues that at the second step of the qualified immunity analysis, no clearly established law provided that the force used in the context of protests, crime control, and the protection of federal property, was unlawful, or that he may be held liable for such conduct. The Court addresses each of these arguments.

### a.  Fourth Amendment Violation

Defendant Russell argues that the governmental interest in policing large protests outweighs Plaintiffs' interests, and thus Plaintiffs fail to allege a Fourth Amendment violation under *Graham*. He asserts that a reasonable officer could have believed that using "significant force" to control large crowds at the protests to prevent "bad actors from using the crowd as cover to endanger the officers" was lawful. ECF 25 at 39.

Plaintiffs, however, do not allege that federal officers generally responded with too much force to large protest crowds. Instead, Plaintiffs allege specific incidents, including that federal officers: (1) "snatched" Plaintiff Pettibone, a U.S. citizen, from a public city street, allegedly blocks away from the federal courthouse, took him the federal courthouse, searched him, detained him, then released him, all allegedly without a warrant and without probable cause; (2) took a photograph of Plaintiff Mac Smiff while he was wearing clothing designated as

"Press" and while he was attempting to interview federal officers and several hours later shot him in the head with an impact munition without warning or a dispersal order while he was standing alone away from the courthouse and from other protesters; (3) shot Plaintiff Andre Miller in the head with a tear gas canister without warning or a dispersal order, causing a concussion and a cut requiring seven stitches, while Mr. Miller was standing several blocks away from the courthouse amidst a group of peaceful protesters; (4) shot Plaintiff Nichol Dennison in the head with a tear gas canister without warning or a dispersal order, which caused a cut requiring eleven stitches, while Ms. Dennison was standing with her arms linked in the "wall of moms" near the fence around the federal courthouse, peacefully protesting; (5) shot Plaintiff Maureen Healy in the head with an impact munition without warning when she was with a group of peaceful protester a block away from the federal courthouse, causing a concussion; (6) shoved, repeatedly struck with batons, and sprayed chemical irritant in the face of Plaintiff Christopher David in response to him asking federal officers why they were not upholding the Constitution, after he allegedly witnessed the officers attack a group of peaceful protesters, breaking his hand and requiring him to have surgery; (7) aimed a firearm at, shot a chemical irritant point blank in the face of, and struck with batons including in the face of, Plaintiff Duston Obermeyer without warning, when he repeated Mr. David's question about whether the federal officers knew their oath of office to uphold the Constitution, after Obermeyer allegedly witnessed the officers attacking peaceful protesters; and (8) shot Plaintiff James McNulty multiple times without warning or a dispersal order, with tear gas, with rubber bullets, and with a pepper ball, one of which went through his clothes, skin, fat layer, and into his muscle, requiring him to go to the emergency room, while he was standing with a group of peaceful protesters on a City street a block away from the federal courthouse. All of these alleged incidents occurred

during the time that Defendant Russell is alleged to have been in Portland and in the command center directing and observing the conduct of the federal officers.

### i.  Plaintiff Pettibone

Defendant Russell does not assert any argument for how Plaintiff Pettibone fails to allege a Fourth Amendment violation or why Defendant Russell is entitled to qualified immunity for the arrest of Pettibone. Arresting someone without a warrant or probable cause (as Plaintiffs allege occurred with Pettibone) is clearly a Fourth Amendment violation. *See United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) ("Under the Fourth Amendment, a warrantless arrest requires probable cause.").

### ii.  Plaintiffs David and Obermeyer

The alleged attacks against Plaintiffs David and Obermeyer are not incidents of crowd control but, as alleged, are targeted and specific uses of force in response to verbal questions by David and Obermeyer about the federal officers' failure to uphold their constitutional oath of office. The attacks allegedly involved strikes by batons and full face chemical irritant sprays.

Under *Graham*, to determine whether an officer has violated the Fourth Amendment, the Court balances "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. Thus, the Court first "assess[es] the gravity of the particular intrusion on Fourth Amendment interests," then "assess[es] the importance of the government interests at stake," and finally, "balances[s] the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1161 (9th Cir. 2011) (quotation marks omitted).

