UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| MARK PETTIBONE, an individual, *et al.*, | |
| Plaintiffs, | Case No. 3:20-cv-01464-YY |
| v. | FINDINGS AND RECOMMENDATIONS |
| JOSEPH R. BIDEN, Jr, in his official capacity, *et al.*, | |
| Defendants. | |

YOU, Magistrate Judge.

**FINDINGS**

This suit arose from the protests in support of the Black Lives Matter movement that occurred during the summer of 2020. Many of those protests centered around the Mark O. Hatfield U.S. Courthouse in downtown Portland. Plaintiffs are eight individuals who participated in protests outside the courthouse and two organizations whose members also took part in demonstrations outside the courthouse. Their complaint alleges, in relevant part, that federal agents assigned to protecting the federal courthouse during the protests used unreasonable force and unlawful arrest or detention against the individual plaintiffs.

1 – FINDINGS AND RECOMMENDATIONS

Currently pending are a series of motions to dismiss filed by the federal agents accused of violating the individual plaintiffs' constitutional rights. ECF 170, ECF 174,[1] ECF 175, ECF 178. These moving defendants include agents from U.S. Customs and Border Protection, the U.S. Marshals Service, and employees of the Federal Protective Service, who were engaged in the operation to defend the courthouse during the protests.[2] Some of the individual federal agents have also requested judicial notice for a series of facts about the protests set out in media reports, social media posts, and other sources. ECF 174.

The request for judicial notice should be granted, but only to take notice of the existence of the proffered materials and not for the truth of the matters asserted in those materials. The motions to dismissed should be granted because the U.S. Supreme Court's recent decision in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), forecloses the availability of a so-called *Bivens* cause of action for plaintiffs' Fourth Amendment claims against the moving defendants.

## I.    Background

The following facts are taken from plaintiffs' Second Amended Complaint and the materials attached to it and are, for the purpose of resolving the current motions, assumed to be true. Starting in late May 2020, and for more than 80 consecutive nights at the time this action was filed in August 2020, protestors gathered and marched in "large numbers" in the streets of Portland, including the area surrounding the federal courthouse and the Multnomah County

---

[1] Defendants 17 and 18 filed two motions; one under seal (ECF 173) and one redacted version (ECF 174). The arguments are the identical in the two versions; for simplicity, only the redacted and publicly-viewable motion is cited here, though both motions are resolved by these Findings and Recommendations.

[2] Claims based on the actions of high-ranking federal officials such as former President Donald Trump, then-acting Secretary of the Department of Homeland Security Chad Wolf, and other supervisory federal officials involved in planning and directing the federal government's response to the ongoing protests in Portland are addressed in other findings and recommendations and orders. *E.g.* ECF 95, ECF 149.

Justice Center. Sec. Am. Compl. ¶ 54, ECF 80. On June 26, 2020, former President Trump issued Executive Order 13,933 on "Protecting American Monuments, Memorials, and Statutes and Combating Recent Criminal Violence," which directed cabinet officials and federal agency administrators, including defendant Chad Wolf as then-Acting Secretary of the Department of Homeland Security, to provide "personnel to assist with the protection of Federal monuments, memorials, statues, or property." *Id*. ¶ 56. Wolf and other DHS officials "created and sent a Rapid Deployment Force to Portland in advance of the July 4, 2020 holiday weekend as part of what they termed 'Operation Diligent Valor.' " *Id.* ¶ 59. Federal agents from Customs and Border Protection, Immigration and Customs Enforcement, and the U.S. Marshals Service all participated in the operation. *Id.* ¶ 60.

According to the complaint, these federal agents, while purportedly engaged in the mission to "protect federal property," used harsh and severe "tactics" against the protestors that included "surveillance, warrantless arrests, or custodial detentions of protesters, and the indiscriminate use of excessive force, including shooting protesters in the head and body with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting and beating them with batons, and firing massive clouds of tear gas at them, even when doing so was not necessary to protect federal property or the persons on it." *Id.* ¶ 62. And it is these actions, as specifically used against plaintiffs here at various times, that are the basis of plaintiffs' complaint.

Plaintiff Mark Pettibone was "snatched off the street by unidentified federal agents, who arrested him and detained him in jail for hours without ever informing him of the reasons for their actions, much less charging him with an offense." *Id.* ¶ 119. Plaintiff Mac Smiff was shot by a federal agent "in the head with an impact munition while he was lawfully attending the

protests," *id.* ¶ 134, and plaintiff James McNulty was shot "three times with rubber bullets and one time with a pepper ball." *Id.* ¶ 198. Plaintiff Andre Miller was "shot . . . in the head with a tear gas cannister, causing a gash in his head the required seven stitches and a concussion that continues to have lingering effects," *id.* ¶ 175, and plaintiffs Nichol Denison and Maureen Healy were hit in the head with tear gas cannisters or other projectile. *Id.* ¶¶ 151, 163. Federal agents knocked plaintiff Christopher David to the ground, struck him multiple times with batons, and sprayed him with chemical irritant. *Id.* ¶¶ 172–73. Other federal agents also struck plaintiff Duston Obermeyer with batons and sprayed him in the face at point-blank range with a chemical irritant. *Id.* ¶ 189.

