**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MARK PETTIBONE; FABIYM ACUAY, AKA Mac Smiff; ANDRE MILLER; NICHOL DENISON; MAUREEN HEALY; CHRISTOPHER DAVID; DUSTON OBERMEYER; JAMES MCNULTY, <br><br>*Plaintiffs-Appellees,* <br><br> and <br><br> BLACK MILLENIAL MOVEMENT, an organization; ROSE CITY JUSTICE, INC., an Oregon nonprofit corporation, <br><br> *Plaintiffs,* <br><br> v. <br><br> GABRIEL RUSSELL, in his individual and official capacity, <br><br> *Defendant-Appellant,* <br><br> and | No. 22-35183 <br><br> D.C. No. 3:20-cv-01464-YY <br><br><br> OPINION |

JOSEPH R. BIDEN; CHAD F.
WOLF; U.S. DEPARTMENT OF
HOMELAND SECURITY; UNITED
STATES MARSHALL SERVICE;
ALEJANDRO N. MAYORKAS;
JOHN DOES, 1-200; in their
individual capacities,

                  *Defendants.*

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted December 9, 2022
Seattle, Washington

Filed February 2, 2023

Before: M. Margaret McKeown, Eric D. Miller, and
Salvador Mendoza, Jr., Circuit Judges.

Opinion by Judge Miller

# SUMMARY[*]

## Civil Rights

Reversing the district court's order denying defendant's motion to dismiss, the panel held that *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), did not provide a cause of action for protesters who alleged that Gabriel Russell, then the Director of the Federal Protective Service's Northwest Region, ordered or acquiesced in subordinates' unlawful arrests and uses of excessive force during protests outside the federal courthouse in Portland, Oregon in the summer of 2020..

The panel first held that it had jurisdiction over this interlocutory appeal. The Supreme Court's opinion in *Wilkie v. Robbins*, 551 U.S. 537 (2007), establishes that, in an interlocutory appeal from a denial of qualified immunity, courts necessarily have jurisdiction to decide whether an underlying *Bivens* cause of action exists.

Applying the two-step analysis set forth in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), the panel held that a *Bivens* remedy could not be extended to this case because it presented a new context, and at least two independent factors indicated that the court was less equipped than Congress to determine whether the damages action should proceed.

This case differed from *Bivens*—the only Supreme Court case recognizing an implied damages remedy for Fourth Amendment violation because (1) defendant Gabriel

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Russell, a high-level supervisor, was of a different rank than the agents in *Bivens*; (2) Russell's alleged actions, which consisted of ordering or acquiescing in unconstitutional conduct, took place at a higher level of generality than the actions of the agents in *Bivens*; and (3) the legal mandate under which Russell acted differed from that of the agents in *Bivens* in that Russell was directing a multi-agency operation to protect federal property and was carrying out an executive order. And because Russell was carrying out an executive order, providing a *Bivens* remedy in this context would carry a greater "risk of disruptive intrusion by the Judiciary into the functioning of other branches" than was present in *Bivens*. This case also differed from *Carlson v. Green*, 446 U.S. 14 (1980), which involved prison officials and a claim of cruel and unusual punishment under the Eighth Amendment.

Allowing a *Bivens* action to proceed in this case could expose sensitive communications between Russell and other high-level executive officers. Moreover, Congress had afforded plaintiffs an alternative remedy that independently foreclosed a *Bivens* action. Because plaintiffs had no cause of action under *Bivens*, the panel did not consider whether Russell would be entitled to qualified immunity.

# COUNSEL

Brian J. Springer (argued) and Mark B. Stern, Attorneys, Appellate Staff; Scott E. Asphaug and Natalie K. Wight, United States Attorneys; David G. Cutler, Trial Attorney; Glenn Greene, Senior Trial Attorney; Brian M. Boynton, Principal Deputy Assistant Attorney General; United States Department of Justice, Civil Division, Washington, D.C.; for Defendants-Appellant.