For the first step, "[b]oth pepper spray and baton blows are forms of force capable of inflicting significant pain and causing serious injury. As such, both are regarded as 'intermediate

force' that, while less severe than deadly force, nonetheless present a significant intrusion upon an individual's liberty interests." *Young*, 655 F.3d 1156, 1161 (9th Cir. 2011). "Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use[.]" *Deorle v. Rutherford*, 272 F.3d 1272, 1285 (9th Cir. 2001). Thus, the alleged conduct resulted in a serious intrusion on David and Obermeyer's Fourth Amendment interests.

In the second step of the *Graham* analysis, the Court evaluates the government's interest by assessing the "core factors": (a) the severity of the crime; (b) whether the suspect posed an immediate threat to the officers' or public's safety; and (c) whether the suspect was "actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. These factors are not exclusive and the Court looks to the totality of the circumstances. *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010). The Ninth Circuit has stated, however, that "the most important single element of the three specified factors" is whether the suspect posed an immediate threat to the safety of the officer or others. *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994); *see also Young*, 655 F.3d at 1163 ("Of the three factors we traditionally examine in determining the governmental interest, the most important is whether the individual posed an immediate threat to officer or public safety.").

Based on Plaintiffs' well-pleaded allegations, which as noted the Court must accept at this stage of the litigation, David and Obermeyer were not committing any crime because there was no dispersal order given with which they failed to comply, and they were merely asking federal officers why those officers were disregarding their constitutional oath. Even if they criticized the officers in that exchange, such criticism would not have been a crime. *United States v. Poocha*, 259 F.3d 1077, 1082 (9th Cir. 2001) ("Poocha used profanity to express his disapproval of an officer's conduct. Criticism of the police, profane or otherwise, is not a

crime."). There is no indication that these Plaintiffs were violent or otherwise presented any threat to the federal officers or the public. There also is no reason to conclude that these Plaintiffs were resisting or evading arrest, although they did attempt to block the baton blows. Defendant Russell identifies no other factor that supports the government's position, other than generally arguing that the officers could use force to "seize" large crowds and to prevent "bad actors" from using the crowd as "cover." That interest, assuming it were viable, is unrelated to the alleged conduct pertaining to Plaintiffs David and Obermeyer, who were not part of a large crowd or subject to force while officers were attempting to quell large crowds. Instead, David and Obermeyer allegedly were specifically targeted and individually engaged, possibly in retaliation for their questions to officers. Thus, the government has not shown at this stage of the lawsuit, based on Plaintiffs' allegations, that the government had a strong interest in engaging in the alleged conduct.

Finally, balancing the significant intrusion against David and Obermeyer's Fourth Amendment interests with the government's need for that intrusion weighs in favor of Plaintiffs. Use of intermediate force requires a strong governmental interest, and the Individual-Capacity Defendants have failed to show that interest at this stage. The governmental interest is insubstantial, and the intrusion on David's and Obermeyer's interests is significant. The *Graham* analysis supports the conclusion that the use of force was not reasonable.

### iii.  Remaining Named Plaintiffs

The remaining named Plaintiffs all allege that they were shot in the head with less-lethal impact munitions. They all allege that they were shot without warning and without being given a dispersal order. They were all among peaceful protesters or standing away from other protesters. As alleged, none were among the violent, or bad, actors.

Like the use of batons, the use of impact munitions is intermediate force. *See Deorle*, 272

F.3d at 1284-85. Thus, it requires a strong countervailing government interest. *Id.* at 1285.

Additionally, use of such force "should be preceded by a warning, when feasible." *Id.*; *see also*

*id.* at 1283-84 ("The absence of a warning or an order to halt is also a factor that influences our

decision. . . . Our cases demonstrate that officers provide warnings, where feasible, even when

the force used is less than deadly."). All the remaining plaintiffs allege that they were not given

any warning before being shot.