These plaintiffs have brought Fourth Amendment claims against the federal agents in their individual capacities. *Id.* ¶¶ 219–225 (Second Claim for Relief). There are numerous other claims alleged in the complaint, but the Fourth Amendment claims against the federal agents in their individual capacities are the primary target of the federal agents' pending motions to dismiss. The motions are brought as follows:

- Defendants 1 through 6 and 8 through 15 were involved in plaintiff Pettibone's arrest, search, and detention. Defendants 1 through 6 are employees of the U.S. Marshals Service; defendants 8 through 13 are Customs and Border Protection Agents; and defendants 14 and 15 are employees of the Federal Protective Service. Defs. 1–6, 8–15 Mot. Dismiss, ECF 170.

- Defendant 7 is a supervisor with the U.S. Marshals Service, and is alleged to have approved or directed the use of force by defendants 17, 18, and 19 against plaintiffs David and Obermeyer. Def. 7 Mot. Dismiss, ECF 175.

- Defendants 17 and 18 are employees of the U.S. Marshals Service who are alleged to have used excessive force against plaintiffs David and Obermeyer. Defs. 17 & 18 Mot. Dismiss, ECF 174.

- Defendant 16 is an employee of the U.S. Marshals Service who was allegedly involved in plaintiff Pettibone's arrest, search, and detention; defendant 19 is also an employee of the U.S. Marshals Service and is alleged to have been involved in using excessive force against plaintiffs David and Obermeyer. Defs. 16 & 19 Mot. Dismiss, ECF 178.

As will become clear, the specific federal agency for which any individual federal agent worked for is often not relevant to the legal analysis that follows. Thus, all the moving federal agents are generally referred to collectively as "defendants," unless otherwise noted.[3]  The defendants have also moved to dismiss plaintiffs' Seventh and Eighth claims for relief, which allege a conspiracy to deprive plaintiffs of their constitutional rights. *E.g.*, Defs. 1–6, 8–15 Memo ISO Mot. Dismiss 52–54, ECF 171; *see also* Sec. Am. Compl. ¶¶ 258–76, ECF 80. Additionally, defendants 17 and 18 have requested judicial notice of facts contained in various media reports, social media posts, and other sources. Defs. 17 & 18 Mot. Dismiss 3–7, ECF  174.

## II.    Standards

To state a claim for relief, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This standard "does not require 'detailed factual allegations,' " but does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

---

[3] There is a protective order in place that protects from disclosure the names of the defendants who brought the currently pending motions. ECF 59. The defendants have been separately identified in a document filed under seal. ECF 144.

(citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly*, 550 U.S. at 570).

In evaluating a motion to dismiss, the court must accept the allegations of material fact as true and construe those allegations in the light most favorable to the non-moving party. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In addition to the allegations in the complaint, the court may consider documents that are attached to or incorporated by reference in the complaint, where the parties do not contest the authenticity of those documents, as well as matters capable of judicial notice. *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

## III. Discussion

### A. Request for Judicial Notice

Defendants 17 and 18 request judicial notice of six groups of facts, which depend on news reports, a Twitter post, and facts asserted in another lawsuit in the District of Oregon. Defs. 17 & 18 Mot. Dismiss 3–7, ECF 174. In resolving a Rule 12(b)(6) motion, review is generally limited to the contents of the complaint. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001). However, the Ninth Circuit has identified two exceptions to this general rule: "First, a court may consider material which is properly submitted as part of the complaint on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment. If the documents are not physically attached to the complaint, they may be considered if the documents' authenticity is

not contested and the plaintiff's complaint necessarily relies on them." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal citations and quotation marks omitted). And second, "under Fed. R. Evid. 201, a court may take judicial notice of matters of public record, but a court may not take judicial notice of a fact that is subject to reasonable dispute."[4] *Id.* at 688–89 (internal quotation marks omitted).

Judicial notice of news articles and Twitter posts is appropriate to "indicate what was in the public realm at the time, not whether the contents of those articles were in fact true." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010); *In re Twitter, Inc. Sec. Litig.*, No. 16-CV-05314-JST, 2020 WL 4187915, at *3 (N.D. Cal. Apr. 17, 2020) (taking "judicial notice of the tweets solely to indicate what was in the public realm at the time, but not for the purpose of determining whether the contents of those tweets were in fact true") (internal quotation marks and citation omitted). The present request for judicial notice is therefore appropriate to establish that the news reports and Twitter post exist, but not to the extent defendants seek to establish the truth of the facts asserted in those materials.

Similar reasoning applies to defendants' request to take judicial notice of a criminal judgment in another case to establish the underlying facts of that crime. Defs. 17 & 18 Mot. Dismiss 3, ECF 174. For one, the cited document does not establish the specific facts that defendants have offered for notice—it indicates a conviction for assault of a federal officer, but does not mention the assault was committed with a sledgehammer. *See id.* (citing *United States v. Gaines*, 3:20-cr-00223-IM, ECF No. 63 (D. Or., Dec. 13, 2021)). And even if it did, it is not appropriate to take notice of a document from another case to establish the truth of its contents.