Rachel C. Lee (argued), Christopher Rifer, Crystal S. Chase, Jeremy D. Sacks, Per A. Ramfjord, Amy Edwards, Jacob C. Goldberg, Todd A. Hanchett, and Joel A. Mullin, Stoel Rives LLP, Portland, Oregon; Kelly K. Simon, and Rachel Dallal Gale, ACLU of Oregon, Portland, Oregon; for Plaintiffs-Appellees.

**OPINION**

MILLER, Circuit Judge:

During the summer of 2020, Mark Pettibone protested outside the federal courthouse in Portland, Oregon. He alleges that federal officers unlawfully arrested protesters and used excessive force, including by indiscriminately using tear gas against peaceful protesters. Together with other protesters, he brought this action against Gabriel Russell, then the Director of the Federal Protective Service's Northwest Region, under *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). The district court denied Russell's motion to dismiss. We conclude that no *Bivens* cause of action is available in this case, and we therefore reverse.

I

Because this is an appeal from an order resolving a motion to dismiss, we assume the truth of the facts alleged in the complaint. *Ellis v. Salt River Project Agric. Improvement & Power Dist.*, 24 F.4th 1262, 1266 (9th Cir. 2022).

Following the murder of George Floyd in Minneapolis in May 2020, numerous protests took place across the country, including near the Mark O. Hatfield United States Courthouse in Portland. In June 2020, the President issued an executive order stating that "[o]ver the last 5 weeks, there has been a sustained assault on the life and property of civilians, law enforcement officers, [and] government property" throughout the country and attributing this to "[a]narchists and left-wing extremists [who] have sought to advance a fringe ideology that paints the United States of

America as fundamentally unjust and have sought to impose that ideology on Americans through violence and mob intimidation." Exec. Order No. 13,933, § 1, 85 Fed. Reg. 40081 (June 26, 2020), *revoked*, Exec. Order No. 14,029, 86 Fed. Reg. 27025 (May 14, 2021). The order directed the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security to provide "personnel to assist with the protection of Federal monuments, memorials, statues, or property." *Id.* § 5, 85 Fed. Reg. at 40083. The federal government subsequently deployed more than 100 law enforcement officers from Customs and Border Protection, Immigration and Customs Enforcement, and the United States Marshals Service to Portland, in what officials called "Operation Diligent Valor." Russell oversaw the officers in Portland.

Pettibone alleges that officers involved in Operation Diligent Valor arrested protesters "without any lawful basis" and also "indiscriminately used violent tactics on lawful protesters," including by "shooting them in the head and body with impact munitions and pepper balls, spraying them directly in the face with pepper spray, shoving them to the ground, hitting and beating them with batons, [and] firing massive clouds of tear gas at them." Pettibone alleges that "[t]he tactics used by the officers went beyond what was required for their limited mission of protecting federal property and reflected a policy designed to retaliate against and to deter the protesters because of their views and beliefs."

The complaint includes specific allegations of allegedly unlawful conduct directed at individual plaintiffs. For example, Pettibone alleges that he was "snatched off the street and put in an unmarked van by unidentified men in military-style uniforms who did not explain their actions . . .

and held him in jail with no explanation." Another plaintiff alleges that although he "wore distinctive clothing that identified him as a member of the press," he was injured "when an unidentified federal officer shot him in the head with an impact munition while he was lawfully attending the protests." And another alleges that while "[s]he merely stood in a line of women with arms linked," a tear-gas canister was "hurled into her head, causing a three-inch gash to her forehead."

Although Russell did not personally carry out any of the arrests or uses of force, Pettibone alleges that Russell "knew or reasonably should have known that officers . . . would cause and were causing the arrests of protesters and the repeated use of excessive force against protesters." According to the complaint, Russell "personally observed protesters in Portland and the actions of federal officers from an incident command post or an emergency operations center," and he "monitored social media and reviewed publicly available videos showing events at the protests." Despite Russell's awareness of officers' uses of force, Pettibone alleges, "Russell knowingly failed to order any change in tactics or response to avoid unconstitutional injury to peaceful protesters." Pettibone also alleges that Russell "implemented tactics that included identifying and arresting individual protesters" and that he directed the arrest of certain protesters, including Pettibone.