The Individual-Capacity Defendants make the same argument, that the government has

an interest in general law enforcement, large crowd control, and stopping "riotous" people and

bad actors in the crowd and can therefore use force against the entire crowd. The Ninth Circuit,

however, has instructed the government to use a different approach, explaining:

> Demonstrations can be expected when the government acts in
> highly controversial ways, or other events occur that excite or
> arouse the passions of the citizenry. The more controversial the
> occurrence, the more likely people are to demonstrate. Some of
> these demonstrations may become violent. The courts have held
> that the proper response to potential and actual violence is for the
> government to ensure an adequate police presence and to arrest
> those who actually engage in such conduct, rather than to suppress
> legitimate First Amendment conduct as a prophylactic measure.

*Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1996). Only when the crowd is "behaving as a

unit and it is not possible . . . for the police to tell who is armed and dangerous or engaging in

criminal acts and who is not" may law enforcement have "reasonable suspicion as to the

members of the entire group." *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1195 (9th Cir. 2015).

Based on Plaintiffs' allegations, that was not the case with respect to the remaining Plaintiffs

when they were shot. At this stage of the proceedings, the Court accepts these allegations by

Plaintiffs as true, construes them in the light most favorable to Plaintiffs, and draws all

reasonable inferences in Plaintiffs' favor. *See Wilson*, 668 F.3d at 1140; *Daniels-Hall*, 629

F.3d at 998; *Newcal Indus.*, 513 F.3d at 1043 n.2.

As with Plaintiffs David and Obermeyer, the remaining Plaintiffs were not engaged in

any criminal activity, were not a danger to the officers or the public, and were not resisting.

Indeed, some were attempting to leave the area when they were shot, but that does not equate to

evading arrest because they were not under arrest and had not been asked to halt. The

government interest is minimal and does not meet the strong threshold necessary to outweigh the

intrusion on Fourth Amendment interests of intermediate force. Russell's argument under

*Graham* fails.

### b.   Clearly Established Law

The Individual-Capacity Defendants briefly argue that no caselaw clearly established the

alleged Fourth Amendment violations or that Defendant Russell could be held liable for them.

### i.   Plaintiff Pettibone

For decades, the law has been clearly established that a warrantless arrest requires

probable cause. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981) (stating "the general rule

that every arrest, and every seizure having the essential attributes of a formal arrest, is

unreasonable unless it is supported by probable cause"); *Torres v. City of L.A.*, 548 F.3d 1197,

1207 n.7 (9th Cir. 2008) (stating that a warrantless "arrest is lawful under the Fourth Amendment

only if it is accompanied by probable cause to believe that the arrestee has committed, or is

committing, an offense"); *McKenzie v. Lamb*, 738 F.2d 1005, 1007 (9th Cir. 1984) ("The fourth

amendment to the United States Constitution, applicable to the states through the fourteenth

amendment, prohibits arrests without probable cause."). The Supreme Court has cautioned that

in the context of qualified immunity, officers "will often find it difficult to know how the general

standard of probable cause applies in the precise situation encountered" and thus "existing

precedent must place the lawfulness of the particular arrest beyond debate." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). Defendant Russell, however, does not argue that the federal officers had probable cause or that they are entitled to qualified immunity because a reasonable officer in their position would have believed that they had probable cause.

Further, the Court finds that as alleged by Plaintiff Pettibone, this is the "rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear." *See id.*; *see also Deorle*, 272 F.3d at 1286 ("When the defendant's conduct is so patently violative of the constitutional right that reasonable officials would know without guidance from the courts that the action was unconstitutional, closely analogous pre-existing case law is not required to show that the law is clearly established." (simplified)). Based on decades of precedent, it was beyond debate that a person could not be taken off a city street, searched, and detained, without a warrant or probable cause. That law enforcement may have purportedly seized Pettibone as part of an investigation into purported damage to federal property or a crime that purportedly took place on federal property is no different than any other criminal investigation. Federal law enforcement officers clearly know, and knew in July 2020, that they may not lawfully detain persons without a warrant and without probable cause under the U.S. Constitution.