---

[4] Federal Rule of Evidence 201(2) provides: "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

*Kristiansen v. Russell*, No. 3:21-CV-00546-IM, 2022 WL 1910138, at *3 (D. Or. June 2, 2022) (citing *Coal. for a Sustainable Delta v. F.E.M.A.*, 711 F. Supp. 2d 1152, 1172 n.6 (E.D. Cal. 2010)). Thus, the existence of the criminal judgment is noticed, but whatever facts it might contain are not taken as true. *Id.*

Defendants assert that judicial notice of these documents is necessary to establish facts not specifically alleged in plaintiffs' complaint critical to evaluating the "context" in which plaintiffs' *Bivens* claims arise, namely the "violent nature of and damage caused by the Portland protests[.]" Defs. 1–6, 8–15 Reply 3, ECF 193. Judicial notice of materials extrinsic to the complaint is not required for that factual "context." Plaintiffs' Second Amended Complaint cites to dozens of news reports, press conference, social media posts, and other lawsuits about the 2020 protests that provide ample factual background to properly analyze the legal sufficiency of plaintiffs' *Bivens* claims at this procedural juncture. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice— without converting the motion to dismiss into a motion for summary judgment.").

In sum, the requests for judicial notice by defendants 17 and 18 should be granted to recognize the existence of the offered materials, but denied as to the truth of the facts asserted in those materials. To the extent that other moving defendants seem to offer other materials extrinsic to the complaint to establish the truth of the events described in those materials, but do so without making a specific request for judicial notice, those materials are not considered in resolving the pending motions. *See, e.g.*, Defs. 1–6, 8-15 Memo. ISO Mot. Dismiss 8–9, ECF 171.

B.      Law of the Case

Plaintiffs asserts that the present motion should be denied based on a previous ruling in

this case that a *Bivens* remedy is available against defendant Gabriel Russell, the Region 10

Director of the Federal Protective Service and supervisor of the federal agents whose conduct is

at issue in the present motions. Resp. 10–11, ECF 188. The law of the case doctrine "generally

preludes a court from reconsidering an issue decided previously by the same court or by a higher

court in the identical case." *Hall v. City of Los Angeles*, 697 F.3d 1059, 1067 (9th Cir. 2012).

The doctrine is discretionary, however, *id.*, and does not apply here for several reasons.

"All rulings of a trial court are 'subject to revision at any time before the entry of

judgment.' " *U.S. v. Houser*, 804 F.2d 565, 567 (9th Cir. 1986) (quoting FED. R. CIV. P. 54(b)).

A district court "may reconsider its prior rulings so long as it retains jurisdiction over the case."

*U.S. v. Smith*, 389 F.3d 944, 948 (9th Cir. 2004); *see also E.E.O.C. v. Serrano's Mexican*

*Restaurants, LLC*, 306 F. App'x 406, 407 (9th Cir. 2009) (cited pursuant to Ninth Circuit Rule

36-3) ("There is no strict prohibition against one district judge reconsidering and overturning the

interlocutory order or ruling of a prior district judge in the same case before final judgment,

though one judge should not overrule another except for the most cogent reasons."). In fact, a

district court may *sua sponte* reconsider and rescind a prior order without first requesting

additional briefing from the parties. *City of Los Angeles, Harbor Div. v. Santa Monica*

*Baykeeper*, 254 F.3d 882, 887 (9th Cir. 2001). Whether "the first decision was clearly erroneous"

or "an intervening change in the law has occurred" are indisputably cogent reasons for revisiting

prior rulings. *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993), *cert. denied* 508 U.S. 951

(1993).

Judge Simon's previous order regarding defendant Russell expressly recognized that the claims against the defendants here were not then at issue. Opinion & Order 6 n.2, ECF 149. Additionally, the defendants here raise different arguments than defendant Russell did. *Compare* Def. Russell Mot. Dismiss 4–15, ECF 25 *with* Defs. 1–6 & 8–15 Mot. Dismiss 11–33, ECF 171. And, perhaps most importantly, since the previous order was issued, the Supreme Court decided *Egbert*, and that decision and its reasoning, as explained below, has a substantial impact on the analysis of the present motion regarding the viability of plaintiffs' *Bivens* claims against defendants. For all those reasons, the previous ruling regarding defendant Russell does not control here.

C.    ***Bivens* Analysis**

In *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), the Supreme Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001). The Supreme Court held that the plaintiff was entitled to sue Federal Bureau of Narcotics agents for monetary damages arising out of a warrantless entry into his apartment and subsequent search and arrest, even though no federal statute provided a private cause of action for damages against the federal agents for violating the plaintiff's constitutional rights. *Bivens*, 403 U.S. at 389–90, 397. Since *Bivens*, the Supreme Court has extended a private right of action against federal officials for constitutional violations only twice. *See Davis v. Passman*, 442 U.S. 228 (1979) (recognizing a damages remedy against a United States congressman under the Fifth Amendment due process clause for gender discrimination); *Carlson v. Green*, 446 U.S. 14 (1980) (recognizing a damages remedy against federal prison officials under the Eighth Amendment for failure to treat inmate's injuries).

Since *Carlson* was decided in 1980, the Supreme Court has become increasingly cautious about finding new implied causes of action stemming from constitutional violations. *See Hernández v. Mesa*, 140 S. Ct. 735, 743 (2020) ("[F]or almost 40 years, we have consistently rebuffed requests to add to the claims allowed under *Bivens*."); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) ("In cases decided after *Bivens* . . . the Court adopted a far more cautious course before finding implied causes of action."); *see also Quintero Perez v. United States*, 8 F.4th 1095, 1104 (9th Cir. 2021) ("The [Supreme] Court has counseled that the 'watchword is caution' in extending a *Bivens* remedy to 'new' contexts"). As the Supreme Court summed up in *Abbasi*, "[g]iven the notable change in the Court's approach to recognizing implied causes of action . . . the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." 137 S. Ct. at 1857 (citing *Iqbal*, 556 U.S. at 675).