Pettibone brought this action in the District of Oregon against various federal agencies and officers, including Russell. As relevant to this appeal, the complaint asserted *Bivens* claims against Russell, alleging that he violated the Fourth Amendment. Russell moved to dismiss on the grounds that no *Bivens* remedy is available and that, even if it were, Russell is entitled to qualified immunity. The district

court rejected both arguments and denied the motion.

II

In this interlocutory appeal, Russell's principal argument is that no *Bivens* cause of action is available here. The first question we must confront is whether we have jurisdiction to consider that argument.

We have appellate jurisdiction over "final decisions of the district courts." 28 U.S.C. § 1291. An order denying a motion to dismiss does not end the litigation, and therefore it ordinarily is not "final" and is not immediately appealable. *Burlington N. & Santa Fe Ry. v. Vaughn*, 509 F.3d 1085, 1089 (9th Cir. 2007). But there are exceptions to that general rule. Because qualified immunity is "an immunity from suit rather than a mere defense to liability," the denial of a motion to dismiss is effectively final—and thus immediately appealable—when the motion to dismiss is based on qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985) (emphasis omitted); *see Peck v. Montoya*, 51 F.4th 877, 885 (9th Cir. 2022).

Russell's motion to dismiss asserted both qualified immunity and the lack of a *Bivens* cause of action. Pettibone argues that we may consider the *Bivens* issue only if we have pendent appellate jurisdiction over it—that is, only if it is "'inextricably intertwined' with or 'necessary to ensure meaningful review of' decisions over which we have [interlocutory] jurisdiction." *Meredith v. Oregon*, 321 F.3d 807, 812 (9th Cir. 2003) (quoting *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995)); *see CDK Global LLC v. Brnovich*, 16 F.4th 1266, 1273–74 (9th Cir. 2021). Pettibone relies on *Wong v. United States*, in which we applied principles of pendent appellate jurisdiction to decline to consider the availability of a *Bivens* cause of action in an

interlocutory appeal of a denial of qualified immunity. 373 F.3d 952 (9th Cir. 2004). *Wong* explained that the availability of a *Bivens* remedy is not "inextricably intertwined" with the question of qualified immunity—and therefore is not properly before the court in an interlocutory appeal from a denial of qualified immunity—because "[d]eciding th[e] [*Bivens*] question requires the consideration of entirely distinct legal standards from, and its resolution is not a logical predicate to the resolution of, the qualified immunity issue." *Id.* at 961. Pettibone also invokes older cases in which we rejected jurisdiction over the *Bivens* question as "outside the limited scope of th[e] interlocutory appeal" from a denial of qualified immunity. *Pelletier v. Federal Home Loan Bank of S.F.*, 968 F.2d 865, 871 (9th Cir. 1992); *see Todd v. United States*, 849 F.2d 365, 368 (9th Cir. 1988).

All of those cases, however, predated the Supreme Court's decision in *Wilkie v. Robbins*, 551 U.S. 537 (2007). In *Wilkie*, the Court considered an interlocutory appeal from a denial of qualified immunity, and it also resolved the antecedent *Bivens* issue. *Id.* at 548–49. In explaining why there was appellate jurisdiction to decide whether a *Bivens* cause of action existed, the Court did not apply the pendent appellate jurisdiction test. It did not ask, in other words, whether "(a) [the issues are] so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Cunningham v. Gates*, 229 F.3d 1271, 1285 (9th Cir. 2000) (internal citation omitted). Instead, the Court said, without elaboration, that the recognition of the underlying *Bivens* cause of action was "directly implicated by the defense of qualified immunity

and properly before us on interlocutory appeal." *Wilkie*, 551 U.S. at 549 n.4 (quoting *Hartman v. Moore*, 547 U.S. 250, 257 n.5 (2006)). *Wilkie* establishes that, in an interlocutory appeal from a denial of qualified immunity, we necessarily have jurisdiction to decide whether an underlying *Bivens* cause of action exists.