### ii.  Plaintiffs David and Obermeyer

Plaintiffs David and Obermeyer allegedly were beaten with batons and sprayed in the face with chemical irritants, allegedly without probable cause, a warning, the issuance of a dispersal order, or when they were around violent protesters. They allegedly were beaten and sprayed with chemical irritants in response to questioning federal officers why they were not upholding their oath of office. "For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains

the liberty of a citizen." *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997). Thus, David and Obermeyer were seized within the meaning of the Fourth Amendment.

The Individual-Capacity Defendants argue that the law was not clearly established that federal law enforcement officers could not respond with general force to large protests when some people were engaging in violent acts. David and Obermeyer, however, do not allege that they were subject to general force in response to large protests. David and Obermeyer allege that they were specifically targeted for force when they questioned federal officers about the officers' behavior related to other peaceful protesters. The law was clearly established in 2020 that David and Obermeyer had the right to criticize and verbally challenge the federal officers. *Velazquez v. City of Long Beach*, 793 F.3d 1010, 1019 (9th Cir. 2015) ("Ninth Circuit law . . . clearly establishes the right verbally to challenge the police[.]" (first alteration in *Velazquez*) (quoting *Mackinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995)); *see also Poocha*, 259 F.3d at 1082 (stating that using profanity and criticizing police is not a crime); *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1377 (9th Cir. 1990) (stating that making obscene gestures and yelling profanities at an officer "was not illegal; criticism of the police is not a crime" (citing *Houston v. Hill*, 482 U.S. 451, 461-63 (1987)).

The law also was clearly established in 2020 that use of batons and chemical irritants are intermediate levels of force that require strong governmental interests to be used. *See Felarca*, 891 F.3d at 817; *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011); *Young*, 655 F.3d at 1161; *Deorle*, 272 F.3d at 1285. Such interests might include preventing a serious crime, responding to a risk of harm to the officers or the public, responding to a serious risk of flight, or responding to the suspect resisting arrest. *See Graham*, 490 U.S. at 396. As discussed above, based on Plaintiffs' allegations, none of these governmental interests applied.

Additionally, this case is somewhat similar to *Young*, in that, as alleged, Plaintiffs David and Obermeyer were subject to baton strikes and chemical irritants without justification. Indeed, this case is more compelling than *Young*. In *Young*, the injured party had committed a traffic offense and then refused to cooperate with law enforcement, and the Ninth Circuit held those minor offenses did not provide strong enough countervailing government interests for the force used without warning. *Young*, 655 F.3d at 1165-67. Here, David and Obermeyer allegedly did not commit any crime, because criticizing, and even profanely taunting, law enforcement officers is not illegal. Thus, there is even less justification for the force used here as compared to *Young*.

Yet, the Ninth Circuit held in *Young* that the law against the use of force under the circumstances was clearly established, explaining:

> The principle that it is unreasonable to use significant force against a suspect who was suspected of a minor crime, posed no apparent threat to officer safety, and could be found not to have resisted arrest, was thus well-established in 2001, years before the events at issue in this case. Just as in *Blankenhorn* [*v. City of Orange*, 485 F.3d 463 (9th Cir. 2007)], these well-established principles of Fourth Amendment law sufficed to put Wells on notice that the force used was excessive—that to pepper spray an individual and strike him with a baton for disobeying a traffic officer's order to get back in his car (and sitting instead on the curb eating his broccoli) constituted a violation of the Fourth Amendment.

> In addition to *Blankenhorn's* holding as to the notice provided to reasonable officers by 2001, our holding in *Headwaters II* [*Headwaters Forest Defense v. County of Humboldt*, 276 F.3d 1125 (9th Cir. 2002),] would have provided a reasonable officer in Wells's position with specific and unambiguous notice that the use of pepper spray and baton blows constituted excessive force. In *Headwaters II*, we held that police officers employ excessive force in violation of the Fourth Amendment when they use pepper spray upon an individual who is engaged in the commission of a non-violent misdemeanor and who is disobeying a police officer's order but otherwise poses no threat to the officer or others. 276 F.3d at 1131. While the facts in *Headwaters II* are in some respects distinct from those of this case, that case's straightforward holding would have provided explicit and unambiguous notice to any reasonable officer in Wells's position that the use of intermediate

> force in general, and of pepper spray in particular, would, under
> the circumstances as alleged in this case, constitute an excessive
> response to a suspect's commission of a misdemeanor and
> disobedience of a police order.