When a court is "asked to extend *Bivens*," it must engage in a "two-step inquiry," first asking "whether the request involves a claim that arises in a 'new context' or involves a 'new category of defendants.' " *Hernández*, 140 S. Ct. at 743 (citation omitted). If the claim presents a new *Bivens* context, the court next considers whether there are "special factors counselling hesitation about granting the extension." *Id.* (internal quotation marks and citation omitted).

As mentioned above, the Supreme Court's recent decision in *Egbert* must be considered in resolving the present motions, and the parties have provided supplemental briefing regarding the effect that *Egbert* has on the claims in this case. ECF 200, ECF 201, ECF 202. In *Egbert*, the Supreme Court analyzed two *Bivens* claims: (1) a Fourth Amendment claim "involv[ing] similar allegations of excessive force" presenting "almost parallel circumstances or a similar mechanism of injury" to *Bivens* itself, 142 S. Ct. at 1805 (internal quotation marks omitted); and (2) a First Amendment retaliation claim. *Id.* at 1807–08. Both claims were based on the plaintiff's

interaction with a U.S. Border Patrol agent. *Id.* at 1801. The Supreme Court acknowledged the two-step framework, but explained that it "often resolve[d] to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* at 1803. On the Fourth Amendment claim, the Supreme Court found that, despite the close legal and factual parallels to *Bivens*, the claim presented a new *Bivens* context. *Id.* at 1804. And it held that "two independent reasons" prevented an implied judicial remedy in this new context: "Congress is better positioned to create remedies in the border-security context, and the Government already has provided alternative remedies that protect plaintiffs," *id.*, specifically an administrative grievance and review process. *Id.* at 1806.

The parties here dispute whether *Egbert* alters the two-step approach and creates a new test for *Bivens* claims by collapsing the two-part inquiry into a single step that asks only whether "there is any reason to think that Congress might be better equipped to create a damages remedy." 142 S. Ct. at 1803; Pls. Supp. Br. 3, ECF 200; Defs. Supp. Br. 2, ECF 201; Defs. 17 & 18 Supp. Br. 2, ECF 202. Some lower courts have interpreted *Egbert* as collapsing the two-part test into a single "special factors" inquiry. *E.g.*, *Silva v. United States*, 45 F.4th 1134 (10th Cir. 2022) (explaining that *Egbert* "appeared to alter the existing two-step *Bivens* framework"); *Davis v. Greer*, No. 21 C 0995, 2022 WL 2460782, at *2 (N.D. Ill. July 6, 2022) ("*Egbert* explains that the threshold inquiry resolves to a single question[.]") (internal quotation marks omitted).

Others have concluded that the two-step analysis still applies, though *Egbert* requires giving more "emphasis on the presence of special factors." *Cienciva v. Brozowski*, No. 3:20-CV-2045, 2022 WL 2791752, at *8 (M.D. Pa. July 15, 2022); *see also Roberts v. United States Marshall Serv.*, No. 21-CV-11234 (LTS), 2022 WL 2986683, at *3 (S.D.N.Y. July 27, 2022) (explaining that "[w]hile not overruling the two-step approach," the *Egbert* court "narrowed" the

test); *Washington v. Fed. Bureau of Prisons*, No. CV 5:16-3913-BHH, 2022 WL 3701577, at \*4 (D.S.C. Aug. 26, 2022) ("*Egbert* clarified this analytical framework in a manner that made it even more rigorous, in effect making it significantly more unlikely that an implied cause of action will be recognized.").

The question seems to be one of semantics. *Egbert* did not directly overrule the two-step approach; in *Egbert*, the "newness" of the presented context was not contested. 142 S. Ct. at 1804 ("The Court of Appeals conceded that [the original plaintiff's] claim presented a new context for *Bivens* purposes."). But the Supreme Court's discussion of the relationship between the context and special factors analysis suggests, at the very least, a modified approach. The "contextual" similarity between *Egbert* and *Bivens* is striking; several other justices writing separately recognized the unmistakable parallels between the two cases. *Egbert*, 142 S. Ct. at 1810 (Gorsuch, J., concurring) ("Candidly, I struggle to see how this set of facts differs meaningfully from those in *Bivens* itself."); *id.* at 1815 (Sotomayor, J., concurring in the judgment in part and dissenting in part) (noting that the circumstances were "materially indistinguishable from the claim brought in *Bivens*"). Despite the obvious similarities, the majority explained that "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances' with *Bivens*, *Passman*, or *Carlson* unless he also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law." *Id.* at 1809 (quoting *Ziglar*, 137 S. Ct. at 1859). Thus, even where a case shares some, even many, similarities with *Bivens*, the special factors analysis must apply.

Still, *Egbert* did not overrule *Bivens*. *See id.* ("[T]o decide the case before us, we need not reconsider *Bivens* itself."). And despite the Supreme Court's continued pull-back from extending *Bivens* to new contexts, it has emphasized "the continued force, or even the necessity,

of *Bivens* in the search-and-seizure context in which it arose." *Ziglar*, 137 S. Ct. at 1856. In other

words, context still matters, and it is to the context of plaintiffs' *Bivens* claims to which the court

now turns. *See Greenpoint Tactical Income Fund LLC v. Pettigrew*, 38 F.4th 555, 564 n.2 (7th

Cir. 2022) ("The opinion in *Egbert* is consistent with the Court's cutting back on the scope

of *Bivens* but does not change our understanding of *Bivens*' continued force in its domestic

Fourth Amendment context.").