Our more recent cases have reflected this understanding of *Wilkie*. In *Mejia v. Miller*, for example, we held that, in an interlocutory appeal from a denial of qualified immunity, we had jurisdiction to decide whether a *Bivens* remedy was available because "the existence of the cause of action is an antecedent legal question defining the claim . . . , and it is directly implicated by the defense of qualified immunity." 53 F.4th 501, 502 (9th Cir. 2022). We reached the same conclusion in *Ioane v. Hodges*, where we said that "[b]efore reaching the issue of qualified immunity, the first question we must address is whether [the plaintiff] may bring a *Bivens* suit." 939 F.3d 945, 951 (9th Cir. 2018). Earlier, we took the same approach in *Ministerio Roca Solida v. McKelvey*, 820 F.3d 1090 (9th Cir. 2016). We explained that the defendant "filed an interlocutory appeal to challenge the denial of qualified immunity" and that such a challenge addresses, "*by necessity*, the validity of the underlying *Bivens* cause of action." *Id*. at 1093 (emphasis added). In none of those cases did we mention pendent appellate jurisdiction or apply the test associated with that doctrine.

To be sure, in *Mejia* and the other recent cases, we did not expressly address the pre-*Wilkie* cases, such as *Wong*, *Pelletier*, and *Todd*, that rejected interlocutory jurisdiction over the *Bivens* issue. But the approach we have taken is inconsistent with that of the earlier cases. We read our more recent decisions as implicitly recognizing that the earlier cases are "clearly irreconcilable" with *Wilkie* and are

therefore no longer good law. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).

Since *Wilkie*, we have not directly addressed whether the new rule is that we have jurisdiction to consider the availability of a *Bivens* cause of action in an interlocutory appeal from a denial of qualified immunity, but every other circuit to have considered that question has answered it in the affirmative. Those courts have applied *Wilkie* to hold that in an interlocutory appeal from a denial of qualified immunity, "one potential ground of decision is a conclusion that the plaintiff does not have a legally sound claim for relief." *Vance v. Rumsfeld*, 701 F.3d 193, 197 (7th Cir. 2012) (en banc); *accord Vanderklok v. United States*, 868 F.3d 189, 197 (3d Cir. 2017); *Tun-Cos v. Perrotte*, 922 F.3d 514, 520 (4th Cir. 2019); *Byrd v. Lamb*, 990 F.3d 879, 881 (5th Cir. 2021) (per curiam), *cert. denied*, 142 S. Ct. 2850 (2022); *Elhady v. Unidentified CBP Agents*, 18 F.4th 880, 884 (6th Cir. 2021), *cert. denied sub nom. Elhady v. Bradley*, 143 S. Ct. 301 (2022); *Farah v. Weyker*, 926 F.3d 492, 497 (8th Cir. 2019); *Big Cats of Serenity Springs, Inc. v. Rhodes*, 843 F.3d 853, 856 (10th Cir. 2016); *Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 918 (D.C. Cir. 2018). *But cf. Dixon v. von Blanckensee*, 994 F.3d 95, 101 n.4 (2d Cir. 2021) (rejecting the plaintiff's claim on qualified immunity grounds and declining to determine jurisdiction over the *Bivens* question). We see no reason to depart from the consensus among the other courts of appeals.

We conclude that we have appellate jurisdiction to consider Russell's argument that no *Bivens* cause of action exists in this case.

III

Congress has made a cause of action available to any

person who has suffered "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" at the hands of someone acting under color of state law. 42 U.S.C. § 1983. But it has not created a general cause of action to redress violations of the Constitution by *federal* officers. Nevertheless, in three cases decided between 1971 and 1980, the Supreme Court held that the Constitution contains an implied cause of action through which plaintiffs can seek damages from federal officers who violate their constitutional rights. First, in *Bivens*, the Court held that a plaintiff could seek damages from Federal Bureau of Narcotics agents who allegedly violated his Fourth Amendment right to be free from unreasonable searches and seizures. 403 U.S. at 397. Next, in *Davis v. Passman*, the Court extended that remedy to a plaintiff who alleged that her employer, a Member of Congress, had discriminated against her because of her sex, in violation of the Due Process Clause of the Fifth Amendment. 442 U.S. 228, 230–31 (1979). Finally, in *Carlson v. Green*, the Court held that the estate of a deceased prisoner could seek damages from federal prison officials for violations of the prisoner's Eighth Amendment right to be free from cruel and unusual punishment. 446 U.S. 14, 16–18 (1980).