*Young*, 655 F.3d at 1168. The same is true here. *Headwaters II* and *Young*, among other cases,

provided explicit notice to any reasonable law enforcement officer that the use of force under the

circumstances alleged by David and Obermeyer was an unconstitutional use of force. *See*

*Figueroa v. City of Tukwila*, 2012 WL 6059354, at *4 (W.D. Wash. Dec. 6, 2012) ("However

with respect to the pepper spray and strikes to the face, the court 'need look no further than

*Graham's* holding that force is only justified when there is a need for force.' *Blankenhorn*, 485

F.3d at 481. This clear principle would have put a prudent officer on notice that two officers

tackling, using pepper spray, and punching plaintiff in the face, without first attempting a less

violent means of arresting plaintiff who was not, by her account, attempting to flee, was a

violation of that person's Fourth Amendment rights. *See id.*; *LaLonde v. County of*

*Riverside*, 204 F.3d 947, 961 (9th Cir. 2000) (holding that any reasonable officer would know

that use of pepper spray in a situation where an arrestee surrenders and is rendered helpless

constitutes excessive force).").

### iii. Remaining Named Plaintiffs

The remaining named Plaintiffs allege that they were shot in the head with impact

munitions, and some were also shot elsewhere, causing significant injury. The Individual-

Capacity Defendants argue that the law was not clearly established that general force could not

be used to respond to large protests when some protesters behaved violently or unlawfully. The

Individual-Capacity Defendants cite an Eighth Circuit opinion to support this argument. As

discussed above, however, the Ninth Circuit instructs that the appropriate response is "for the

government to ensure an adequate police presence and to arrest those who actually engage in

such conduct." *Collins*, 110 F.3d at 1372.

As further explained by the Ninth Circuit in *Collins*:

> It has been clearly established since time immemorial that city
> streets and sidewalks are public fora. Restrictions on First
> Amendment activities in public fora are subject to a particularly
> high degree of scrutiny.

*Id.* at 1371 (citations and quotation marks omitted). *Collins* involved protests that took place in

San Francisco after the verdicts in the state criminal trial of the officers who beat Rodney King.

*Id.* at 1366. Officers gave several dispersal orders. *Id.* at 1368. Large crowds of protesters

remained after the dispersal orders, moving down the street, and objects were thrown at police.

*Id.* The officers asserted that the crowds acted as "an organized group" and the plaintiffs asserted

that the crowd acted as "a diffuse body of individuals." *Id.* The police encircled and arrested the

group en masse. *Id.*

The Ninth Circuit also addressed potential group activity in *Lyall*. The Ninth Circuit

explained:

> *Ybarra* [*v. Illinois*, 444 U.S. 85 (1979),] stands for the proposition
> that, if a person is simply present in the vicinity of potential
> criminal activity, without doing anything else to indicate that he is
> engaging in criminal activity or that he is armed and dangerous, the
> police do not have probable cause to search him or reasonable
> suspicion sufficient to detain him and frisk him for weapons.
> *Ybarra* does not, however, imply that the police can *never* possess
> reasonable suspicion or probable cause unless it is individualized.
> If a group or crowd of people is behaving as a unit and it is not
> possible (as it was in *Ybarra* ) for the police to tell who is armed
> and dangerous or engaging in criminal acts and who is not, the
> police can have reasonable suspicion as to the members of the
> group.

*Lyall*, 807 F.3d at 1195. Thus, as of 2020, the law was clearly established that law enforcement

officers could not use physical force to seize an entire group of protesters unless the crowd was

behaving as a unit and it was not possible to tell who was armed and dangerous and who was not.