### 1.      New Context

The first question is whether plaintiffs' claims present a "new context" for *Bivens*

purposes. "If the case is different in a meaningful way from previous *Bivens* cases decided by

[the Supreme] Court then the context is new." *Ziglar*, 137 S. Ct. at 1859. The three previous

*Bivens* cases include "a claim against FBI agents for handcuffing a man in his own home without

a warrant; a claim against a Congressman for firing his female secretary; and a claim against

prison officials for failure to treat an inmate's asthma." *Id.* at 1860 (citing *Bivens,* 403 U.S. 388

(1971) *Davis v. Passman*, 442 U.S. 228 (1979); *Carlson v. Green*, 446 U.S. 14 (1980)).[5]

While not an exhaustive list, the Supreme Court has provided examples of "differences

meaningful enough to make a given context a new one," including "the rank of the officers

involved; the constitutional right at issue; the generality or specificity of the official action; the

extent of judicial guidance as to how an officer should respond to the problem or emergency to

be confronted; the statutory or other legal mandate under which the officer was operating; the

risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the

---

[5] The Supreme Court's *Ziglar* opinion cites to *Chappell v. Wallace*, 462 U.S. 296 (1983), but the description of the cases makes clear that the correct citation should be to *Carlson*.

presence of potential special factors that previous *Bivens* cases did not consider."[6] *Ziglar*, 137 S.Ct. at 1859–60. "New context" is broadly interpreted, and "easily satisfied." *Id.* at 1865 ("Given this Court's expressed caution about extending the Bivens remedy, however, the new-context inquiry is easily satisfied.").

Here, plaintiffs' claims present a new context for *Bivens* purposes. True, the claims are based on bedrock Fourth Amendment protections against excessive force and unreasonable searches and seizures. But plaintiffs' case bears little resemblance to *Bivens*, the closest analogue. "There, the plaintiff alleged that federal narcotics agents violated his Fourth Amendment rights by arresting him, handcuffing him in his home, and searching his home without probable cause or a search warrant." *Quintero Perez*, 8 F.4th at 1104–05 (citing *Bivens*, 403 U.S. at 389–90). Here, the violence and lawlessness centered around the federal courthouse in Portland that erupted from peaceful protests during the summer of 2020 is substantially different than a targeted arrest of a single individual at home and is a far cry from the "common and recurrent sphere of law enforcement" where the Supreme Court has stated *Bivens* retains its "continued force, or even . . . necessity." *Ziglar*, 137 S. Ct. at 1856–57; *see also Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 31 (D.D.C. 2021) (finding it "glaringly obvious" that plaintiffs' claims "concern[ing] government officers' response to a large protest in Lafayette Square outside the White House" presented a new *Bivens* context). *Bivens* has never been applied to agents defending a federal courthouse during a civil disorder from ongoing violent attacks against the agents and federal property that included "bricks, baseball bats, sledgehammers, Molotov cocktails, mortar shell commercial-grade fireworks, accelerants, IED's

---

[6] The last factor suggests, perhaps, what *Egbert* made clear: "special factors" should always be part of the analysis of a *Bivens* claim, whether they are considered separately or as part of the "context."

and other violent weapons." Sec. Am. Compl. ¶ 72 n.42 (citing *Oversight of DHS Personnel Deployments to Recent Protests: Hearing Before U.S. Senate Comm. on Homeland Sec. & Governmental Affairs,* https://www.hsgac.senate.gov/oversight-of-dhs-personnel-deployments-to-recent-protests) (Testimony of Chad Wolf at 33:40).

The legal mandate under which the defendants were operating is also different. *Bivens* was based solely on the Fourth Amendment, while defendants here were operating under statutes empowering them to defend federal property, such as 40 U.S.C. § 1315(b)(1), which charges the Department of Homeland Security, of which Customs and Border Protection and Federal Protective Services are part, with "the protection of property owned or occupied by the Federal Government and persons on the property," and 28 U.S.C. § 566, which gives the U.S. Marshals Service "final authority regarding security requirements for the judicial branch of the Federal Government, including "the security of buildings housing the judiciary." *See Brunoehler v. Tarwater*, 743 F. App'x 740, 742 (9th Cir. 2018) (cited pursuant to Ninth Circuit Rule 36-3) ("Here, the Wiretap Act was another 'legal mandate under which the [Agents were] operating.' Given the Supreme Court's observation that 'even a modest extension is still an extension' of *Bivens*, we conclude that the application of an extensive statutory scheme like the Wiretap Act constitutes a meaningful difference from *Bivens*, which concerned only the Fourth Amendment.") (citing *Ziglar*, 137 S. Ct. at 1864).

Moreover, even if the facts alleged by plaintiff are framed in a way that brings them more in-line with *Bivens*—for example, by asking whether a "new context" is presented when agents grabbed plaintiff Pettibone from a public street, put him into an unmarked van, then searched and detained him at the courthouse without a warrant or probable cause—that similarity would not end the analysis under *Egbert.* As explained above, the majority in *Egbert* recognized the case's

similarities to *Bivens* but went on to consider the "special factors." 142 S. Ct. at 1809; *see also Washington*, 2022 WL 3701577, at *5 ("*Egbert* signals a significant shift in how courts should approach the new context inquiry.").