Although the Supreme Court has not overruled *Bivens*, *Davis*, and *Carlson*, it has recognized that they are in tension with "the Court's general approach to recognizing implied damages remedies," and that "the analysis in the Court's three *Bivens* cases might have been different if they were decided today." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017). Since 1980, the Court has not recognized any new *Bivens* remedy. To the contrary, "the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity," *id.* at 1857 (quoting *Ashcroft v. Iqbal*, 556

U.S. 662, 675 (2009)), one that "places great stress on the separation of powers," *Egbert v. Boule*, 142 S. Ct. 1793, 1806 n.3 (2022) (quoting *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931, 1938 (2021) (plurality opinion)); *see Hernandez v. Mesa*, 140 S. Ct. 735, 741 (2020) ("[W]hen a court recognizes an implied claim for damages," it "risks arrogating legislative power."). Thus, if "there is *any* reason to think that Congress might be better equipped to create a damages remedy" for a constitutional violation, we must refrain from recognizing one. *Egbert*, 142 S. Ct. at 1803 (emphasis added).

Before affording a plaintiff a cause of action under *Bivens*, a court must go through two steps:

> First, we ask whether the case presents "a new *Bivens* context"—*i.e.*, is it "meaningful[ly]" different from the three cases in which the Court has implied a damages action. Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are "special factors" indicating that the Judiciary is at least arguably less equipped than Congress to "weigh the costs and benefits of allowing a damages action to proceed."

*Egbert*, 142 S. Ct. at 1803 (internal citation omitted) (quoting *Abbasi*, 137 S. Ct. at 1858–60). Applying that test, we hold that the *Bivens* remedy cannot be extended to the claims before us because this case presents a new context, and several factors indicate that we are less equipped than Congress to determine whether a damages action should proceed.

A

Recognizing a *Bivens* cause of action in this case would require extending *Bivens* to a new context. In assessing whether a context is "new," the Supreme Court has instructed us not to examine *Bivens* cases in the lower courts, but only "the three cases in which the [Supreme] Court has implied a damages action." *Egbert*, 142 S. Ct. at 1803; *see Loumiet v. United States*, 948 F.3d 376, 382 (D.C. Cir. 2020) ("[T]he new-context analysis may consider only Supreme Court decisions approving *Bivens* actions."). The Court has provided a non-exhaustive list of "differences that are meaningful enough to make a given context a new one," including "the rank of the officers involved; . . . the generality or specificity of the official action; . . . the statutory or other legal mandate under which the officer was operating; [and] the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 137 S. Ct. at 1859–60.

This case differs from *Bivens*—the only Supreme Court case recognizing an implied damages remedy for Fourth Amendment violations—along all of those dimensions. In *Bivens*, the defendants were agents of the Federal Bureau of Narcotics who, without a warrant, "entered [Bivens's] apartment[,] . . . manacled [him] in front of his wife and children, and threatened to arrest the entire family" before "search[ing] the apartment from stem to stern." 403 U.S. at 389. Russell, a high-level supervisor, was of a different rank than the agents in *Bivens*. Russell's alleged actions, which consisted of ordering or acquiescing in unconstitutional conduct, took place at a higher level of generality than the actions of the agents in *Bivens*, who personally seized Bivens and searched his apartment. The legal mandate under which Russell acted differed from that of the agents in *Bivens* in

that Russell, an officer of the Federal Protective Service, was directing a multi-agency operation to protect federal property and was carrying out an executive order. And because Russell was carrying out an executive order, providing a *Bivens* remedy in this context would carry a greater "risk of disruptive intrusion by the Judiciary into the functioning of other branches" than was present in *Bivens*. *Abbasi*, 137 S. Ct. at 1860. Those differences are more than sufficient to make this a new *Bivens* context. *See id.* at 1864–65 (explaining that "the new-context inquiry is easily satisfied" and that "even a modest extension is still an extension").