Based on Plaintiffs' allegations, when these Plaintiffs were shot it was obvious that they were not

armed, not dangerous, and not engaging in any violent or illegal behavior, nor was anyone

around them engaged in such behavior. At this stage of the proceedings, those allegations are

enough to preclude the Individual-Capacity Defendants' argument that qualified immunity is

warranted based on the reasonable belief that the force used was permitted as a general response

to protests.

Considering the force itself, the Ninth Circuit has already resolved the issue:

> Every police officer should know that it is objectively
> unreasonable to shoot—even with lead shot wrapped in a cloth
> case—an unarmed man who: has committed no serious
> offense . . . has been given no warning of the imminent use of such
> a significant degree of force, poses no risk of flight, and presents
> no objectively reasonable threat to the safety of the officer or other
> individuals.

*Deorle*, 272 F.3d at 1285. The law was therefore clearly established with respect to less lethal

munitions and qualified immunity is not appropriate at this stage of the proceedings.

### iv. Supervisor Liability

Because qualified immunity is unavailable for any of the direct acts by the federal

officers, the final analysis is whether the law was clearly established that Defendant Russell

could be held liable. The Ninth Circuit treats supervisor liability under § 1983 and *Bivens*

interchangeably. *See* footnote 4, *supra*. The standards for supervisor liability, that a supervisor

must be personally involved in the violation or have a sufficient causal link, have been clearly

established well before 2020. *See Felarca*, 891 F.3d at 820; *Chavez*, 683 F.3d at 1110; *Starr*, 652

F.3d at 1207; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). As discussed above, Plaintiffs'

allegations, taken as true and drawing all reasonable inferences in Plaintiffs' favor, meet this

longstanding, clearly established standard.

**C. Conspiracy**

As for Plaintiffs' Seventh and Eighth Claims for Relief, which allege conspiracy, Plaintiffs objects that Judge You failed to accept Plaintiffs' allegations that federal officers under Defendant Russell's command worked with officers of the PPB, Defendant Wolf met with the PPB union President, and that federal and PPB officers worked together to infringe protesters' rights. Plaintiffs contend that because the protesters were supporting Black Lives Matter and Plaintiffs allege that the federal and local police worked together to stop protests, they worked together in a conspiracy driven by racial animus. The Court agrees with Judge You that the inferences are a step too far for Plaintiffs' claims under §§ 1985 and 1986. At most, Plaintiffs allege a conspiracy to disrupt and prevent First Amendment rights and a that both local and federal law enforcement showed animus to protesters. The missing link, however, is that this animus was "racially motivated." The Court adopts this portion of the Findings and Recommendations.

**D. Leave to Amend**

Finally, Plaintiffs contend that the Findings and Recommendations erred in not addressing Plaintiffs' request for leave to amend. Plaintiffs seek leave to add additional specific allegations to clarify their First Claim for Relief and elaborate on their *Bivens* "special factors" arguments and propose to include six more facts based on a new report that the DHS released after Plaintiffs filed their First Amended Complaint to bolster their Seventh and Eighth Claims for Relief. Plaintiffs also request, if the Court denies leave to amend, that the Court dismiss the claims without prejudice so Plaintiffs can seek leave to amend if further material information from the government surfaces in the future.

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that the "court should freely give leave [to amend a pleading] when justice so requires." A district court should apply

Rule 15's "policy of favoring amendments with extreme liberality." *Price v. Kramer*, 200

F.3d 1237, 1250 (9th Cir. 2000) (simplified). The purpose of the rule "is 'to facilitate decision on

the merits, rather than on the pleadings or technicalities.'" *Novak v. United States*, 795

F.3d 1012, 1020 (9th Cir. 2015) (quoting *Chudacoff v. Univ. Med. Ctr.*, 649 F.3d 1143, 1152 (9th

Cir. 2011)). A district court, however, may, within its discretion, deny a motion to amend "due to

'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue

of allowance of the amendment, [and] futility of the amendment.'" *Zucco Partners, LLC v.