This case shares some similarities with *Bivens*, but it is different in meaningful ways, and *Egbert* requires a consideration of special factors even in a materially indistinguishable case. The next question, then, is whether there are "special factors counselling hesitation" before allowing plaintiffs' *Bivens* claims to proceed. *Ziglar*, 137 S. Ct. at 1857.

2.      **Special Factors**

The "special factors" analysis is broad-ranging and asks the court to answer "only one question: whether there is any rational reason (even one) to think that Congress is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.' " *Egbert*, 142 S. Ct. at 1805 (quoting *Ziglar*, 137 S. Ct. at 1858). "When an issue 'involves a host of considerations that must be weighed and appraised,' it should be committed to 'those who write the laws' rather than 'those who interpret them.' " *Ziglar*, 137 S. Ct. at 1857 (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). "In most instances, the Court's precedents now instruct, the Legislature is in the better position to consider if 'the public interest would be served' by imposing a 'new substantive legal liability.' " *Id.* (quoting *Schwiker v. Chilicky*, 487 U.S. 412, 427 (1988)).

Here again, the Supreme Court's decision in *Egbert* looms large. In the "special factors" analysis in that case, the Supreme Court gave two reasons why a *Bivens* remedy was not available. First, the Court reasoned that Congress was better equipped than courts to "authorize a damages action in [a] national security context" involving Border Patrol agents operating at the international border. *Egbert*, 142 S. Ct. at 1805. Second, the Court found that Congress had

provided "alternative remedies" for individuals aggrieved by the conduct of a Border Patrol agent in the form or an administrative grievance procedure. *Id.* at 1806.

While this case may not present the identical "national security" implications to those at issue in *Egbert* involving the international border, "[t]here is no question the Federal Defendants have a strong interest in protecting federal property and persons on federal property[.]" *Index Newspapers LLC v. United States Marshals Serv.*, 977 F.3d 817, 831 (9th Cir. 2020) (affirming Judge Simon's entry of a preliminary injunction prohibiting federal officers from, among other things, arresting or using physical force against a journalist or legal observer in connection with the summer 2020 protests).[7]

And like the agent in *Egbert*, who was "carrying out Border Patrol's mandate to 'interdic[t] persons attempting the illegally enter or exit the United States' " 142 S. Ct. at 1804 (citing 6 U.S.C. § 211(e)(3)(A)), the moving defendants here were acting pursuant to Congressional direction. Congress empowered the moving defendants with the authority to protect federal property generally, 40 U.S.C. § 1315(b)(1), and "buildings housing the [federal] judiciary" specifically. 28 U.S.C. § 566(i).[8] Of course, there are lurking questions raised by

---

[7] The decision here necessarily answers a different question than was at issue in *Index Newspapers* at the trial and appellate level. There, the question whether the court should enter an injunction turned on, among other things, an evaluation of the plaintiffs' chances of succeeding on the merits of their underlying First and Fourth Amendment Constitutional claims. *Index Newspapers LLC v. City of Portland*, No. 3:20-CV-1035-SI, 2020 WL 4883017 (D. Or. Aug. 20, 2020). The analysis here is substantially different as it in some ways presumes (without yet deciding) that a constitutional violation *did* occur and whether the Supreme Court's evolved *Bivens* doctrine allows plaintiffs to seek money damages against individual federal agents for a presumed constitutional violation if there is no statute providing for a cause of action allowing money damages.

[8] It is difficult to see how the federal criminal statutes regarding "riots," 18 U.S.C. § 2101, or "civil disorders," 18 U.S.C § 231, come into play here. *See* Defs. 1-6, 8-15 Memo. ISO Mot. Dismiss 12–19, ECF 171. These criminal statutes would allow federal agents to arrest an individual suspected of violating them, but in doing so, these statutes are no different than

plaintiffs' allegations here, as none of them were on federal property at the time they were seized without probable cause by federal agents, or shot with nonlethal ammunition or other crowd dispersal methods. *See also Index Newspapers*, 977 F.3d at 832 ("The district court did not question that the provision relied upon by the Federal Defendants, 40 U.S.C. § 1315, grants them the authority to protect federal property, including issuing and enforcing dispersal orders against people on or threatening federal property. . . . But the Federal Defendants' suggestion that § 1315 confers authority to take action to disperse members of the public who are neither on nor threatening federal property is dubious."). However, for purposes of *Bivens* analysis, the question is not whether federal agents' actions were done within the scope of the relevant provisions, but rather whether Congress or the courts should fashion the remedy for constitutional violations as a result of federal agents' actions. *Ziglar*, 137 S. Ct. at 1857. Congress created the statutes empowering the moving defendants to protect federal property and officials, and did not create a cause of action allowing for recovery of damages against individual officers for actions taken in attempting to discharge that duty. So there is, in the wake of *Egbert*, at least some reason to hesitate before creating a damages remedy here by judicial decree.

To be sure, unwarranted claims of "national security" or, by extension, "protection of federal property" should not be given talismanic powers allowing federal agents to disregard the constitution in performing their duties. *Ziglar*, 137 S. Ct. at 1862 (further noting that the "danger of abuse is even more heightened given the difficulty of defining the security interest in domestic

---

federal criminal drug statutes that were at issue in *Bivens*. 403 U.S. at 389. Nor is it notable that Congress did not provide a remedy against a federal agent who "violates" these criminal statutes, as defendants suggest; the "remedy" would be to be charged with a crime. *See* Defs. 1-6, 8-15 Memo. ISO Mot. Dismiss 16, ECF 171. The present question is better understood as whether some other federal law provides a private cause of action for a federal agent's unconstitutional actions in attempting to enforce or investigate the criminal statutes.

cases"). But even wholly apart from the "protection of federal property" rationale, the availability of alternative remedies against the moving defendants is, after *Egbert*, a sufficient reason for finding that a *Bivens* claim is not available here. *See* 142 S. Ct. at 1806–07

"[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Ziglar*, 137 S. Ct. at 1858. "For if Congress has created any alternative, existing process for protecting the injured party's interest that itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Id.* (simplified). *Egbert* specifically held that the U.S. Border Patrol's administrative grievance procedure, even though it did not allow the complainant to participate in the process and there was no subsequent judicial review of the process's outcome, was an adequate alternative remedy that precluded a *Bivens* claim. 142 S. Ct. at 1806–07 ("So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy. That is true even if a court independently concludes that the Government's procedures are not as effective as an individual damages remedy.") (internal quotation marks and citation omitted). Whatever the wisdom of this line of reasoning, that holding is controlling on this court. *See Egbert*, 142 S. Ct. at 1821 (Sotomayor, J., concurring in the judgment in part and dissenting in part) ("The administrative remedy the Court perceives, however, is no remedy whatsoever. The sole 'remedy' the Court cites is an administrative grievance procedure that does not provide [the original plaintiff] with any relief.").

Defendants 8 through 13, who are Customs and Border Protection agents, are subject to the same administrative process that was at issue in *Egbert*. 142 S. Ct. at 1806 ("The U. S.

Border Patrol is statutorily obligated to "control, direct, and supervise . . . all employees. And, by regulation, Border Patrol must investigate "alleged violations of the standards for enforcement activities" and accept grievances from "any persons wishing to lodge a complaint.") (simplified) (citing 8 U.S.C. § 1103(a)(2); 8 C.F.R. §§ 287.10(a)–(b)). Plaintiffs assert that defendants 8 through 13 were not acting as "immigration officers" or were not engaged in "immigration enforcement" and thus the Border Patrol administrative procedure does not provide the same alternative remedy as against the officer in *Egbert*. Pls. Supp. Br. 7–8, ECF 200. But the statutes and regulations are not so limited. "Immigration officers" are empowered "to make arrests . . . for any offence against the United States, if the offence is committed in the officer's . . . presence." 8 U.S.C. ¶ 1357(a)(5)(A). The regulations regarding "enforcement activities" describe and proscribe certain actions by immigration officers related to "an offense against the United States," which includes but is not limited to violations of immigration laws. *E.g.*, 8 C.F.R. § 287.8(b)(2) ("If the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States . . . the immigration officer may briefly detain the person for questioning.").

The key attributes of this remedial system that *Egbert* identified are some kind of investigative process and a way for individuals to file a "grievance" against an officer for alleged misconduct. 142 S. Ct. at 1806 ("And, by regulation, Border Patrol must investigate "[a]lleged violations of the standards for enforcement activities" and accept grievances from "[a]ny persons wishing to lodge a complaint."). Thus, even if defendants 8 through 13 were not subject to the Border Patrol administrative process, there is existing an administrative grievance and investigation process available through the DHS Office of Inspector General. *See* 6 U.S.C. § 113(b) (establishing DHS-OIG); 8 C.F.R. § 287.10(b) (directing complaints about violations of

enforcement standards by an immigration officer to DHS-OIG); *U.S. Nuclear Regul. Comm'n, Washington, D.C. v. Fed. Lab. Rels. Auth.*, 25 F.3d 229, 234 (4th Cir. 1994), *as amended* (June 21, 1994) ("[T]he Inspector General in each agency is entrusted with the responsibility of auditing and investigating the agency . . . . The Inspector General may issue subpoenas, administer oaths, and investigate complaints and information from any employee of the agency "concerning the possible existence of an activity constituting a violation of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority or a substantial and specific danger to the public health and safety.' ") (quoting 5 U.S.C. App. 3 §§ 6(a)(2), 7(a)). Here, defendants 8 through 13 were "designate[d] . . . as . . . law enforcement officer[s] for duty in connection with . . . the Federal Protective Service . . . in the protection of federal property and person on the impacted federal property[.]" *E.g.*, Sec. Am. Compl., Ex. 1 at 1, ECF 80-1. Federal Protective Service is part of the Department of Homeland Security, and thus any agents designated to serve the Federal Protective Service are subject to investigation by the DHS-OIG. 6 U.S.C. § 203(3).

Judge Simon's previous order rejected the DHS-OIG process as an adequate alternative remedy for *Bivens* purposes because "an Inspector General's *post hoc* review of potential Fourth Amendment excessive force and unlawful arrests by federal officers, in which the Inspector General considers the agency's conduct and reports to Congress, is an adequate remedy *for Plaintiffs*." Opinion & Order 16, ECF 149 (emphasis in original). The administrative remedy approved by *Egbert* is not meaningfully distinct from the DHS-OIG investigation process; the regulations applicable to Border Patrol agents provide that grievances regarding an agent's conduct during "enforcement activities" are to be directed to the DHS-OIG and if a Border Patrol agent is alleged to have violated the "standard for enforcement activities," the regulations require

that the allegations "shall be investigated expeditiously consistent with the policies and procedures of the Department of Homeland Security and pursuant to any guidelines issued by the Secretary." 8 C.F.R. §§ 287.10(a)–(b). The overlap between the Border Patrol and DHS administrative processes compels the result, after *Egbert*, that adequate administrative remedies are available against defendants 8 through 13, as well as defendants 14 and 15, who are DHS employees, and thus no *Bivens* claim is available against them.

An essentially identical administrative remedy is available against agents from the U.S. Marshals Service. Just as the Border Patrol is empowered by statute to "supervise and direct" its agents and employees, 8 U.S.C. § 1103(a)(2), the Director of the U.S. Marshals Service must "supervise and direct" the Marshal Service's officials and employees. 28 U.S.C. 561(g). Attendant regulations require the Director to investigate "alleged improper conduct on the part of U.S. Marshals Service personnel." 8 C.F.R. § 0.111(n). And because the Marshals Service is part of the Department of Justice, 28 U.S.C. § 561(a), its officials and employees are subject to the DOJ-OIG, which Congress directed to "review information and receive complaints alleging abuses of civil rights and civil liberties by employees and officials of the Department of Justice[.]" 5 U.S.C. app. § 8E note (Review of Civil Rights Complaints by the Department of Justice).[9] This administrative remedy "forecloses a *Bivens* action here." *Egbert*, 142 S. Ct. at 1806. Thus, defendant 17 and 18's motion to dismiss plaintiffs' Fourth Amendment claims against them must be granted pursuant to *Egbert*.

---

[9] "[W]hether or not a provision is classified to the Code, and if classified, whether or not it is set out as a section or a statutory note, does not in any way affect the provision's meaning or validity." *About Classification of Laws to the United States Code*, U.S. HOUSE OF REP. OFFICE OF LAW REVIEW COUNSEL, https://uscode.house.gov/about_classification.xhtml.

These Findings and Recommendations should not be read to indicate approval or disapproval of the agents' alleged actions or to otherwise suggest that plaintiffs do not raise serious questions about the agents' conduct. Those issues cannot be resolved here. Rather, the only question is whether modern Supreme Court jurisprudence allows for an implied constitutional remedy against the moving defendants in the absence of a statutory cause of action. Under *Egbert*, the answer is no.

###    D.    Claims 7 and 8: Conspiracy to Deprive Constitutional Rights

Defendants also move to dismiss claims 7 and 8, in which plaintiffs allege a racially-motivated conspiracy to deprive plaintiffs of their rights. *E.g.*, Defs. 1-6, 8-15 Memo ISO Mot. Dismiss 52–54, ECF 171; Defs. 17 & 18 Mot. Dismiss 11–14, ECF 174. Those claims as alleged against defendants Chad Wolf and Gabriel Russell were dismissed because plaintiffs failed to allege facts sufficient to demonstrate that defendants Wolf and Russell acted with a "racially motivated" animus to deprive plaintiffs of their rights. Opinion & Order 32, ECF 149.

Plaintiffs' allegations regarding claims 7 and 8 in the Second Amended Complaint as to the individual moving defendants are in all material aspects identical to those made against defendants Wolf and Russell in the Amended Complaint. *See* Sec. Am. Compl. ¶¶ 258–76. For the same reasons claims 7 and 8 against defendants Wolf and Russell were subject to dismissal, the individual moving defendants are also entitled to dismissal of claims 7 and 8 here. *See* Opinion & Order 32, ECF 149. Without directly conceding as much, plaintiffs rightly recognized this outcome as likely and requested dismissal without prejudice to reasserting such a claim if they uncovered further evidence that could support conspiracy claims. Pls. Resp. 49, ECF 188. In the interests of justice, and primarily because the conspiracy claims are not futile, it is appropriate to dismiss claims 7 and 8 without prejudice. *See* Opinion & Order 35, ECF 149.

## RECOMMENDATIONS

Defendants 17 and 18's request for judicial notice (ECF 174) should be granted, but only to the extent that the court takes notice of the existence of the proffered sources, and not the truth of the matters asserted in those sources.

The motions to dismiss filed by defendants 1 through 6 and 8 through 15 (ECF 170), defendant 7 (ECF 175), defendants 17 and 18 (ECF 174), and defendants 16 and 19 (ECF 178) should be granted. Because a *Bivens* remedy is not available and there are no facts that could change the *Bivens* analysis, in particular the availability of alternative remedies against each of the moving defendants here, plaintiffs' first claim for relief alleging Fourth Amendment violations against defendants 1 through 19 in their individual capacities should be dismissed with prejudice. Plaintiff's seventh and eighth claims against these defendants should also be dismissed, as plaintiffs have failed to allege sufficient facts to demonstrate that defendants acted with a "racially motivated" animus. However, because it is not apparent that these claims would be futile, the dismissal of the seventh and eighth claims should be without prejudice.

## SCHEDULING ORDER

These Findings and Recommendations will be referred to a district judge.  Objections, if any, are due Thursday, October 06, 2022.  If no objections are filed, then the Findings and Recommendations will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendations will go under advisement.

**NOTICE**

These Findings and Recommendations are not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of a judgment.

DATED September 22, 2022.

/s/ Youlee Yim You
Youlee Yim You
United States Magistrate Judge

26 – FINDINGS AND RECOMMENDATIONS