In reaching a contrary conclusion, the district court recognized that Russell is of a higher rank than the agents in *Bivens* and that, unlike those agents, he is accused of having ordered or acquiesced in the unconstitutional conduct of his subordinates, rather than carrying it out himself. But the district court believed that those facts did not make this context new because *Carlson* established that a supervisory official could potentially be liable for a failure of oversight. *See Carlson*, 446 U.S. at 16 n.1; *Green v. Carlson*, 581 F.2d 669, 671 (7th Cir. 1978), *aff'd*, 446 U.S. 14 (1980). *Carlson*, of course, was different from this case because it involved prison officials and a claim of cruel and unusual punishment under the Eighth Amendment. 446 U.S. at 17. This case is like neither *Bivens* nor *Carlson*, and we are not convinced that a plaintiff can defeat a finding that a case presents a new context by showing that each of its facts, taken separately, resembles facts found in different *Bivens* precedents. But even if such a mix-and-match analysis were permissible, we would still hold that this case presents a new context. Russell and the supervisory medical officer in *Carlson* were acting under different mandates, and allowing the officer in

*Carlson* to be held liable did not present the same "risk of disruptive intrusion" into the functioning of the Executive Branch because that officer was not implementing an executive order. *See Abbasi*, 137 S. Ct. at 1860. Those differences alone are sufficient to make this a new *Bivens* context.

B

"If there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Egbert*, 142 S. Ct. at 1803 (quoting *Hernandez*, 140 S. Ct. at 743). Here, at least two independent reasons counsel in favor of withholding a *Bivens* remedy.

First, the "risk of disruptive intrusion by the Judiciary into the functioning of other branches" counsels hesitation in this case. *Abbasi*, 137 S. Ct. at 1860. Russell was overseeing an operation that was carrying out an executive order. In other words, he was implementing a high-level executive policy in the context of an evolving situation. Allowing a *Bivens* action to proceed in this case could expose sensitive communications between Russell and other high-level executive officers regarding the implementation of that policy. *See id.*

The district court saw this issue differently. In its view, the case "focuses on Defendant Russell's personal involvement and direct causal connection to the alleged constitutional violations while he was in Portland," not on "purported high level policy decisions or communications with then-President Trump." But Russell's "personal involvement" in the alleged violations consisted of his exercise of broad control over a multi-agency operation carried out to protect federal property as directed by an executive order. His decisions in that role cannot be

disentangled from how he was interpreting and implementing policy developed by his superiors at the higher levels of the Executive Branch.

Second, "[i]f there are alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.'" *Egbert*, 142 S. Ct. at 1804 (quoting *Abassi*, 137 S. Ct. at 1858). Here, Congress has afforded plaintiffs like Pettibone an alternative remedy "that independently foreclose[s] a *Bivens* action." *Id.* at 1806. Aggrieved parties can report any alleged misconduct to the Inspector General of the Department of Homeland Security, who must either investigate or refer the matter to the Officer for Civil Rights and Civil Liberties. 5 U.S.C. app. 3 § 8I(f)(2)(B)–(C), (F)–(G); *see also* 6 U.S.C. § 345(a)(1), (4), (6) (requiring Officer for Civil Rights and Civil Liberties to investigate alleged misconduct). Pettibone argues that this remedy is insufficient because it serves only an "information-gathering" function. But the Department can take corrective action against employees in response to the Inspector General's reports, 5 U.S.C. app. 3 § 8I(f)(2)(H)(ii). The grievance procedure is thus comparable to the remedy deemed adequate in *Egbert*. There, the Court held that a regulation requiring an agency to investigate alleged misconduct offered an adequate alternative to *Bivens*, even though the complainant was "not entitled to participate and ha[d] no right to judicial review of an adverse determination"—and even though, as here, the remedial scheme did not provide monetary relief. *Egbert*, 142 S. Ct. at 1806. The grievance procedure available in this case offers a similar right to an investigation, and a similar possibility of corrective action. Just as the availability of such a grievance procedure precluded a *Bivens* action in *Egbert*, so

too does it preclude a *Bivens* action in this case. *See id.* at 1806–07.

Because Pettibone has no cause of action under *Bivens*, we need not consider whether Russell would be entitled to qualified immunity.

**REVERSED.**