Digimarc Corp.*, 552 F.3d 981, 1007 (9th Cir. 2009) (alteration in original) (quoting *Leadsinger,

Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008)). "Not all of the factors merit equal

weight. As this circuit and others have held, it is the consideration of prejudice to the opposing

party that carries the greatest weight." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048,

1052 (9th Cir. 2003). Futility of amendment, however, "can, by itself, justify the denial of a

motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). Generally,

however, "[a]bsent prejudice, or a strong showing of any of the remaining [four] factors, there

exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *Eminence

Capital*, 316 F.3d at 1052 (alterations added, emphasis in original). When weighing these factors,

all inferences should be made in favor of granting the motion to amend. *Griggs v. Pace Am.

Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999).

Leave to amend may be denied if the proposed amendment is futile or would be subject

to immediate dismissal. *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1008 (9th

Cir. 2011). An amendment is futile "only if no set of facts can be proved under the amendment to

the pleadings that would constitute a valid and sufficient claim or defense.'" *Barahona v. Union

*Pac. R.R. Co.*, 881 F.3d 1122, 1134 (9th Cir. 2018) (quoting *Sweaney v. Ada Cnty*, 119

F.3d 1385, 1393 (9th Cir. 1997)); *see also Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656

(9th Cir. 2017) ("An amendment is futile when 'no set of facts can be proved under the

amendment to the pleadings that would constitute a valid and sufficient claim or defense.'"

(quoting *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988))). If the facts or

circumstances possibly could "be a proper subject of relief, [a plaintiff] ought to be afforded an

opportunity to test his claim on the merits." *Foman v. Davis*, 371 U.S. 178, 182 (1962). The

standard for assessing whether a proposed amendment is futile therefore is the same as the

standard imposed under Rule 12(b)(6) of the Federal Rules of Civil Procedure, *see, e.g.*, *Miller v.

Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988), although "viewed through the lens of the

requirement that courts freely give leave to amend when justice so requires." *Barber v. Select

Rehab., LLC*, 2019 WL 2028519, at *1 (D. Or. May 8, 2019) (quotation marks omitted).

Here, the concern with Plaintiffs' request for leave to amend is not based on "undue

delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments

previously allowed," or "undue prejudice to the opposing party by virtue of allowance of the

amendment." *Leadsinger*, 512 F.3d at 532. Instead, the Court finds the proposed amendments

futile. Regarding the policy-based allegations related to the *Bivens* "special factors" analysis, a

*Bivens* claim against Defendant Wolf based on his response to protests in Portland is necessarily

bound to high-level decisions and policy choices about the deployment of federal officers in

Portland. Plaintiffs ask for leave to remove references to the word "policy" and to President

Trump's Executive Order, but those references are not the problem with Plaintiffs' allegations—

it is the substance of their claim, not the phrasing.

As for the DHS report that was released after the current version of Plaintiffs' complaint, the Individual-Capacity Defendants argue that Plaintiffs' proposed amendments still lack sufficient detail to cure the deficiencies of the First Amended Complaint and thus would be futile for the same reasons that Plaintiffs' current complaint fails to state a claim. Although the Court would apply the liberal leave to amend standard, here, upon review, the Court determines that the six new facts from the DHS report do not mention or concern Defendants Wolf or Russell. Nor do the new facts include any evidence of an illegal agreement or conspiracy involving Defendant Wolf or Russell. Thus, at this time, the Court denies leave to amend Plaintiffs' *Bivens* claim against Defendant Wolf and Plaintiffs' conspiracy claims against Defendants Wolf and Russell. The Court, however, agrees with Plaintiffs that new facts may come to light in the future. If that happens, Plaintiffs may seek leave to amend, if appropriate. The Court thus dismisses these claims without prejudice.

## CONCLUSION

The Court **ADOPTS IN PART** Judge You's Findings and Recommendations. ECF 95. The Court GRANTS IN PART the Motion to Dismiss filed by Defendants Wolf and Russell (ECF 25) and dismisses without prejudice the First Claim as against Defendant Wolf and the Seventh and Eighth Claims as against Defendants Wolf and Russell in their individual capacities.

**IT IS SO ORDERED.**

DATED this 27th day of December, 2021.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge